**IN THE UNITED STATES DISTRICT COURT**
**FOR THE ~~WESTERN~~MIDDLE DISTRICT OF PENNSYLVANIA**

_____

STEWART ABRAMSON, individually and on
behalf of a class of all persons and entities
similarly situated,

      Plaintiff

vs.

LINE 5, LLC, ~~HEADSTART WARRANTY GROUP LLC and MLB GLOBAL, LLC d/b/a BENCHMARK WARRANTY~~

      ~~Defendants~~Defendant.

Case No. 26-cv-155

**FIRST AMENDED CLASS ACTION COMPLAINT**

**Preliminary Statement**

~~1.    As the Supreme Court has explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back. As relevant here, the Telephone Consumer Protection Act of 1991, known as the TCPA, generally prohibits robocalls to cell phones and home phones." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2343 (2020).~~

~~2.    However, the TCPA doesn't only restrict robocalls.~~

~~3.~~1.    "Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on

phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms' *id.* § 2(9).

4.2.    "The law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes. The result of the telemarketing regulations was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number. *See id.*; 16 C.F.R. § 310.4(b)(iii)(B) ('It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.')…Private suits can seek either monetary or injunctive relief. *Id*…This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people.  The law empowers each person to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649-50 (4th Cir. 2019).

2

3.    Plaintiff Stewart Abramson ("Plaintiff") brings this action under the TCPA alleging that ~~MLB Global~~Line5, LLC ~~d/b/a Benchmark Warranty sent pre-recorded telemarketing calls on behalf of Headstart Warranty Group LLC and Line 5, LLC promoting their goods and services, including~~text messages to ~~calls~~him after he asked ~~that were on the National Do Not Call Registry,~~ such ~~as the Plaintiff.~~text messages stop. Those ~~calls~~text messages were made without the ~~call recipient's~~Plaintiff's prior express written consent.

~~6.    Because the calls were transmitted using technology capable of generating thousands of similar calls per day, Plaintiff brings this action on behalf of a proposed nationwide class of other persons who were sent the same illegal telemarketing calls.~~

4.    A class action is the best means of obtaining redress for the ~~Defendants'~~Defendant's illegal ~~telemarketing~~actions and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

**Parties**

5.    Plaintiff Stewart Abramson is a resident ~~in this District~~of Pennsylvania.

~~6.    Defendant MLB Management Services LLC d/b/a Benchmark Warranty is a seller of vehicle service contracts, colloquially known as extended warranties, who sent pre-recorded telemarketing calls on behalf of Headstart Warranty Group LLC, the service contract company, and Line 5, LLC, the financing company for those contracts.~~Defendant Line 5, LLC is a limited liability company that contacted the Plaintiff.

~~9.~~

**Jurisdiction & Venue**

3

10.7.    The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the Plaintiff's claims arise under federal law.

11.8.    This Court has general personal jurisdiction over both Defendants Headstart Warranty Group, LLC and Line 5, LLC, because they have registered to do business in Pennsylvania, thereby consenting to the exercise of general personal jurisdiction in Pennsylvania. This Court has specific personal jurisdiction over Defendant MLB because it sent calls into this District, including as part of its efforts to further the joint business enterprise in which it was engaged with Headstart and Line 5.

12.9.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, as the automated calls to the Plaintiff were sent into this District.

**The Telephone Consumer Protection Act**

13.10.  In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

The National Do Not Call Registry

14.11.  The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

15.12.  A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*.

4

16.13.  The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

**Factual Allegations**

17.    Defendant MLB Management Services d/b/a Benchmark Warranty sells vehicle service contracts, colloquially known as "extended warranties." Upon information and belief, as best Plaintiff can discern, MLB acts as a sales agent for Defendant Headstart's service contracts, akin to an insurance agent selling an insurer's coverage.

18.    Defendant Headstart Warranty Group LLC is a seller and guarantor of vehicle service contracts. Upon information and belief, as best Plaintiff can discern,  Headstart is the guarantor of the vehicle service contracts and is the entity that will purportedly pay a covered repair under the contract.

19.    Defendant Line 5 handles the customer management, payment processing, and also provides financing for, the service contracts sold by MLB and guaranteed by Headstart.

20.    To generate business for this joint enterprise, MLB and Line 5 place illegal telemarketing calls, some pre-recorded, on Headstart's behalf.

21.14.  Plaintiff'sPlaintiff Abramson's telephone number, (412) XXX-XXX, is a non-commercial telephone number not associated with any business.

22.15.  Plaintiff'sPlaintiff Abramson's telephone number is used for personal residential purposes.

23.16.  Plaintiff's telephone number has been listed on the National Do Not Call Registry since he listed it there over a year prior to the calls at issuein June of 2015.

5

24.    ~~Plaintiff has never been a customer of any of the Defendants nor asked or inquired to be a customer of any of the Defendants.~~

25.    ~~Despite that, the Plaintiff received at least eighteen telemarketing calls from MLB and/or Line 5~~At some point in October ~~of 2024, including from the caller IDs 626-921-2336 and 864-351-5782.~~

26.    ~~Four such of these calls occurred on October 15, 2024 from the 626-921-2336 caller ID number, including multiple calls while the Plaintiff was on the line.~~

27.    ~~The calls all began with a prerecorded message, and began:~~

~~Hey Stewart, my name is Adam and I'm calling on behalf of the Vehicle Service Department. [and umm,] How are you doing today? . . . Are you still driving a Nissan?~~

28.    ~~Defendants use the fake name "Vehicle Service Department" to obfuscate their identities and themselves as the source of the illegal calls Plaintiff received.~~

29.    ~~To identify the identity of the identity of the individuals calling him illegally, and for no other reason, the Plaintiff played along during a call he received.~~

30.    ~~Plaintiff replied, "Yes." After a few more questions with the AI, the Plaintiff was eventually transferred to a live agent, Thomas Martinez, who was obviously human.~~

31.    ~~Thomas, the human who answered, asked the Plaintiff for the mileage of his car, asked about the car's condition, and then proceeded to provide the Plaintiff pricing.~~

32.    ~~Unlike the previous AI/Mechanical Turk, Mr. Martinez was clearly a human being. He explained the protection plan and what was included, and also extolled some of the benefits and expressed that the Plaintiff would receive an electronic document with the repair contract and the discussed Line 5 Financing information, from Line 5.~~

6

33.    Mr. Martinez stated that he works for "Benchmark Warranty," which is a registered fictitious name in Missouri that is owned by MLB Global, explained that Defendant HeadStart Warranty Group would administer the policy, and further explained that Defendant Line 5 would be financing the policy.

17.    Thereafter, the20224, Plaintiff received various telemarketing calls regarding an extended vehicle service warranty.

18.    On or about October 16, 2024, Plaintiff agreed to an extended vehicle service warranty with a third party and the warranty was financed by Line5 with whom Plaintiff signed a security agreement.

34.19.  Plaintiff received various emails and text messages from Line5 around October of 2024 after agreeing to the warranty and security agreement. One such text message came from 858-346-7695 that very day and read:

> This is Line 5 - Congratulations! Click here to add your payment method to your new Line 5 Account. https://plaid.line5.com/uzhtb9 Reply STOP to unsubscribe.

35.20.  That very same daySewp, the Plaintiff also received a notice from Equifax that Defendant Line 5, LLC made a soft inquiry about the Plaintiff on the Plaintiff's credit report without his consent.

36.    The next day, the Plaintiff received a call from 800-537-7773, which is Defendant MLB's number. The caller was Mr. Martinez and was calling to follow up.

37.    The Plaintiff also got another call from Mr. Martinez from 412-387-2584, who was calling to get the Plaintiff to agree to a $90.49/month for 50 month car service contract and stated that he wanted to follow up to see how the financing with Line 5 was going.

7

38.    Thereafter, the Plaintiff received more calls from that number, including on October 16, including several text messages.

39.    The Plaintiff also received prerecorded calls from Line 5 on October 17, October 21, and October 24 including from 425-541-0312. The calls were identical prerecorded messages, with the voice stating that it was Line 5 and asked the Plaintiff to call back the number 844-775-4635.

40.21.    Thereafter, theThe Plaintiff received a text message from Line 5 and responded "STOP" and also contacted Line 5 on 844-775-4635 to get to the bottom of the calls and requesting that the calls stop, and received confirmation of the STOP, but the calls continued anyway, including on October 25, 2024 from the same caller ID 425-541-0312. This call was also an identical prerecorded message, with the voice stating that it was Line 5 and asked the Plaintiff to call back the number 844-775-4635.

22.    This call was also an identical prerecorded message, with the voice stating that it was Line 5 and asked the Plaintiff to call back the number 844-775-4635.

41.23.    Moreover, on October 24, 2024, the Plaintiff sent a letter to MLB, HeadStart, and Line 5, inquiring why he was receiving illegal calls and to get them to stop and for all three such Defendant entities to place the Plaintiff's number on their internal Do Not Call List.

42.24.    Despite such aforementioned revocations, on October 26, 2024, the Plaintiff gotreceived yet another text message from Line 5 and again responded STOP, received a confirmation, but they still continued.

43.25.    Despite this, the Plaintiff continued to getreceive text messages and prerecorded calls from Line 5, including a prerecorded call identical to the others that Plaintiff received on October 28, and a text message on October 30, to which the Plaintiff responded STOP a third

8

time, to which he received a third confirmation. ~~Despite this, the Plaintiff received yet another identical prerecorded call on October 30 from Line 5.~~

~~44.~~26.  ~~The~~ Despite this, the Plaintiff ~~also~~ received ~~three~~yet another identical prerecorded ~~calls~~call on October ~~28, 2024~~30 from ~~864-351-5782~~Line 5.

~~45.    The calls all began with a prerecorded message, and began:~~

~~Hey is this Michael? My name is Adam and I'm calling from the Vehicle Service Department. [umm,] How are you doing today? . . . Are you still driving a Chevy Silverado?~~

~~46.    ~~Plaintiff ~~replied, "Yes." After a few more questions with the AI, the Plaintiff was~~ eventually ~~transferred to a live agent, Jeremy Hoskins, who was obviously human.~~

~~47.    Jeremy, the human who answered, began to go into the sales pitch, but then stated that he saw that the Plaintiff had spoken with Thomas Martinex, and then transferred the call to Thomas Martinez, who stated that Jeremy was his coworker and also an MLB sales agent.~~

~~48.~~27.  The Plaintiff obtained a copy of the purported "Security Agreement" that was sold ~~on the calls from counsel for Line 5. That~~cancelled the extended warranty and security agreement ~~lists the "Seller" as "Thomas Martinez" (of Defendant MLB, assigs the contract to Defendant Line 5, and states that the "Seller" of the protection plan is Defendant HeadStart, listed as "HeadStart Direct."~~.

~~49.    Moreover, as far back as August of 2024, the Plaintiff made a Do Not Call Request of Headstart, which was ignored.~~

~~50.~~28.  The aforementioned prerecorded calls were placed using and beginning with a prerecorded voices because: (a) the robot's questions and speech were sometimes cut off and clunky, (b) the robot had an identical, generic, monotone voice, (c) it would be illogical for a human to call someone and play various scripted questions and statements without the ability to

engage in dialogue, (d) the robot repeated the same identical phrases during the call multiple times exactly the same way, just like playing back a recording, and (e), the Plaintiff was eventually transferred to a human being who was obviously human.

51.    For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

52.    In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

53.    The FCC has instructed that sellers such as Headstart may not avoid liability by hiding behind third party agents like Defendant MLB or outsourcing telemarketing and sales operations to third parties, such as Line 5 and MLB:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnotes and alteration marks omitted).

54.    In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of

agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." Id. at 6574 ¶ 1.

55.     Headstart is liable for Defendant MLB's and Line 5's conduct and telemarketing calls placed by Line 5 and/or MLB and ultimately bade for Headstart to generate customers for Headstart and its agents, including the Plaintiff.

56.     Indeed, Headstart's relationships with Defendants MLB and Line 5 contain numerous hallmarks of agency.

57.     Those hallmarks are principally in the purported agreement Plaintiff was asked to sign, which listed Line 5 as a "Lienholder" and MLB as the specific seller of the contract which Headstart underwrote and obliged itself to.

58.     As such, MLB and Line 5 entered into contracts purporting to bind Headstart, and therefore purported to be able to incur obligations and enter into contractual relations involving Headstart.

59.     Headstart thus had full knowledge of MLB and Line 5's illegal conduct and did not terminate or discipline them, thus implicitly ratifying their actions and endorsing their illegal behavior.

60.     The aforementioned facts also demonstrate that Headstart failed to supervise MLB and Line 5 or enforce their compliance with applicable laws and regulations.

61.     Headstart could also have eliminated the illegal conduct and risk of TCPA violations complained of herein by selling in a compliance manner directly to consumers, or at the very least requiring its agents to report do not call requests and forbidding its agents from using other than approved lead generation sources, but it did not.

11

62. Headstart was interested in hiring agents to sell its products and services and financing companies to finance its contracts, who would in turn handle all aspects of the sales process, vet potential clients, and incur obligations on its behalf to interested customers they managed to sell.

63. To do so, Headstart authorized and hired MLB and Line 5 to orchestrate an *en masse* telemarketing campaign to sell its contracts for which it would be obliged.

64. Headstart controlled the day-to-day activities of MLB and Line 5 by providing the specific criteria for the consumers it would accept and oblige itself to and required its agents, to adhere to those criteria, including form contracts it drafted, which also made clear they had actual knowledge of both parties' conduct.

65. Defendants did so despite numerous indications that the Plaintiff was not interested and did not want any further calls.

66. Finally, Headstart could have terminated Line 5 and MLB.

67. It did not.

68. By virtue of identifying the criteria for customers they wanted and that they would accept to sign the contracts and directing the conduct and other indicia of the calls at issue described above, Headstart directed MLB and Line 5 in their calling, including by being the obligor of the contract sold by MLB and Line 5.

69. A reasonable obligor and service contract company like Headstart whose telemarketers, financing companies, and agents are making calls would investigate into the reasons why their agents, financing companies, and telemarketers would be calling numbers on the National Do Not Call Registry and, moreover, with highly-illegal prerecorded robocalls.

70. Indeed, Headstart could have investigated if the contracts it was asked to oblige itself to contained customers whose numbers were on the National Do Not Call Registry.

71. It did not.

72. Headstart hired MLB and Line 5 without a proper investigation and did not terminate either of them when they were informed of MLB and Line 5's illegal calling conduct.

73. As such, they knowingly ratified MLB and Line 5's conduct.

74. Headstart also ratified MLB and Line 5's conduct because, with knowledge of the fact that MLB and Line 5 were calling numbers on the National Do Not Call Registry with highly-illegal prerecorded robocalls, they accepted the Plaintiff's lead and ultimately attempted to sell the Plaintiff a policy to which it would be obliged, which was, on face, sold by MLB and in which Line 5 had a security interest and financed.

75. The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id*. at 6593 ¶ 46.

76. The aforementioned calls to the Plaintiff were unwanted.

77. The calls were nonconsensual encounters.

78. In fact, as outlined above, the Plaintiff expressly revoked any purported consent to receive the calls both prior to and after they were made, but they did not stop.

79. Plaintiff's privacy has been violated by the above-described telemarketing calls.

13

80.    Plaintiff never provided his consent or requested the calls.

81.    Plaintiff and the other call recipients were harmed by these calls. They were temporarily deprived of legitimate use of their phones because the phone line was tied up, they were charged for the calls and their privacy was improperly invaded.

82.    Moreover, these calls injured Plaintiff because they were frustrating, obnoxious, annoying, were a nuisance and disturbed the solitude of Plaintiff and the class.

**Class Action Statement**

83. 29.  Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

84. 30.  Plaintiff brings this action on behalf of himself and the following classes (the "Classes") pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3).

85. 31.  Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

**Robocall Class:** All persons in the United States who, (1) within four years prior to the commencement of this litigation until the class is certified (2) received one or more calls on their cellular telephone or any other protected telephone service (3) from or on behalf of MLB Management Services d/b/a Benchmark Warranty, Headstart Warranty Group LLC, or Line 5, LLC, (4) sent using the same, or substantially similar, pre-recorded messages used to contact the Plaintiff (5) to an individual that had asked such calls to stop or never provided their number to Line 5.

**National Do Not Call Registry Class:** All persons within the United States: (1) whose residential telephone numbers were on the National Do Not Call Registry for at least 31 days; (2) but who received more than one telephone solicitation call from Defendants or a third party acting on Defendants' behalf; (3) within a 12-month period; (4) within the four years prior to the filing of the Complaint.

**Internal Do Not Call Class:** All persons within the United States to whom: (1) Defendants Defendant (or a third-party acting on behalf of Defendants Defendant) sent (2) two or more telemarketing calls in a 12-month period, (3) who had previously asked for the calls to stop, and (4) within the four years prior to the filing of the Complaint.

86.32.  Plaintiff is a member of and will fairly and adequately represent and protect the interests of the Classes as he has no interests that conflict with any of the Class members.

87.33.  Excluded from the Classes are counsel, DefendantsDefendant, and any entities in which DefendantsDefendant have a controlling interest, the Defendants'Defendant's agents and employees, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

88.34.  Plaintiff and all members of the Classes have been harmed by the acts of DefendantsDefendant, including, but not limited to, the invasion of their privacy, annoyance, waste of time, the use of their telephone power and network bandwidth, and the intrusion on their telephone that occupied it from receiving legitimate communications.

89.35.  This Class Action Complaint seeks injunctive relief and money damages.

90.36.  The Class as defined above, are identifiable through Defendants'Defendant's dialer records, other phone records, and phone number databases.

91.37.  Plaintiff does not know the exact number of members in the Classes, but Plaintiff reasonably believes the Class members numbernumbers to be, at minimum, in the hundreds.

92.38.  The joinder of all Class members is impracticable due to the size and relatively modest value of each individual claim.

93.39.  Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.

94.40.  There are well defined, nearly identical, questions of law and fact affecting all parties. The questions of law and fact, referred to above, involving the class claims predominate over questions that may affect individual Class members.

15

95.41.  There are numerous questions of law and fact common to Plaintiff and to the proposed Classes, including, but not limited to, the following:

a.      Whether Defendants made multiple calls to Plaintiff and members of the National Do Not Call Registry Class;

a.      Whether Defendants;

b.      Whether Defendant made calls using artificial or prerecorded voices to Plaintiff and members of the Robocall Class;

c.      Whether DefendantsDefendant properly honored Do Not Call requests;

d.      The corresponding degrees and liability as among and between Defendants;

d.

e.      Whether Defendants'Defendant's conduct constitutes a violation of the TCPA; and

f.      Whether members of the Classes are entitled to treble damages based on the willfulness of Defendants'Defendant's conduct.

96.42.  Further, Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has no interests which are antagonistic to any member of the Classes.

97.43.  Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, and especially TCPA class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes, and have the financial resources to do so.

98.44.  Common questions of law and fact predominate over questions affecting only individual Class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of Class

members, which will be ascertainable from records maintained by ~~Defendants~~Defendant and/or their agents.

99.45.  The likelihood that individual members of the Classes will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

100.46.    Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

### FIRST CAUSE OF ACTION

**Statutory Violations of the Telephone Consumer Protection Act
(47 .S.C. § 227(b)) on behalf of the Robocall Class**

101.47.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

102.48.    The ~~Defendants~~Defendant violated the TCPA by sending or causing to be sent calls to the cellular telephones and other protected telephones of Plaintiff and members of the Robocall Class using ~~a~~ pre-recorded messages without their prior express written consent.

103.49.    As a result of ~~Defendants'~~Defendant's violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and Robocall Class members are entitled to an award of $500 in statutory damages for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

104.50.    The Plaintiff and Robocall Class members are entitled to an award of treble damages if the ~~Defendants'~~Defendant's actions are found to have been knowing or willful.

105.51.    Plaintiff and Robocall Class members are also entitled to and do seek injunctive relief prohibiting ~~Defendants~~Defendant from using a pre-recorded voice in the future, except for emergency purposes.

### SECOND CAUSE OF ACTION

17

**Violation of the Telephone Consumer Protection Act**
**(47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(c) on behalf of Plaintiff and the National Do Not Call Registry Class)**

106.    Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

107.    The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227. by making telemarketing calls, except for emergency purposes, to Plaintiff and members of the National Do Not Call Registry Class despite their numbers being on the National Do Not Call Registry.

108.    Defendants' violations were negligent, willful, or knowing.

109.    As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf, violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the National Do Not Call Registry Class are entitled to an award of up to $500 and in damages for each and every call made and up to $1,500 in damages if the calls are found to be willful.

110.    Plaintiff and the members of the National Do Not Call Registry Class are also entitled to and do seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making telemarketing calls to telephone numbers registered on the National Do Not Call Registry, except for emergency purposes, in the future.

**THIRD CAUSE OF ACTION**

**Violation of the Telephone Consumer Protection Act**
**(47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(d) on behalf of Plaintiff and the Internal Do Not Call Registry Class)**

18

111.52.      Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

112.53.      The foregoing acts and omissions of Defendant, and/or their affiliates, agents, and/or other persons or entities which discovery may reveal may have been acting on Defendant's behalf, constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by sending telemarketing calls, except for emergency purposes, to Plaintiff and members of the Internal Do Not Call Class despite previously requesting that such calls stop.

113.54.      Defendant's violations were negligent, willful, or knowing.

114.55.      As a result of Defendant's, and/or its affiliates, agents, and/or other persons or entities which discovery may reveal may have been acting on Defendant's behalf's, violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the Internal Do Not Call Class are entitled to an award of up to $500 and in damages for each and every call sent and up to $1,500 in damages if the calls are found to be willful

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

A.      Injunctive relief prohibiting Defendants from calling telephone numbers advertising their goods or services, except for emergency purposes, to any residential number on the National Do Not Call Registry in the future;

A.      ;

B.      Injunctive relief requiring DefendantsDefendant to create, maintain, and honor internal Do Not Call requests in the future;

C.      Injunctive relief prohibiting ~~Defendants~~Defendant from using artificial or pre-recorded voices to contact cell phones and other protected lines, except for emergency purposes, in the future;

D.      That the Court enter a judgment awarding Plaintiff and all Class members statutory damages of $500 for each violation of the TCPA and $1,500 for each knowing or willful violation; and

E.      An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing Classes the Court deems appropriate, finding that Plaintiff is a proper representative of the Classes, and appointing the lawyers and law firms representing Plaintiff as counsel for the Classes;

F.      Such other relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff requests a jury trial as to all claims of the complaint so triable.

Plaintiff,
By Counsel,

By: */s/ Jeremy Jackson*
Jeremy C. Jackson (PA Bar No. 321557)
BOWER LAW ASSOCIATES, PLLC
403 S. Allen St., Suite 210
State College, PA 16801
Tel.: 814-234-2626
jjackson@bower-law.com

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
E.D. Pa. Bar #333687
Perrong Law LLC

20

2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

*/s/ Anthony I. Paronich*
Anthony I. Paronich, *Pro Hac Vice*
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

*Attorney for Plaintiff and the Proposed Class*

21