KeyCite Yellow Flag

Disagreed With by James v. Smarter Contact, Inc., M.D.Fla., March 31, 2026

2026 WL 202930

Only the Westlaw citation is currently available.

United States District Court, S.D. Texas, McAllen Division.

David ALVAREZ, Plaintiff,

v.

FIESTA NISSAN, INC., Defendant.

CIVIL ACTION NO. 7:25-CV-00343
|
Signed January 26, 2026

**Attorneys and Law Firms**

Christopher Berman, Miami, FL, Kayla Nicole Kershen, Pro Hac Vice, Andrew John Shamis, Shamis & Gentile, P.A., Miami, FL, for Plaintiff David Alvarez.

Brent A. Bishop, Atlas, Hall & Rodriguez, LLP, McAllen, TX, Cory William Eichhorn, Pro Hac Vice, Holland & Knight, Miami, FL, for Defendant Fiesta Nissan, Inc.

## OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO DISMISS

Randy Crane, Chief United States District Judge

**\*1** Before the Court is Defendant Fiesta Nissan's Motion to Dismiss. [Dkt. No. 18]. After careful consideration, the Court **DENIES IN PART AND GRANTS IN PART** Defendant's motion. Specifically, considering the ordinary language of the statute, the Court finds that "telephone calls" in the context of § 227(c)(5) include text messages; Defendant's motion to dismiss for lack of capacity to sue is **DENIED**. Otherwise, the Court finds that Plaintiff has not presented sufficient facts to establish that there is a substantial likelihood that he will suffer the same injury in the future. Defendant's motion to dismiss Plaintiff's claim for injunctive relief is **GRANTED** and Plaintiff's injunctive claim is **DISMISSED WITHOUT PREJUDICE**.

## BACKGROUND

Beginning in February 2025, Defendant Fiesta Nissan, Inc., an automobile dealership, sent Plaintiff David Alvarez a series of marketing text messages. According to Plaintiff, these texts—like countless similar text messages received by Americans every day—were unwanted and unauthorized. With one difference, however: Plaintiff says that, back in 2008, he placed his phone number on the National Do-Not-Call Registry.[1] Under regulations implementing the Telephone Consumer Protection Act (TCPA), "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or his telephone number on the national do-not-call registry ...." 47 C.F.R. § 64.1200(c). If they do, Congress has provided a private right of action in the TCPA: "A person who has received more than one *telephone call* within any 12-month period by or on behalf of the same entity," despite that person's phone number being on the Do-Not-Call Registry, may bring an action for damages and/or injunction. 47 U.S.C.A. § 227(c)(5) (emphasis added). Plaintiff has filed this putative class action under that cause of action, alleging that Defendant initiated more than one telephone solicitation (in the form of text messages) to Plaintiff and class members who registered their respective telephone numbers on the Do-Not-Call-Registry. *See* Dkt. No. 1, at p.8.

The TCPA was passed in 1991, one year before the advent of the text message.[2] The Do-Not-Call Registry, however, was not created until 2003, and since then the FCC has interpreted the TCPA to include text messages. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014 (F.C.C. 2003) ("[The TCPA] encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls."); 47 C.F.R. § 64.1200(e) (applying that ruling to the do-not-call restriction in § 64.1200(c)). For the last twenty-three years, this interpretation has been afforded some deference; courts across the country, including the Fifth Circuit and the Supreme Court, have analyzed other portions of the TCPA without contesting that "calls" include both voice calls and text messages.[3] "Nor," as the Sixth Circuit then pointed out, "in light of well-established administrative-law jurisprudence, could they [contest it] legitimately." *Keating v. Peterson's Nelnet, LLC*, 615 Fed. Appx. 365, 370 (6th Cir. 2015). Under the *Chevron* doctrine, courts "unhesitatingly afford[ed] deference to the agency holding that a text message should be treated as a 'call' for purposes of the TCPA." *Id.* at 371 (citing *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

**\*2** But *Chevron* deference is no more. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 144 S.Ct. 2244, 2267, 219 L.Ed.2d 832 (2024). Furthermore, the Supreme Court has recently ruled that "[i]n an enforcement proceeding, a district court must independently determine for itself whether the agency's interpretation of a statute is correct." *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 606 U.S. 146, 145 S. Ct. 2006, 2015, 222 L.Ed.2d 405 (2025). No longer bound by the agency's interpretation, the district courts "instead must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *Id.*

Considering this, Fiesta Nissan's motion to dismiss presents two straightforward questions: Are text messages truly "telephone calls" for purposes of the cause of action in § 227(c)(5)? If they are not, Fiesta Nissan moves to dismiss based on a lack of capacity to be sued. If they are, Fiesta Nissan argues that at the very least Plaintiff lacks the Article III standing necessary to seek injunctive relief.

**STANDARD OF REVIEW**

There is no subsection of Rule 12(b) that specifically authorizes a motion to dismiss based on the lack of capacity to be sued. However, Rule 12(b)(6) motions to dismiss for failure to state a claim "are appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). To survive a 12(b)(6) motion to dismiss, a complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679, 129 S.Ct. 1937. "Generally, a court ruling on a motion to dismiss may rely on only the complaint and its proper attachments." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008). "A court is permitted, however, to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.' " *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)).

**I. Administrative Procedure Act (APA) Standards**

Additionally, Plaintiff argues that the Court must conduct its review of the statute under the deferential "arbitrary-and-capricious" standard laid out in Administrative Procedure Act (APA). In support, Plaintiff points to language in the Supreme Court's recent *Seven County* decision, which states that "when an agency exercises discretion granted by a statute, judicial review is typically conducted under the [APA]'s deferential arbitrary-and-capricious standard," under which "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 145 S. Ct. 1497, 1511, 221 L.Ed.2d 820 (2025).

However, there are several reasons why this standard is inapt here. First, in the immediately preceding line, the Supreme Court in *Seven County* makes clear that "[a]s a general matter, when an agency interprets a statute, judicial review of the agency's interpretation is *de novo*." *Id.* Here this Court is not tasked with reviewing a direct exercise of agency discretion, such as a rulemaking or order—rather, it is merely interpreting a statutory cause of action to decide whether a certain act is encompassed by it. In fact, the Supreme Court in *McLaughlin* took care to make this precise distinction:

> **\*3** "Judicial review in enforcement proceedings of course may also include review of whether the rule or order was arbitrary and capricious under the APA or otherwise was unlawful. Because this case involves interpretation of a statute, *we focus here on that scenario.*"

*McLaughlin*, 145 S. Ct. at 2015 n.2 (emphasis added). The Court then instructed the district court, when faced with an enforcement action, to "determine the meaning of the law under ordinary principles of statutory interpretation." *McLaughlin*, 145 S. Ct. at 2015. How can the district court determine ordinary meaning if it can only consider "whether the agency action was reasonable"? *Seven County*, 145 S. Ct. at 1511.

The reality is the Court here is presented with a federal statute and an ambiguity, the resolution of which is "[t]he very point of the traditional tools of statutory construction." *Loper Bright*, 144 S. Ct. at 2266. Although this Court must "afford[ ] appropriate respect to the agency's interpretation," *McLaughlin*, 145 S. Ct. at 2015, that does not mean that the court must *defer* to that interpretation based on mere reasonableness. In fact, "in the business of statutory interpretation," *Loper Bright* commands exactly the opposite.

*Loper Bright*, 144 S. Ct. at 2266 ("[I]f it is not the best, it is not permissible.").

## ANALYSIS

### II. Text Messages and § 227(c)(5).

The Court is aware of only one other court in this Circuit that has considered the scope of the § 227(c)(5) cause of action post-*McLaughlin*, and none that have analyzed the language directly.[4] *See Duron v. Kings Capital Holding LLC*, No. 3:25-cv-00149-DCG, 2026 LX 68851 (W.D. Tex. Jan. 13, 2026) (report and recommendation relying on precedent); *see also, Watkins v. EyeBuyDirect, Inc.*, No. 1:25-CV-00538-RP, 2025 U.S. Dist. LEXIS 167479 (W.D. Tex. Aug. 28, 2025) (analyzing the regulation at 47 C.F.R. § 64.1200(d), rather than the statute). Moreover, other courts have contested whether the FCC ever actually explicitly interpreted "telephone calls" to include text messages in the first place. *See Jones v. Blackstone Med. Services, LLC*, 792 F. Supp. 3d 894, 900–901 (C.D. Ill. 2025) ("[T]he FCC's interpretation of call to include text messages is a complicated one, and potentially does not even apply to Section 227(c)(5).").[5] Regardless, although this Court affords respect to the FCC's interpretation of the terms used in the TCPA, it remains incumbent upon district courts to "independently determine for itself whether the agency's interpretation of a statute is correct." *McLaughlin*, 145 S. Ct. at 2015. The court begins, then, with the text, before moving onto statutory context.

### a. Statutory Text

 **\*4**  The true problem in this case "comes from the fact that technology has done more to change [telephone]s than [Congress] has done to change § [227(c)(5)]." *In re Erickson*, 815 F.2d 1090, 1092 (7th Cir. 1987) (Easterbrook, J.). Section 227(c) does not define the term "telephone call," nor does any other part of the statute. Where a statute leaves terms undefined, courts must "accord those terms their 'ordinary, contemporary, common meaning.' " *Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 563 (5th Cir. 2024) (quoting *Rest. L. Ctr. v. United States Dep't of Lab.*, 115 F.4th 396, 403–04 (5th Cir. 2024)). In today's regular parlance, of course, no ordinary person would use the word "telephone call" to refer to a text message. *Davis v. CVS Pharmacy, Inc.*, 797 F. Supp. 3d 1270, 1273 (N.D. Fla. 2025) ("No ordinary user of the English language would write the sentence 'John

called Sue' intending to mean "John sent a text message to Sue'.") But this Court is cognizant that a usage which seems obvious *now* is not always a reflection of the *original* meaning of the statute. The use of the verb "to text"—now ubiquitous—had no such meaning in 1991. However, that does not mean it could not have been encompassed by the meaning of "telephone call." Indeed, the term "text message" only seems distinct from the idea of a "telephone call" today because the former term developed in our language specifically to distinguish a text communication from a voice communication.

These later developments have no bearing on our analysis, as "every statute's meaning is fixed at the time of enactment." *Loper Bright*, S.Ct. 2244 at 2266 (quotation omitted). And that meaning can be broad. Indeed, "[i]n their full context, words mean what they conveyed to reasonable people at the time they were written—with the understanding that general terms may embrace later technological innovations." *United States v. Palomares*, 52 F.4th 640, 648 (5th Cir. 2022) (Oldham, J., concurring) (quoting A. SCALIA & B. GARNER, READING LAW 16 (2012)). For that reason, "a 2012 statute referring to aircraft, if still in effect in 2112, would embrace whatever inventions the label fairly embraces, even inventions that could not have been dreamed of in 2012." SCALIA & GARNER, *supra*, at 16.

The question, then, is whether the concept of a "text message" is fairly embraced by the meaning of "telephone call" in 1991. Looking to a dictionary contemporaneous with the TCPA's passage, the relevant definition of "call" was "to get or try to get into communication by telephone." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 197 (1990). This language is capacious. Thus, a plain-language reading suggests that to send a text message is to "try to get or to get into communication by telephone."

This is usually where courts stop. Importantly, however, Fiesta Nissan points out that the word "call" is modified by "telephone" in Section 227(c)(5). The definition of "telephone" at the time of the TCPA's passage was "an instrument for producing sounds at a distance; *specif* : one in which sound is converted into electrical impulses for transmission by wire." *Id.* at 1212. And when used as a verb, to "telephone" is to "communicate by telephone," to "send by telephone," or to "speak to by telephone." *Id.* This modification, they argue, precludes the complete phrase "telephone call" from encompassing the concept of a text

message, as telephones are defined by their ability to transmit sound. Dkt. No. 29, at p.7.

Although it is a closer call, the Court finds there is nothing in the meaning of "telephone" that excludes the function of a text message. Remarkably relevant here is the classic case of *In re Erickson*, 815 F.2d 1090 (7th Cir. 1987). In that case, Judge Easterbrook considered a Wisconsin statute that made certain farming property unavailable to satisfy a civil judgment, allowing a farmer to retain "one mower" and "one hay loader." *Id.* at 1091–92. Just one problem: since the law's passage in 1935, farm technology had changed considerably. Old horse-drawn "mowers" were replaced by hydraulic, tractor-mounted haybines with hay conditioners, and "hay loaders" were replaced by automatic bailing/tying machines. *Id.* at 1092–93. And yet, the court found that the new technology was embraced by the old terms. Specifically, Judge Easterbrook wrote that a " 'mower' is not limited to the thing called a mower today," because "[a] statutory word of description does not designate a particular item (e.g., "a Massey-Ferguson Mower, Model GY– 2589, manufactured in 1935, serial number 3875808") but a *class of things* that share some important feature." *Id.* at 1092 (emphasis added). Indeed, "a mower with a built-in stereo cassette deck would still be a 'mower', ... because it would still cut the hay," yet with "a second function, entertainment, just as the haybine has a second function, crushing the hay." *Id.* at 1093.

**\*5** The Court finds this reasoning persuasive here. Defendant seems to define "telephone call" as "a call from a telephone as existed in 1991"—that is, *only* able to communicate by voice. But if "telephone" was as absolutely defined by its sound-transmission ability as required by that reading, it would prevent an otherwise unlawful voice call using a telephone with *any* modern features from falling under the statute. Thus, voice calls from almost every modern telephone—most of which can text, among many other capabilities—would not qualify as a "telephone call" under § 227(c)(5). "[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (quotation omitted). Just as a mower that both cuts and conditions hay is still a mower, a telephone which communicates texts and voice is still a telephone. And just as an aircraft built a hundred years from now such that it "could not have been dreamed today" can be embraced by 2012 statute regulating aircraft, so can a call from a telephone built in 2025—or 2125 for that matter—be embraced by

a 1991 statute. SCALIA & GARNER, *supra*, at 16. Later meaning ascribed to words like "text message" cannot affect the Courts analysis of the original meaning of the phrase; in fact, considering the broad original meaning of "call" in 1991, society reasonably might have decided to refer to all telephone communications as "calls." That society does not today has no bearing here.

This reading is bolstered by the technology's history. First, it is known that cellphones and text-messaging services displaced pagers (or "beepers") as everyday technology.[6] That was largely because pagers and cellphones served many of the same uses. *See* Jeffrey Selingo, *The Bell Is Tolling For the Beeper*, N.Y. TIMES, April 11, 2002, at G4 ("[M]any ... are buying two-way pagers like the BlackBerry, which allow them to answer a message without searching for a phone."). By 1990, pagers could display alphanumeric messages, which were sent by *calling* the pager from a telephone. *See Radio Pager With Display*, N.Y. TIMES, July 6, 1981, at D3; Calvin Sims, *Checking Your Watch For Messages, Too*, N.Y. TIMES, Nov. 8, 1989, at D9. Although Plaintiff likely received the text messages at issue via a modern cellphone data messaging service, in 1991 he might very well have received messages to his pager, sent via telephone calls. If the latter is covered by the statute, why not the former?

At bottom, it is true that a telephone in 1991 was an instrument "for producing sounds at a distance." So is a telephone today. But that instrument may also send messages via "calls." Thus, to make a "telephone call," for purposes of § 227(c)(5), is to "to get or try to get into communication" with an "instrument for producing sounds at a distance." A text message therefore falls reasonably within the literal language of the statute.

### b. Statutory Context

Although the literal meaning of the phrase is clear on its own, "text may never be taken out of context." *United States v. Graves*, 908 F.3d 137, 142 (5th Cir. 2018). That is why "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 492, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015) (quotation omitted). With this in mind, two reasons stand out as to why the subsection containing § 227(c)(5), and the broader structure of the Act, counsel reading the cause of action to include "text messages."

First, Section 227(c)(5) explicitly confers a private right of action for "violation of the regulations prescribed *under this subsection*[.]" 47 U.S.C. § 227(c)(5). As Plaintiff points out, section 227(c)(1) and (2) make clear that the subsection was included to direct the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving *telephone solicitations* to which they object[,]" and to promulgate regulations in furtherance of that interest. 47 U.S.C. §§ 227(c)(1)-(2) (emphasis added). And the TCPA defines "telephone solicitations": the "initiation of a telephone call *or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person[.]" *Id.* at § 227(a)(4) (emphasis added). This language is broad, coloring the cause of action and the entire subsection it enforces. Congress added that definition later, after text messaging had become commonplace. Some courts have interpreted that amendment to § 227(c)(1)—and concurrent lack thereof to § 227(c)(5)—as evidence that Congress "intend[ed] different meanings" for the two provisions. *Davis v. CVS Pharmacy, Inc.*, 797 F. Supp. 3d 1270, 1274 (N.D. Fla. 2025) (quotation omitted). But those two provisions are within the same subsection. An equally plausible implication may be drawn that Congress believed its definition of "telephone solicitation" in the directive of the subsection, combined with the FCC's interpretation, was enough to broaden the subsection's cause of action to include *all* telephone solicitations. Indeed, "it strains belief to suggest that Congress silently determined that such oral messages were more invasive or objectionable than written ones." *Wilson v. MEDVIDI Inc.*, No. 5:25-CV-03996-BLF, 2025 WL 2856295, at *3 (N.D. Cal. Oct. 7, 2025).

 **\*6** Second, the Court cannot ignore the fact that Section 227(b) of the TCPA uses the same term—"telephone call"—as it does in § 227(c). As mentioned previously, the FCC as well as myriad courts have for years interpreted "telephone call" in § 227(b) to include text messages. *See supra* note 3. Importantly, that usage has been ratified by Congress. *See Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act*, PL 116-105, December 30, 2019, 133 Stat 3274 (recognizing that text messages are covered in § 227(b) in providing for streamlined information sharing with the FCC relating to "a call made or a text message sent in violation of subsection (b)"). As the Supreme Court has held, "[w]here, as here, 'Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation,' we cannot but deem that construction virtually conclusive."

*Commodity Futures Trading Com v. Schor*, 478 U.S. 833, 846, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)). This ratification is, of course, only "conclusive" as to § 227(b); that said, it remains strongly persuasive as to a subsection of the same statute that uses identical language.

In sum, both the original text and the context support reading § 227(c)'s cause of action to include text messages within its prohibition on violative "telephone calls" to persons on the National Do-Not-Call List. This Court declines to dismiss Plaintiff's claim for lack of capacity to sue.

### III. Article III Standing

Fiesta Nissan argues in the alternative that Plaintiff's injunctive claim should be dismissed because Plaintiff lacks Article III standing to seek injunctive relief. Specifically, Fiesta Nissan argues that "Plaintiff does not allege an imminent threat of future text messages or even the possibility of such text messages." Dkt. No. 18, at p.11.

Section 227(c)(5) explicitly permits a plaintiff to bring "an action based on a violation of [§ 227(c)] ... to enjoin such violation." 47 U.S.C. § 227(c)(5)(A). However, although a statute might authorize injunctive relief, the Court is not "mechanically obligated to grant an injunction for every violation of law." *United States v. Marine Shale Processors,* 81 F.3d 1329, 1360 (5th Cir. 1996) (quoting *Weinberger v. Carlos Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)). Rather, the Court "must exercise its discretion with an eye to the congressional policy as expressed in the relevant statute." *Id.*

Regarding standing for injunctive relief, the Fifth Circuit has explained that

> "a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future. Based on the facts alleged, there must be a substantial and continuing controversy between two adverse parties. The plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred."

*Bauer v. Texas,* 341 F.3d 352, 358 (5th Cir. 2003). Several courts in this circuit have addressed this issue in similar cases, finding that when there is no evidence that the defendant has called or attempted to call the plaintiff's phone "since the ... call complained about in th[e] lawsuit," there can be "no imminent threat of repeated violations of the TCPA." *Shields*

*v. Gawk Inc.*, No. 3:18-CV-00150, 2019 WL 1787781, at *6 (S.D. Tex. Apr. 24, 2019), *adopted by* 2019 WL 2103423 (S.D. Tex. May 14, 2019); *see also Hunsinger v. 204S6TH LLC*, No. 3:21-CV-2847-G-BH, 2022 WL 1110354, at *10 (N.D. Tex. Mar. 23, 2022), *adopted by* 2022 WL 1102864 (N.D. Tex. Apr. 13, 2022); *Internal Med. Rural Health Clinic of New Albany, P.A. v. Langmas Grp., Inc.*, No. 3:18-CV-00192-GHD-RP, 2019 WL 1905165, at *1 (N.D. Miss. Apr. 26, 2019).

Neither Plaintiffs nor Defendant here have presented evidence that the challenged conduct has either continued or ceased. However, this does not strike the Court as an effective standard. For one, the timing is questionable. If a plaintiff is required to show that there has been some *post-suit* attempt to unlawfully contact him in order to secure an injunction, then a plaintiff would be unable to request injunctive relief in their initial pleading. This would restrict the statute's cause of action and likely run counter to the "congressional policy as expressed in the relevant statute." *Marine Shale Processors*, 81 F.3d at 1360. This is partially why all that is required is "facts from which the continuation of the dispute may be *reasonably inferred.*" *Bauer*, 341 F.3d at 358 (emphasis added).

**\*7**  That said, it is likely true that the timing and number of challenged calls, on their own, do not show "a sufficient likelihood that [Plaintiff] will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Plaintiff must show something more. In data-breach cases, for example, which revolve around similar concerns of future conduct (to wit, the unlawful usage of one's data, in this case one's phone number), some courts have found that evidence of "ongoing retention of the data collected from private messages meant that there was a risk that it would resume using the [plaintiffs'] data." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1119 (9th Cir. 2020); *Bell v. Hawx Servs., LLC*, No. 2:24-CV-00825-DC-DMC, 2025 WL 2533371, *4 (E.D. Cal. Sept. 3, 2025); *but see Williams v. Singing River Health Sys.*, No. 1:24-CV-24-HSO-MTP, 2025 WL 2487792, at *11 (S.D. Miss. Aug. 28, 2025) (collecting cases that find the risk of future data breach still too speculative when the defendant "retains [plaintiff's] data" but has not improved their data security since the breach).

This Court need not decide what that "something more" is now. Plaintiff's current pleadings do not present sufficient factual material regarding imminence one way or another, much less to carry his injunctive-relief burden — indeed, Plaintiff does not even argue that he is in imminent threat of future unlawful text messages from Fiesta Nissan at all. Rather, Plaintiff's argument focuses solely on past harm. *See* Dkt. No. 25, at p.13–14. Plaintiff's pleadings and response do not argue that Defendant still retains Plaintiff's phone number, nor do they explain exactly how many messages he received from Defendant before suit.

Because § 227(c)(5)(A) does not, "in so many words, or by a necessary and inescapable inference, restrict[ ] the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Weinberger*, 456 U.S. at 313, 102 S.Ct. 1798. Plaintiff still must, therefore, "allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Bauer*, 341 F.3d at 358. In other words, although there is enough to present a claim for damages, Plaintiff cannot rely on the bare statutory violation to establish the presence of likely future harm.

Defendant's motion to dismiss Plaintiff's prayer for injunctive relief is granted, and said claim is dismissed without prejudice.

**CONCLUSION**

In sum, the Court **DENIES IN PART AND GRANTS IN PART** Defendant's motion. Specifically, considering the plain language of the statute, this Court finds that "telephone calls" in the context of § 227(c)(5) include text messages; Defendant's motion to dismiss for lack of capacity to sue is **DENIED**. Otherwise, the Court finds that Plaintiff has not presented sufficient facts to establish that there is a substantial likelihood that he will suffer the same injury in the future. Defendant's motion to dismiss Plaintiff's claim for injunctive relief is **GRANTED**, and said injunctive claim is **DISMISSED WITHOUT PREJUDICE.**

SO ORDERED January 26, 2026, at McAllen, Texas.

**All Citations**

Slip Copy, 2026 WL 202930

Footnotes

1    Congress passed the Telephone Consumer Protection Act (TCPA) in 1991, which in relevant part gave broad authority to the FCC to "evaluate alternative methods and procedures"—including the creation of a "do not call" registry—"to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object" and to promulgate rules and regulations to implement that protection. 47 U.S.C. § 227(c)(1)(A)–(E). The National Do-Not-Call Registry was created in 2003 pursuant to that Act. *See* 47 C.F.R. § 64.1200(c)(2).

2    "The world's very first text message, sent Dec. 3, 1992, was a cheerful, if early, holiday greeting: 'Merry Christmas,' it read, short and sweet." *Jones v. Blackstone Med. Servs., LLC*, 792 F. Supp. 3d 894, 899 (C.D. Ill. 2025) (quoting Alex Fitzpatrick, *How Text Messages Are Being Killed and Replaced*, TIME (Dec. 3, 2014), https://time.com/3612277/text-message-history-future/)

3    *See, e.g., Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156, 136 S.Ct. 663, 193 L.Ed.2d 571 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."); *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 688 (5th Cir. 2021) ("Robocalls and robotexts are nuisances. Congress banned them in the [TCPA]."); *Breda v. Cellco P'ship*, 934 F.3d 1, 4 n.1 (1st Cir. 2019) ("The TCPA also applies to other forms of communications, such as text messages."); *Murphy v. DCI Biologicals Orlando, Ltd. Liab. Co.*, 797 F.3d 1302, 1305 (11th Cir. 2015) ("The prohibition against auto dialed calls applies to text message calls as well as voice calls.").

4    This issue has been addressed by courts across several other Circuits, including in the Ninth Circuit. *See e.g., Esquivel v. Mona Lee, Inc.*, 2025 WL 3275607, at *2 (S.D. Cal. Nov. 24, 2025). As Defendant points out, it is important to note that Ninth Circuit cases are different; they often rely on *Satterfield v. Simon & Schuster, Inc.*, which, rather than fully defer to the FCC's interpretation, arguably decided the issue based on the statutory language. 569 F.3d 946, 953 (9th Cir. 2009) ("[W]e look to the ordinary, contemporary, and common meaning of the verb 'to call.' "). This approach partially saves it from *Loper Bright.*

5    The countervailing argument, however, is that § 227(c)(5)'s implementing regulations specifically state that they are "applicable to any person or entity making telephone solicitations or telemarketing calls *or text messages* to wireless telephone numbers to the extent described in the Commission's Report and Order." 47 C.F.R. § 64.1200(c). The language of that regulation, as well as the robust precedent holding the same, *see* supra at n.3, counsels this court to proceed under the assumption that the FCC has interpreted § 227(c)(5) to include text messages.

6    "The biggest blow came when Motorola, whose beepers account for more than 80 percent of the market, said that it would stop making one-way and some two-way pagers this summer and concentrate on messaging devices for wireless telephone networks instead." Jeffrey Selingo, *The Bell Is Tolling For the Beeper*, N.Y. TIMES, April 11, 2002

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Cited in uploaded document as:
Cole v. C/T Install Am., LLC, No. 25-3531, 2026 U.S. Dist. LEXIS 63254, at *5-6 (E.D. Pa. Mar. 23, 2026)

2026 WL 916582
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Virginia COLE, on Behalf of Herself
and Others Similarly Situated,

v.

C/T INSTALL AMERICA, LLC

CIVIL ACTION NO. 25-3531
|
Filed 03/23/2026

**Attorneys and Law Firms**

Anthony Paronich, Paronich Law, P.C., Hingham, MA, Jeremy C. Jackson, Bower Law Associates, PLLC, State College, PA, for Plaintiff.

Andrew W. Muir, Law Office of Andrew W. Muir LLC, Wyomissing, PA, James B. Saylor, Steven W. Schlesinger, Kelley Drye & Warren LLP, New York, NY, for Defendant.

## ORDER

CATHERINE HENRY, Judge.

 **\*1  AND NOW,** this 23rd day of March 2026, upon review of the Motion to Dismiss of Defendant, C/T Install America, LLC, Plaintiff's opposition thereto and Defendant's reply, as well as all supplemental authority provided by the parties, it is hereby **ORDERED** as follows:

1. The Motion to Dismiss of Defendant, C/T Install America, LLC, (ECF No. 10) is **DENIED**[1].

2. C/T Install America, LLC, shall file an Answer to Plaintiff's Complaint within 20 days.

**All Citations**

Slip Copy, 2026 WL 916582

## Footnotes

1    Defendant, C/T Install America, LLC, filed a motion to dismiss in this matter, claiming that this putative class action brought under the Telephone Consumer Protection Act, 47 U.S.C. §§ 227 et seq. ("TCPA") should be dismissed for failing to state a claim. Plaintiff's Complaint asserts that Defendant violated the Do Not Call ("DNC") requirements of the TCPA by sending two text messages to her cell phone concerning window installation services. Defendant moved to dismiss, claiming: 1) Plaintiff's TCPA claim must fail because Plaintiff is not a "residential telephone subscriber;" 2) Plaintiff's TCPA claim must fail because the plain language of Section 227(c) of the TCPA does not regulate text messages; and 3) Plaintiff has failed to sufficiently allege a "willful" or "knowing" violation of the TCPA that would entitle her to an award of treble damages. ECF No. 11-1, Def's Memorandum in Support ("Memo") at 1-2. After a thorough review of the briefs of the parties, I find that Plaintiff sufficiently pled that she is a residential telephone subscriber, that Section 227(c) of the TCPA does in fact regulate text messages, and that Plaintiff sufficiently pled that Defendant committed a willful or knowing violation of the TCPA. Accordingly, Defendant's motion will be denied.

The TCPA was passed by Congress in 1991 to address consumer privacy concerns related to telemarketing. In drafting the TCPA, Congress "enacted detailed, uniform, federal substantive prescriptions and provided for a regulatory regime" administered by the Federal Communications Commission. Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 383 (2012). The TCPA authorized the creation of a nationwide Do Not Call registry and directed the FCC to establish a "list of telephone numbers of residential subscribers who object to receiving telephone solicitations," 47 U.S.C. § 227(c)(3), and to prohibit telemarketers from "making or transmitting a telephone solicitation" to phone numbers on the list. Id., § 227(c)(3)(F). Section 227(c) provides a private right of action for persons who have received "more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations." 47 U.S.C. § 227(c)(5). The regulations further provide that "[n]o person or entity shall initiate any telephone solicitation to [a] residential telephone subscriber who has registered his or her telephone number on the [DNC registry]." 47 C.F.R. § 64.1200(c)(2).

In the instant matter, Plaintiff alleges that her cell phone number was registered to the DNC list, and therefore, the marketing texts that she received from Defendant were violations of the TCPA. Defendant argues that Plaintiff's claim must fail because she received text messages on her cell phone, which is not a residential phone, so she is not a "residential telephone subscriber." Defendant also argues that the text of the TCPA only permits recovery for "telephone calls" to a phone number on the DNC list, not text messages.

First, as to Defendant's argument that Plaintiff is not a "residential telephone subscriber" because the messages in question were sent to her cell phone, I find this argument to be unavailing. Plaintiff's Complaint stated that she uses the phone in question as her "personal residential telephone number," and "does not use, and at no time used, [the phone] for business or commercial purposes." ECF No. 1, Complaint at ¶¶ 9-10. Further, Defendant makes no allegation that Plaintiff's phone is used for business purposes. Consistent with numerous courts who have addressed this issue, I find that a "residential subscriber" is not limited to a residential landline but rather can include a person who uses a cell phone for personal use. *See Isaacs v. USHealth Advisors, LLC*, No. 24-216, 2025 WL 2268359, at \*3 (N.D. Ga. Aug. 7, 2025); *Harriel v. Bealls, Inc.*, No. 25-1165, 2025 WL 2379617, at \*2 (M.D. Fla. Aug. 15, 2025); *Wilson v. Hard Eight Nutrition, LLC*, 804 F.Supp.3d 1141,1151 (D. Ore. June 24, 2025); *Loudermilk v. Maelys Cosmetics USA, Inc.*, No. 24-1866, 2025 WL 3625779, at \*3 (N.D. Ga. Dec. 11, 2025); *Showers v. Pelican Investment Holdings Group, LLC*, No. 23-2864, 2026 WL 251730, at \*6 (S.D. Ill. Jan. 30, 2026). *But see Moore v. Triumph CSR Acquisition, LLC*, No. 23-4659, 2023 WL 8601528, at \*2-3 (N.D. Ill. Dec. 12, 2023) (finding that a cell phone is not a residential phone).

Next, Defendant argues that § 227(c) of the TCPA does not apply to text messages, as the text of § 227(c) provides relief only to an individual who has received "more than one **telephone call** within any 12-month period," as opposed to a text message. 42 U.S.C. § 227(c)(5) (emphasis added). I note that at the time the TCPA was enacted in 1991, text messages did not yet exist, so Congress could not have specifically included text messages in the language of § 227(c). *See Keating v. Peterson's Nelnet, LLC*, 615 F.App'x 365, 370 (6th Cir. 2015) ("[T]he first text message was not sent until December 3, 1992...") However, in 2003 as part of its responsibility to administer the TCPA, the FCC issued regulations directing that the TCPA should be applied to text messages. See *In re Rules & Regs. Implementing the TCPA*, 18 FCC Rcd. 14014, 14115 (2003). ("[The TCPA] encompasses both voice calls and text calls to wireless numbers ..."); 47 C.F.R. § 64.1200(e) (applying that ruling to the do-not-call restriction in § 64.1200(c)). Despite this guidance from the FCC, Defendant argues that the plain language of § 227(c) does not specifically regulate text messages and that texts are therefore excluded from protection under this section of the TCPA. Memo at 2. Accordingly, I must determine whether the phrase "telephone call" as used in § 227(c) includes text messages.

Initially, I note that prior to the Supreme Court's recent decisions in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), and *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146 (2025), I was required to defer to the FCC's decision that a text message should be treated as a "telephone call" under the TCPA. See *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). This doctrine, called *Chevron* deference, was eliminated by the Supreme Court in *Loper Bright*, where the Court expressly overruled *Chevron* and stated that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 603 U.S. at 412. The next year, in *McLaughlin Chiropractic*, the Court stated that courts must "determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *McLaughlin Chiropractic*, 606 U.S. at 155.

In performing this statutory interpretation of the TCPA, I first examine the text of the TCPA itself, interpreting the words of the statute with their "ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). As discussed previously, § 227(c)(5) does not specifically include text messages, so I must interpret the plain meaning of the phrase "telephone call" as used in that section. I note that Webster's Dictionary from the time of the TCPA's passage in 1991 defines "call" in this context as "to get or try to get into communication by telephone." *Alvarez v. Fiesta Nissan, Inc.*, No. 25-343, 2026 WL 202930, at \*4 (S.D. Tex. Jan. 26, 2026) (citing Webster's Ninth New Collegiate Dictionary 197 (1990)). A text message is sent via telephone in an attempt to communicate with another person. Based upon the definition of "call" at the time of the TCPA's passage, there was no requirement that the communication via telephone be oral. Therefore, I find that a text message falls under this definition of a "call" as set forth in § 227(c)(5), and my analysis could very well end there. However, for the sake of completeness, I will continue with the remainder of the statutory analysis.

Continuing on to examine the structure of the TCPA as a whole, I note that the Supreme Court as well as other courts have found that "calls" under § 227(b), a neighboring section of the TCPA, include text messages. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016). I also note that both §§ 227(b) and 227(c) use the same term – "telephone call." (§ 227(b) prohibits the initiation of "any **telephone call** to any residential telephone line" using an automated telephone system and § 227(c) protects a person who "receives more than one **telephone call** over a 12-month period.") As with other courts who examined the structure of the TCPA, I find that it is "strongly persuasive... [that] a subsection of the same statute uses identical language," *Alvarez*, 2026 WL 202930 at *6. "The fact that the term 'call' as used in § 227(b) encompasses 'text messages,' supports the interpretation that the term 'call' as used in § 227(c) also encompasses 'text messages.' " *Mujahid v. Newity, LLC*, No. 25-8012, 2025 WL 3140725, at *2 (N.D. Ill. Nov. 10, 2025). As further support, § 227(c) prohibits sending "telephone solicitations" to numbers on the DNC list, and the TCPA defines "telephone solicitations" as "the initiation of a telephone call or **message** for the purpose of encouraging the purchase or rental of ... goods, or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4) (emphasis added). The structure of the entire TCPA leads to the conclusion that § 227(c) does include text messages.

In examining the purpose of the TCPA, I again find that it leads to the conclusion that "call" as used in § 227(c) includes text messages. "The TCPA was enacted to 'protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile machines and automatic dialers.' " *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. June 19, 2009). Given Congress's expressly stated goal "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object," 47 U.S.C. § 227(c)(1), "it strains belief to suggest that Congress silently determined that [ ] oral messages were more invasive or objectionable than written ones." *Wilson v. Medvidi, Inc.*, No. 25-3996, 2025 WL 2856295, at *3 (N.D. Cal. Oct. 7, 2025). Congress intended the TCPA to protect the privacy of consumers from unsolicited marketing efforts, and a text message can be just as invasive as a phone call.

Lastly, I find that interpreting § 227(c) to include text messages is consistent with both the previously discussed guidance from the FCC, as well as numerous decisions from other courts on this same issue. *See Mujahid*, 2025 WL 3140725, at *2; *Alvarez*, 2026 WL 202930, at *4; *Wilson v. Medvidi, Inc.*, 2025 WL 2856295, at *3. *Wilson v. Better Mortgage Corp.*, No. 25-5503, 2025 WL 3493815 (S.D.N.Y Dec. 5, 2025); *Mey v. Liberty Home Guard, LLC*, No. 23-281, 2026 WL 486556 (N.D. WV, Jan. 5, 2026). *But see Jones v. Blackstone Med. Servs., LLC*, 792 F.Supp.3d 894, 899 (C.D. Ill. July 21, 2025) (finding that Section 227(c) does not apply to text messages based on a plain reading of the TCPA and its implementing regulations); *Davis v. CVS Pharmacy, Inc.*, 797 F.Supp.3d 1270, 1273 (N.D. Fla. Aug. 26, 2025) (finding that the text of § 227(c) was clear and a text message was not a telephone call.); *Sayed v. Naturopathica Holistic Health, Inc.*, No. 25-847, 2025 WL 2997759, at *2 (M.D. Fla. Oct. 24, 2025) (finding that Section 227(c) does not apply because "a text message is not a telephone call"); *Dilanyan v. Hugo Boss Fashions, Inc.*, No. 25-5093, 2025 WL 3549868, at *1 (C.D. Cal. Dec. 3, 2025) (stating that the Court "reads the ordinary meaning of 'telephone call' to exclude 'text message,' " and finding that Section 227(c) does not apply); *Radvansky et al. v. 1-800-Flowers.com, Inc.*, No. 25-2811, 2026 WL 456919, at *3 (N.D. Ga. Feb. 17, 2026) (stating that the "statutory text here is clear that only telephone calls are actionable under § 227(c)(5), not text messages."). I recognize that some courts have analyzed this issue and come to a different conclusion, but my interpretation is consistent with the weight of authority. Accordingly, I find that nothing in the text, structure or purpose of the TCPA suggests the barring of text messages under § 227(c) as proposed by Defendant, and I conclude that § 227(c) includes text messages within its definition of a "telephone call."

As to the last issue argued by Defendant, I find that Plaintiff's Complaint sufficiently pleads a claim of "willful or knowing" violations of the TCPA so as to sustain a claim for treble damages at this stage of the case. Therefore, Defendant's motion will be denied.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag
Disagreed With by Cole v. C/T Install America, LLC, E.D.Pa., March 23, 2026

2025 WL 3549868
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Nikolay DILANYAN

v.

HUGO BOSS FASHIONS, INC. et al

Case No. 2:25-cv-05093-JLS-BFM
|
Filed December 3, 2025

**Attorneys and Law Firms**

Peng Shao, R23 Law APC, Los Angeles, CA, Jared Victor Walder, R23 Law APC, Los Angeles, CA, for Nikolay Dilanyan.

David M. Krueger, Pro Hac Vice, Benesch Friedlander Coplan and Aronoff, Cleveland, OH, Jesse K. Bolling, Enenstein Pham Glass and Rabbat LLP, Costa Mesa, CA, Stephanie A. Sheridan, Benesch Friedlander Coplan and Aronoff LLP, San Francisco, CA, for Hugo Boss Fashions, Inc.

**PROCEEDINGS: (IN CHAMBERS) ORDER (1) DENYING MOTION TO DISMISS (Doc. 22); (2) CERTIFYING ORDER FOR INTERLOCUTORY APPEAL; AND (3) STAYING ACTION PENDING APPEAL**

Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is a motion to dismiss filed by Defendant Hugo Boss Fashions, Inc. (Mot., Doc. 22.) Plaintiff Nikolay Dilanyan opposed, and Defendant replied. (Opp., Doc. 24; Reply, Doc. 25.) Having reviewed the papers and heard oral arguments, and for the following reasons, the Court DENIES Defendant's motion to dismiss.

**I. BACKGROUND**
Between March 12, 2022, and May 8, 2025, Defendant sent at least 289 text messages to Plaintiff's personal cell phone either before 8 a.m. or after 9 p.m. (Compl. ¶¶ 25–32, Doc. 2.) On June 4, 2025, Plaintiff initiated this putative class action against Defendant, alleging that Defendant violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(1), by sending text messages at unlawful times. (Id. ¶¶ 40, 64–70.) Plaintiff seeks to represent a class of individuals who have "received more than one telemarketing text message from Defendant ... during any twelve-month period." (Id. ¶ 44.)

On August 28, 2025, Defendant filed a motion to dismiss, arguing Plaintiff does not have a private right of action under § 227(c)(5) of the TCPA because Plaintiff alleges that he received only text messages, not telephone calls. (Mot.)

**II. LEGAL STANDARD**
In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all "well-pleaded factual allegations" in a complaint. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Furthermore, courts must draw all reasonable inferences in the light most favorable to the non-moving party. See Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010). However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.' " Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

**III. ANALYSIS**
Plaintiff alleges that Defendant violated 47 C.F.R. § 64.1200(c)(1), which provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a]ny residential telephone subscriber before the hour of 8 a.m. or after 9 p.m." (Compl. ¶ 68.) Plaintiff brings this action pursuant to 47 U.S.C. § 227(c)(5), which enables "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" to bring an action for damages or injunctive relief. (Id. ¶ 67.) Defendant argues that Plaintiff cannot bring an action under § 227(c)(5) of the TCPA because the text messages Plaintiff received are not "telephone call[s]" within the meaning of § 227(c)(5). (Mot. at 6.)

### A. "Telephone call" under § 227(c)(5)

"[W]hen [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)). Courts must "interpret statutory terms in accordance with their ordinary meaning." *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015). By striving to interpret a statute based on its text, a court "avoid[s] the pitfalls that plague too quick a turn to the more controversial realm of legislative history." *Lamie*, 540 U.S. at 536. "Courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024); *see also McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025) (holding that district courts should "independently assess[ ] whether an agency's interpretation of the relevant statute is correct").

**\*2** The Court reads the ordinary meaning of "telephone call" to exclude "text message." When the TCPA was enacted in 1991, text messaging did not exist, so the plain meaning of "telephone call" at the time could not possibly include a text message. *See Jones v. Blackstone Med. Servs., LLC*, 2025 WL 2042764, at \*4 (C.D. Ill. July 21, 2025). And to the ordinary person today, telephone calls and text messages are two distinct forms of communication—one involves speaking with or attempting to speak with someone in real time, and the other involves a one-way, often written communication. As Defendant articulates, "[n]o ordinary user of the English language would write the sentence 'John called Sue' intending to mean 'John sent a text message to Sue.' " (Mot. at 11.)

Subsequent amendments to the TCPA support the Court's plain meaning analysis. After enacting § 227(c)(5), Congress amended § 227(e) of the TCPA, which prohibits the transmittal of a misleading phone number, by replacing the reference to "a call made using a telecommunications service or IP-enabled voice service" with "a call made using a voice service or a text message sent using a text messaging service." *See* Consolidated Appropriations Act, 2018, H.R. 1625, 115th Cong., Pub. L. No. 115-141, div. P, § 503(a) (2018) (codified at 47 U.S.C. § 227(e)). That Congress updated § 227(e) to include text messages in addition to calls, but has not similarly amended § 227(c)(5), suggests that Congress views a text message as a distinct form of communication to which

§ 227(c)(5)'s private right of action does not apply. *See Barajas-Romero v. Lynch*, 846 F.3d 351, 359 (9th Cir. 2017) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.") (quoting *Kucana v. Holder*, 558 U.S. 233, 249 (2010)).

In his opposition, Plaintiff does not argue that the plain meaning of a "telephone call" encompasses a text message.[1] (*See* Opp. at 4–5.) Instead, Plaintiff points to 47 C.F.R. § 64.1200(c)(1), the regulation promulgated under § 227(c), which prohibits the initiation of "any telephone solicitation to any residential telephone subscriber before the hour of 8 a.m. or after 9 p.m." (Opp. at 4.) Plaintiff further notes that the TCPA defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of ... property, goods, or services ...." 47 U.S.C. § 227(a)(4); (Opp. at 4). Plaintiff contends that the private right of action created by § 227(c)(5) should be read in harmony with this regulation, but such a reading would contravene the plain language of § 227(c)(5), which references only telephone calls, not telephone solicitations. In fact, § 227(a)(4)'s definition of a "telephone solicitation" as encompassing both "a telephone call and message" undercuts Plaintiff's argument; like the language in § 227(e), it suggests that messages are distinct from calls under the TCPA. Indeed, the case to which Plaintiff cites, *Wilson v. Skopos Financial, LLC*, reasoned that "the FCC has *expanded* the TCPA to apply to text messages," implicitly recognizing that the language of § 227(c)(5) itself does not include text messages. 2025 WL 2029274, at \*4 (D. Or. July 21, 2025) (emphasis added).

**\*3** Plaintiff alternatively contends that the Court's interpretation of § 227(c)(5) must align with the Ninth Circuit's conclusion in *Satterfield v. Simon & Schuster, Inc.* that "a text message is a 'call' within the meaning of the TCPA." 569 F.3d 946, 952 (9th Cir. 2009); (Opp. at 6). Defendant offers several compelling arguments as to why *Satterfield* may not apply. The Ninth Circuit in *Satterfield* considered the definition of "to make any call" within § 227(b)(1)(A), a separate provision from § 227(c)(5), which uses the distinct term "telephone call." And the Ninth Circuit reached its conclusion only after deferring under *Chevron* to the FCC's determination that a "call" encompasses a "text message." *Id.* at 954. Because courts may no longer "defer to an agency interpretation of the law simply because a statute is ambiguous," *Loper Bright*, 603 U.S. at 413, *Satterfield*'s

finding that the FCC's interpretation of "call" is reasonable does not control the Court's present statutory analysis.

However, *Satterfield*'s conclusion that "a text message is a 'call' within the meaning of the TCPA" appears to be broad enough to control here. *Satterfield*, 569 F.3d at 952. *Satterfield* does not limit its holding to only § 227(b)(1)(A); by contrast, it states that "a text message is a 'call' *within the meaning of the TCPA*," *Satterfield*, 569 F.3d at 952 (emphasis added), suggesting that a text message is also a "telephone call" under § 227(c)(5). And *Satterfield*'s holding remains binding despite *Loper Bright*'s repudiation of *Chevron* deference: because *Loper Bright* explicitly did "not call into question prior cases that relied on the *Chevron* framework," *Satterfield* is not "clearly irreconcilable" with *Loper Bright.*[2] *Loper Bright*, 603 U.S. at 412; *Miller v. Gammie*, 335 F.3d 889, 900 (2003) (holding that Ninth Circuit cases are "effectively overruled" when they are "clearly irreconcilable" with intervening Supreme Court authority). Further, several other courts within this circuit have considered the meaning of "telephone call" under § 227(c)(5) after the Supreme Court's decision in *Loper Bright*, and they have followed *Satterfield* to find that a text message is a "telephone call." *See, e.g., Barton v. Delfgauw*, 2025 WL 2402131, at *3 n.1 (W.D. Wash. Aug. 18, 2025); *Wilson v. MEDVIDI Inc.*, 2025 WL 2856295, at *2 (N.D. Cal. Oct. 7, 2025); *Messerlian v. JP Grp. LA*, 2025 WL 2074360, at *5 (C.D. Cal. May 23, 2025). The Court is therefore reticent to conclude that *Satterfield* does not control. Accordingly, because "a text message is a 'call' " under *Satterfield*, and Plaintiff alleges that he has received multiple text messages from Defendant, the Court concludes that Plaintiff is entitled to bring an action under § 227(c)(5) as "[a] person who has received more than one telephone call within any 12-month period."

**\*4** Defendant's motion to dismiss is therefore DENIED.

### B. Interlocutory Appeal

Although the Court denies Defendant's motion to dismiss, the Court agrees with Defendant that this issue is appropriate for interlocutory appeal because of the unique questions raised by the application of *Satterfield* to the instant action. A district court may certify an order for interlocutory appeal under 28 U.S.C. § 1292(b) "[i]n rare circumstances[.]" *James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1067 n.6 (9th Cir. 2002). To certify an order for interlocutory appeal, the district court must determine that the order "meets the three certification requirements outlined § 1292(b): '(1) that there

be a controlling question of law, (2) that there be substantial grounds for difference of opinion [as to that question], and (3) that an immediate [resolution of that question] may materially advance the ultimate termination of the litigation.' " *ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*, 22 F.4th 1125, 1130 (9th Cir. 2022) (citing *In re Cement Antitrust Litig. (MDL No. 296)*, 673 F.2d 1020, 1026 (9th Cir. 1981)). "[T]he district court may certify the order for interlocutory appeal in the text of that order[.]" *Id.* at 1131.

The Court concludes that the first requirement is satisfied. "A controlling question of law must be one of law—not fact—and its resolution must 'materially affect the outcome of litigation in the district court.' " *Id.* at 1130 (citing *In re Cement Antitrust Litig.*, 673 F.2d at 1026). Here, there are two central questions of law. First, the Ninth Circuit may reconsider this Court's analysis of the binding effect of *Satterfield* in light of *Loper Bright.* Second, the Ninth Circuit may interpret the meaning of "telephone call" within § 227(c)(5). *See Burton v. Prudential Ins. Co. of Am.*, 2014 WL 10537434, at *2 (C.D. Cal. Sept. 12, 2014) ("[T]he Ninth Circuit has found 'novel question[s] of statutory interpretation' to be particularly appropriate for occasions for certification.") (quoting *Joffe v. Google, Inc.*, 746 F.3d 920, 924 (9th Cir. 2013)). Further, the resolution of these questions will determine the meaning of a "telephone call" within § 227(c)(5) of the TCPA, which will materially affect the outcome of the litigation, because a determination that a text message is not a telephone call would result in the dismissal of this action.

Second, "[t]he substantial grounds prong is satisfied when novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions." *ICTSI Oregon, Inc.*, 22 F.4th at 1130 (internal quotation marks and citation omitted). "[T]his prong is satisfied ... if novel and difficult questions of first impression are presented." *Id.* (internal question marks and citation omitted). The Court determines that this prong is satisfied because the Ninth Circuit has not yet had the opportunity to reexamine *Satterfield* following the Supreme Court's decision in *Loper Bright.* And where district courts have interpreted the language of § 227(c)(5) after *Loper Bright*, they have reached differing conclusions. *Compare Jones*, 2025 WL 2042764, at *4 ("[U]nder a plain reading, Section 227(c)(5) of the TCPA does not regulate text messages."), *with Wilson*, 2025 WL 2856295, at *4 ("[N]othing in the text, structure, or purpose of the TCPA suggests the distinction between written and oral communications[.]").

**\*5** Third, "the materially advance prong is satisfied when the resolution of the question may appreciably shorten the time, effort or expense of conducting the district court proceedings." *ICTSI Oregon, Inc.*, 22 F.4th at 1131 (internal question marks and citation omitted). As noted above, a determination on appeal that text messages are not telephone calls under § 227(c)(5) of the TCPA would result in the dismissal of this action, as Plaintiff alleges that he has received only text messages from Defendant. The resolution of an interlocutory appeal may therefore conserve resources that would be expended if the parties were to continue litigating this action to reach a final judgment. This prong is satisfied.

Accordingly, Defendant's request for interlocutory appeal is GRANTED. "Although the filing of an interlocutory appeal does not automatically stay proceedings in the district court, the district court has broad discretion to decide whether a stay is appropriate to 'promote economy of time and effort for itself, for counsel, and for litigants.' " *Ass'n of Irritated Residents v. Fred Schakel Dairy*, 634 F. Supp. 2d 1081, 1094 (E.D. Cal. 2008) (citing *Filtrol Corp. v. Kelleher*, 467 F.2d 242, 244 (9th Cir. 1972)). The Court concludes that allowing the litigation to proceed when the interlocutory appeal is pending could waste time and resources, as the appeal may result in the dismissal of the action, rending such efforts moot. The Court therefore STAYS this action pending resolution of the interlocutory appeal.

## IV. CONCLUSION

For the above reasons, Defendant's motion to dismiss is DENIED.

The Court CERTIFIES this Order for interlocutory appeal. Defendant must file its Petition for Permission to Appeal within **ten (10) days** of the entry of this Order. *See* 28 U.S.C. § 1292(b); Fed. R. App. P. 5. This action is STAYED pending the resolution of the appeal. The parties are ORDERED to file a joint status report within **ten (10) days** of a final determination of the appeal from the Ninth Circuit. If Defendant does not timely file a Petition seeking appeal, the parties are ORDERED to file a joint status report within **ten (10) days** of Defendant's deadline to file its Petition.

## All Citations

Slip Copy, 2025 WL 3549868

Footnotes

1    At oral argument, Plaintiff argued that the definition of a "telephone call" does encompass a "text message" because "telephone call" should be read in a functional sense, as an attempt to get into communication with somebody, rather than in a technological sense. For the reasons articulated above, the Court disagrees that "telephone call" is defined so broadly.

2    Defendant argues that *Loper Bright* overruled *Satterfield.* (Mot. at 10.) In response to Plaintiff's argument that "the [*Loper Bright*] Court explained that cases decided under *Chevron* remain binding" (Opp. at 6), Defendant emphasizes that *Loper Bright* maintained statutory *stare decisis* only for "[t]he holdings of [prior] cases that specific agency actions are lawful." (Reply at 9–12); *Loper Bright*, 603 U.S. at 412. The specific agency action at issue in *Satterfield*, Defendant contends, was the FCC's specific interpretation of § 227(b), so *Satterfield*'s holding is not entitled to *stare decisis* here. (Reply at 10–11.) However, Defendant's reliance on the words "specific agency action" is not enough to make *Satterfield*'s application to § 227(c)(5) "clearly irreconcilable" with *Loper Bright* in light of *Loper Bright*'s explicit statement that it "does not call into question prior cases that relied on the *Chevron* framework." *Loper Bright*, 603 U.S. at 412; *see United States v. Alaska*, 151 F.4th 1124, 1136 (9th Cir. 2025) ("Clear irreconcilability is a high standard. It is not enough for there to be some tension between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to cast doubt on the prior circuit precedent.") (citation modified).

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 3275607
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

Joe ESQUIVEL, on behalf of himself
and all others similarly situated, Plaintiff,

v.

MONA LEE, INC., Defendant.

Case No.: 3:25-cv-00607-H-BLM
|
Signed November 24, 2025

**Attorneys and Law Firms**

Adrian R. Bacon, Todd M. Friedman, Law Offices of Todd M. Friedman, Calabasas, CA, Max Scott Morgan, Pro Hac Vice, The Weitz Firm, LLC, Philadelphia, PA, for Plaintiff.

Jonathan Joannides, Digital Frontier Law, APC, San Jose, CA, for Defendant.

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

MARILYN L. HUFF, District Judge

**\*1** On March 14, 2025, Plaintiff Joe Esquivel filed a complaint against Defendant Mona Lee Inc. (Doc. No. 1, Complaint.) On July 28, 2025, Defendant filed a motion to dismiss. (Doc. No. 17.) On July 30, 2025, Plaintiff filed a first amended class action complaint ("FAC"). (Doc. No. 19, FAC.) On August 1, 2025, Defendant responded to Plaintiff's FAC with a second motion to dismiss. (Doc. No. 20.) On August 4, 2025, the Court denied Defendant's first motion to dismiss as moot and vacated the hearing set for that motion. (Doc. No. 21.) On August 25, 2025, Plaintiff filed its opposition. (Doc. No. 22.) On August 26, 2025, Defendant filed its reply. (Doc No. 23.) On October 7, 2025, the Court took Defendant's second motion to dismiss under submission. (Doc. No. 26.) For the reasons set forth below, the Court **DENIES** Defendant's motion.

**Background**

As alleged in the FAC, Plaintiff Joe Esquivel is a citizen and resident of California and Defendant Mona Lee Inc. is a Delaware corporation headquartered in Massachusetts. (Doc. No. 19, FAC, ¶¶ 8–10.) On February 2, 2024, Plaintiff allegedly registered his telephone number ending in 4489 on the national do-not-call registry. (Doc. No. 19, FAC, ¶ 35.) From November 5, 2024 to November 22, 2024, Defendant sent Plaintiff text messages regarding its solar products and services. (Doc. No. 19, FAC, ¶ 39.) These messages included responses to inquiries, prompts to schedule phone consultations, reminders for scheduled phone consultations, and an advertisement for Black Friday deals. (Doc. No. 19, FAC, Ex. A.) Plaintiff further alleges that Defendant either did not have written do-not-call policies, had policies that did not comply with the minimum requirements of the TCPA, 47 C.F.R. § 64.1200(d), or did not properly implement such policies at the time of the texts. (Doc. No. 19, FAC, ¶ 47.)

Defendant moves to dismiss on the ground that Section 227(c)(5) of the TCPA does not provide a private right of action for Plaintiff because text messages are not "telephone solicitations" or "calls" under the TCPA. (Doc. No. 20.) Additionally, in the alternative, Defendant argues that the text messages are responses to inquiries within the scope of an "established business relationship." (Doc. No. 20.) Plaintiff's opposition argues that Section 227(c)(5) grants him a private right of action because text messages constitute "telephone solicitations" and "calls" under the TCPA. In addition, Plaintiff also alleges that he sufficiently pled facts regarding Defendant's solicitation and that Defendant's factual arguments are premature for a motion to dismiss. (Doc. No. 22.) The Court addresses each argument in turn.

**Discussion**

**I. Legal Standard**

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of claims for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court may grant a Rule 12(b)(6) motion to dismiss only if the motion lacks "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A complaint sufficient on its face need not give "detailed factual allegations," but it must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." Id. at 555. When considering a motion to dismiss, the court must accept all allegations of material fact as true and construe those facts in the light most

favorable to the non-movant. Los Angeles Lakers, Inc. v. Fed. Ins. Co., 869 F.3d 795, 800 (9th Cir. 2017). However, a court need not accept legal conclusions as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

**II. Scope of Section 227 and Text Messages**

**\*2** Defendant argues under statutory construction that a text message does not constitute a telephone solicitation or call under the TCPA. (Doc. No. 20.) In opposition, Plaintiff cites case law including Ninth Circuit authority and FCC guidance that a text message constitutes a telephone solicitation and call under the TCPA. (Doc No. 22.)

Congress enacted the TCPA "to address a growing number of telephone marketing calls and certain telemarketing practices thought to be an invasion of consumer privacy ..." In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14018 (June 26, 2003). To that end, Section 227(c) "protect[s] residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Section 227(c)(5) provides a private right of action against solicitations violating the national do-not-call registry to any person who receives "more than one telephone call within any 12-month period by or on behalf of the same entity in violation of" 47 C.F.R. § 64.1200(c). 47 U.S.C. § 227(c)(5); see Barton v. JMS Assoc. Mktg., LLC, 2023 WL 2009925 (9th Cir. Feb. 15, 2023) (finding a private right of action under Section 227(c)(5) for violation of Section 64.1200(c)(2)). Both Section 227(a)(4) and Section 64.1200(f)(15) define telephone solicitation as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(f)(15).

Supreme Court and Ninth Circuit precedent conclude that text messages qualify as calls under the TCPA. The Supreme Court explicitly held in Campbell-Ewald Co. v. Gomez that "[a] text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." 577 U.S. 153, 156 (2016). Ninth Circuit precedent echoes the same, such as in Satterfield v. Simon & Schuster, Inc. where the panel held that "a text message is a 'call' within the meaning of the TCPA." 569 F.3d 946, 952 (9th Cir. 2009). The Ninth Circuit elaborated on this in Van Patten v. Vertical Fitness Group, LLC, where it explained that "telemarketing text messages [ ], absent consent, present the precise harm and infringe the same privacy interests Congress sought to

protect in enacting the TCPA." 847 F.3d 1037, 1043 (9th Cir. 2017) ("Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients."). More recently, the Ninth Circuit has held that unwanted text messages qualify as an injury in fact sufficient to confer standing for a TCPA claim. See Hall v. Smosh Dot Com, Inc., 72 F.4th 983, 988 (9th Cir. 2023); Van Patten, 847 F.3d at 1043; Chennette v. Porch.com, Inc., 50 F.4th 1217, 1221 (9th Cir. 2022). Plaintiff has alleged in its FAC that Defendant's text messages were in contravention of both Plaintiff's do-not-call registration and repeated requests to stop. (Doc. No. 19, FAC, ¶¶ 1–3, 36–47; Ex. A.)

Additionally, FCC guidance states that text messages constitute calls under the TCPA. Within both Section 227(b) and Section 227(c), Congress codified a grant of authority to the FCC to prescribe regulations guiding the enforcement of the TCPA. 47 U.S.C. §§ 227(b)(2); 227(c)(1)–(4). A 2024 FCC regulation explicitly confirmed that Section 227(c) applies to text messages, stating "[t]he Commission adopts the proposal to codify the National DNC Registry's existing protections to text messages. Texters must have the consumer's express invitation or permission before sending a marketing text to a wireless number in the DNC Registry." Targeting and Eliminating Unlawful Text Messages, Implementation of the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls, 89 Fed. Reg. 5098, 5101 (Jan. 26, 2024). The adoption came shortly after, effective March 26, 2024, amending Section 64.1200(e) to state that "paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers ..." 47 C.F.R. § 64.1200(e); Targeting and Eliminating Unlawful Text Messages, 89 Fed. Reg. at 5099.

**\*3** Defendant states that "[a]s the Supreme Court reaffirmed in Loper Bright, the judiciary—not the executive branch —must interpret statutes in accordance with their text, and that while courts once deferred to the Federal Communications Commission's expansive interpretation of 'call,' such deference is no longer required." (Doc. No. 20 (citing Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024); McLaughlin Chiropractic Assocs. v. McKesson Corp., 606 U.S. 146 (2025).) Loper Bright and McLaughlin did not wholly abrogate FCC guidance. And significantly, McLaughlin did not examine the issue in this motion of whether a text message qualifies as a call under the TCPA. See

McLaughlin, 606 U.S. at 146 (holding that "[t]he Hobbs Act does not bind district courts ... to an agency's interpretation of a statute.").

Although FCC guidance is no longer binding on district courts, its regulations can still inform a district court's analysis. Before its 2024 clarification, the FCC issued at least two regulations stating that texts are covered under the TCPA. See 2003 Rules & Reguls., 18 F.C.C. Rcd. at 14115 ("We affirm that under the TCPA, it is unlawful to make any call using an automatic telephone dialing system or an artificial or prerecorded message to any wireless telephone number ... [t]his encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls"); In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C. Rcd. 7961 ¶ 107 (July 10, 2015) ("Glide raises the issue of whether SMS text messages are subject to the same consumer protections under the TCPA as voice calls. We reiterate that they are.").

Given the language of the TCPA, precedent, and FCC regulatory guidance, the Court concludes that Plaintiff's allegations regarding Defendant's text messages rise to a cause of action under Section 227(c)(5).

### III. Section 227(a)(4) Exception

Defendant also argues that the text messages at issue do not constitute telephone solicitations because they fall under one of Section 227(a)(4)'s exceptions. Section 227(a)(4)(B) states that "telephone solicitation" "does not include a call or message to ... any person with whom the caller has an established business relationship." 47 U.S.C. § 227(a)(4)(B). Section 64.1200(f)(5) elaborates that an established business relationship is a "prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration ... on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call." 47 C.F.R. § 64.1200(f)(5).

In opposition, Plaintiff argues that Defendant's factual arguments misconstrue the allegations in the complaint and are premature in a motion to dismiss. (Doc. No. 22.) Plaintiff cites to the allegations of the FAC the requests it made to Defendant to cease communication:

- "Stop"

- "Mona Lee stop sending me messages."

- "Stop I don't appreciate it."

- "I didn't request any appointments with your company so stop sending me messages please, the time that you message me it's too early, please have considerations of others, and why do you want with my utility bill? That's private [information] and not for me to discuss with you!! Who are you looking for? Can you disconnect every communication with your Company because I have no business with you at all. Did someone send you to bother me with your texts?"

- "Unsubscribe me please, I didn't request any inquiries on your business."

**\*4** • "Unsubscribe me, I never signed up for your text, so stop."

(Doc. No. 22 (quoting Doc. No. 19, FAC, Ex. A).)

When considering a motion to dismiss, the court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant. Los Angeles Lakers, 869 F.3d at 800. Defendant argues that all its text messages to Plaintiff were sent pursuant to their established business relationship. (Doc. No. 20.) To support this, Defendant points out that the content of its automated text messages "support[s] a reasonable inference that they were sent in response to a ... inquiry or application." (Doc. No. 20 (emphasis removed).) Defendant's argument that such messages were sent in response to Plaintiff's inquiries is not apparent from the allegations in the FAC. And Plaintiff alleges in the FAC that he continuously received text messages from Defendant despite requesting that Defendant stop. (Doc. No. 19, FAC, ¶ 36–47.) The precise nature and context of the text messages is a factual matter for discovery and better suited for a motion for summary judgment when the record is more developed.

### Conclusion

For the foregoing reasons, the Court **DENIES** Defendant Mona Lee Inc.'s motion to dismiss. The Court orders Defendant to file an answer within 30 days of the date of this order.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 3275607

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

Franklin v. Navient Corporation, Not Reported in Fed. Supp. (2019)

⚑ KeyCite Yellow Flag

Amended on Reconsideration by [Franklin v. Navient, Inc.](#), D.Del., July 12, 2021

2019 WL 4222681

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

Ricky R. FRANKLIN, Plaintiff,

v.

NAVIENT CORPORATION,

et al., Defendants.

Civil Action No. 17-1640-RGA

|

Signed 09/05/2019

**Attorneys and Law Firms**

Ricky R. Franklin, Stockbridge, Georgia; Pro Se Plaintiff.

[Joelle Eileen Polesky](#), Esquire, Stradley Ronon Stevens & Young, LLP, Wilmington, Delaware, Counsel for Defendants.

## MEMORANDUM OPINION

[ANDREWS](#), U.S. District Judge

**\*1** Plaintiff Ricky R. Franklin, who appears *pro se* and has been granted leave to proceed *in forma pauperis*, filed this action on November 13, 2017, raising claims pursuant to the Telephone Consumer Protection Act ("TCPA"), [47 U.S.C. §§ 227, *et seq.*](#), and the Fair Debt Collection Practices Act, [15 U.S.C. §§ 1692, *et seq.*](#) (D.I. 2). The Court has jurisdiction pursuant to [28 U.S.C. § 1331](#). Pending is a motion for summary judgment filed by Defendants Navient, Inc. and Student Assistance Corporation (improperly named as Student Assistance, Inc.) and Plaintiff's opposition. (D.I. 32, 37). The matter has been fully briefed. For the reasons discussed below, the Court will grant in part and deny in part Defendants' motion.

## I. BACKGROUND

On June 28, 2004, Plaintiff obtained a federal consolidation loan (*i.e.*, student loan) under the Federal Family Education Loan Program. (D.I. 35 at ¶ 4; D.I. 35 at Ex. 1). Plaintiff's student loan is guaranteed against default by the United States Department of Education. (*Id.* at ¶ 5). Navient serviced Plaintiff's student loan during the relevant time-frame as set forth in the Complaint. (*Id.* at ¶ 6). Student Assistance Corporation is an affiliate of Navient and assisted in the servicing of Plaintiff's student loan. (*Id.* at ¶ 7). Plaintiff did not own a telephone number ending in 3733 when he entered into the 2004 contract. (D.I. 37-2 at 2 at ¶ 4). He began using the cellular telephone number ending in 3733 in November 2011. (*Id.*).

Navient has not received any payments toward Plaintiff's student loan since June 8, 2007. (D.I. 35 at ¶ 25). Beginning on or about April 30, 2012, Plaintiff executed the first of four unemployment deferment requests. (*Id.* at ¶ 10). The deferment requests included Plaintiff's cellular telephone number ending in 3733, and Plaintiff agreed to allow "the school, the lender, the guarantor, the Department, and their respective agents and contractors to contact me regarding my loan(s), including repayment of my loan(s), at the current or any future number that I provide for my cellular telephone or other wireless device using automated dialing equipment or artificial or prerecorded voice or text messages." (*Id.* at ¶ 10; and Ex. 2). Navient accepted the terms in Plaintiff's April 30, 2012 deferment request and deferred the payments due under his student loan. (*Id.* at ¶ 11).

Plaintiff executed deferment requests on March 13, 2013 and August 25, 2014, which included the 3733 number and express language consenting to automated dialing equipment or artificial or prerecorded voice or text messages. (*Id.* at ¶¶ 12, 14; and Ex. 3). Navient accepted the terms of Plaintiff's second and third deferment requests, and Plaintiff's student loan payments were deferred. (*Id.* at ¶¶ 13, 15.)

According to Plaintiff's log, between January 25, 2015 and March 24, 2015, Defendants called the 3733 number 17 times. (D.I. 37 at Ex. A at ¶ 12-13; Ex. F). According to Plaintiff, when he was called at the 3733 number on January 26, 2015, and on March 24, 2015, he told representatives that they did not have permission to call him on his cell phone. (*Id.* at Ex. A at ¶ 7). According to Plaintiff, he sent Defendants letters in March 2014 and March 2015 requesting all "correspondence requests to be done in writing," referring to his Exhibit E. (*Id.* at 7, Ex. A at ¶ 6, Ex. E). The letters at Exhibit E request written debt validation information. (*Id.* at Ex. E).

**\*2** According to Andrew Reinhart, Navient senior account analyst, Navient first began calling Plaintiff's 3733 number on March 17, 2015. (D.I. 34 at ¶¶ 4, 5 and Ex. 1; D.I. 35 at

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 20 of 95

Franklin v. Navient Corporation, Not Reported in Fed. Supp. (2019)

¶ 16). According to Defendants, Navient placed five calls to Plaintiff's 3733 number between March 17, 2015 and March 24, 2015, all made using Navient's interactive intelligence telephone system. (D.I. 34 at ¶ 6 and Ex. 1 at DEF000037).

When Plaintiff executed a fourth deferment request on March 31, 2015, he provided the 3733 number and consented to automated dialing equipment or artificial or prerecorded voice or text messages. (D.I. 35 at ¶ 17 and Ex. 5). Navient accepted the terms in the March 31, 2015 deferment request and deferred Plaintiff's student loan payments. (*Id.* at ¶ 18). On September 24, 2015, Plaintiff executed a forbearance request and authorized "the entity to which I submit this request (*i.e.* the school, the lender, the guaranty agency, the U.S. Department of Education, and their respective agents and contractors) to contact me regarding my request or my loan(s), including repayment of my loan(s), at the number that I provide on this form or any future number that I provide for my cellular telephone or other wireless device using automated telephone dialing equipment or artificial prerecorded voice or text messages." (*Id.* at ¶ 19 and Ex. 6). Navient accepted the terms in Plaintiff's September 24, 2015 forbearance request and deferred Plaintiff's student loan payments. (*Id.* at ¶ 20).

On September 24, 2015, Plaintiff provided updated information and in the update provided his 3733 number and consent for his cell phone's use for automatic dialing and text messages when he listed the 3733 Number as his "Primary" and "Alternate" phone numbers and agreed, as follows:

> I authorize SLM Corporation, Sallie Mae Bank, Navient Corporation and Navient Solutions, Inc., and their respective subsidiaries, affiliates and agents, to contact me at such number using any means of communication, including, but not limited to, calls placed to my cellular phone using an automated dialing device, calls using prerecorded messages and/or SMS text messages, regarding any current or future loans owned or serviced by SLM Corporation, Sallie Mae Bank, Navient Corporation or Navient Solutions, Inc., or their respective subsidiaries, affiliates and agents, even if I will be charged by my service provider(s) for receiving such communications

(D.I. 35 at ¶ 17 and Ex. 7).

Plaintiff executed a second forbearance request on October 1, 2016. (*Id.* at ¶ 22). It included the 3733 number and gave consent to contact Plaintiff on his cellular telephone. (*Id.* at ¶ 23 and Ex. 8). Navient accepted the terms in Plaintiff's

October 1, 2016 forbearance request and deferred his student loan payments. (*Id.* at ¶ 23).

Once Plaintiff's deferments and forbearances ended, Defendants began making calls to Plaintiff's 3733 number between January 24, 2017 and March 28, 2017 regarding the amount due and owing on Plaintiff's student loan using the LiveVox Human Call Initiator platform.[1] (D.I. 34 at ¶¶ 7-15 and Ex. 1; D.I. 35 at ¶ 24).

**\*3** Defendants also made calls to Plaintiff's 3733 number using the Interactive Intelligence telephone system in preview mode. (*Id.* at ¶ 14 and Ex. 1). Preview mode is a form of manual dialing, wherein the agent is presented with a customer's account information at his or her workstation, and determines whether to place a call to the customer. (*Id.* at ¶ 15). In preview mode, the agent views a given customer's account profile, manually initiates a telephone call by clicking the phone button on his or her screen via a keyboard command or mouse click, listens to the phone ring, speaks with the customer about the account (if reached), and ends the call by noting the result of the call in Navient's or Student Assistance Corporation's system of record. (*Id.* at ¶ 17). A preview mode call cannot be made without human intervention to place the call. (*Id.* at ¶ 18).

The 2015 calls Defendants made to Plaintiff's 3733 number used the Interactive Intelligence telephone system, but Defendants' phone log does not indicate that the calls were made in the preview mode. (D.I. 34-1 at 2). Nor does the record explain the difference between when the Interactive Intelligence telephone system is used in preview mode and when it is not.

During his deposition, Plaintiff described an "auto dialer" as alleged in his Complaint as, "a system that dials numbers using an automated system and dials it frequently" and that calls his "phone a specific time every day for a month and a half around the same time." (D.I. 36-1 at 2). Plaintiff testified that other than noting that his number was called around the same time daily for a month and a half, he did not have any other information as to how the auto dialer worked. (*Id.* at 4).

## II. LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion that a fact

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 21 of 95

Franklin v. Navient Corporation, Not Reported in Fed. Supp. (2019)

cannot be--or, alternatively, is--genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Scott v. Harris, 550 U.S. 372, 380 (2007); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 247-49 (1986).

## III. DISCUSSION

Defendants move for summary judgment: (1) as to the claims raised under the TCPA on the grounds that (a) calls made to collect loans guaranteed by the United States are exempt from the TCPA as a matter of law, (b) Plaintiff could not unilaterally withdraw his consent to receive automatic telephone dialing system calls, (c) Plaintiff has no proof that Defendants placed calls to Plaintiff's 3733 number using automatic telephone dialing systems, and (d) Defendants did not use an automatic telephone dialing system because every call was made using the Interactive Intelligence telephone system in preview mode or the LiveVox system; and (2) Defendants are not "debt collectors" as defined under the FDPCA.

### A. Telephone Consumer Protection Act

As noted above, Defendants seek summary judgment on the TCPA claims. They contend that calls made to collect loans guaranteed by the United States are exempt from the TCPA as a matter of law, that Plaintiff could not unilaterally withdraw his consent to receive automatic telephone dialing system calls, that Plaintiff has no proof that Defendants placed calls to Plaintiff's 3733 number using automatic telephone dialing system, and that Defendants did not use an automatic telephone dialing system because every call was made using the Interactive Intelligence telephone system in preview mode or the LiveVox system.

### 1. Exemption under the TCPA

**\*4** The number of telephone calls made to Plaintiff prior to November 2, 2015 using Navient's Interactive Intelligence telephone system is in dispute, but the parties agree that calls were made to Plaintiff's cellular telephone. All other telephone calls were placed after November 2, 2015.

Under the TCPA:

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States--

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice-- ...

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States.

47 U.S.C. § 227(b)(1)(A)(iii). That portion of the TCPA exempting calls made "solely to collect a debt owed to or guaranteed by the United States" was added by Congress as part of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, 129 Stat. 584 § 301 (Nov. 2, 2015).

Based on this exemption, Defendants assert that the TCPA claims fall outside the TCPA because Plaintiff's loan is guaranteed by the United States, the phone calls occurred after the TCPA was amended, and the calls were to collect a debt guaranteed by the United States. Plaintiff states that he had not heard of Defendants until December 2013 when a representative told him that Sallie Mae no longer existed and that his loan had been transferred. (D.I. 37 at Ex. A at ¶ 5). Plaintiff contends that because his loan was transferred in its entirety, the debt is no longer owed to the United States Government. Plaintiff, however, cannot escape the fact that his loan under the Federal Family Education Loan Program ("FFELP") is guaranteed by the United States Government.

The Higher Education Act established the FFELP -- a system of loan guarantees administered by the U.S. Secretary of Education that were "meant to encourage lenders to loan money to students and their parents on favorable terms."

*Chae v. SLM Corp.*, 593 F.3d 936, 938-39 (9th Cir. 2010). The FFELP regulated three parts of student loan transactions: (1) between lenders and borrowers, (2) between borrowers and guaranty agencies, and (3) between guaranty agencies and the Department of Education. *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 640 (7th Cir. 2015) (citing *Chae*, 593 F.3d at 939). "Under the program, lenders used their own funds to make loans to students attending postsecondary institutions. These loans were guaranteed by guaranty agencies and reinsured by the federal government." *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 643 (7th Cir. 2019) (citing 20 U.S.C. § 1078(a)–(c)). "Thus, the federal government served (and still serves) as the ultimate guarantor on FFELP loans." *Id.*

The plain language of the TCPA statute is unambiguous: calls made solely to collect U.S.-guaranteed debts are exempt from TCPA coverage. Here, Plaintiff's debts were all guaranteed by the United States. There was no other plausible purpose for the challenged calls but to collect those U.S.-guaranteed debts. All calls made after the exemption became effective, and Plaintiff's claims directed towards those calls must be dismissed. *See Whalen v. Navient Solutions, LLC*, 2018 WL 1242020 (S.D. Ind. Mar. 9, 2018) (dismissing a TCPA complaint because of the 2015 Budget Act exemption); *Hassert v. Navient Sols., Inc.*, 232 F. Supp. 3d 1049, 1050 (W.D. Wis. 2017); *Weaver v. Navient Sols., Inc.*, 2017 WL 3456325, at *4 (N.D. Ohio Aug. 11, 2017); *Kesselman v. GC Servs. Ltd. P'ship*, No., 2016 WL 9185399, at *4 (C.D. Cal., Nov. 17, 2016). In light of the fact Plaintiff's loan is guaranteed by the United States, all telephone calls made to him after the 2015 amendment are exempted by the TCPA.

**\*5** Plaintiff argues, however, that the Federal Communications Commission issued regulations limiting the scope of the Budget Act amendments. Plaintiff relies upon the FCC's August 11, 2016 order that contained proposed regulations to allow consumers to revoke consent to receive automated telephone dialing system calls to their cellular telephones, even if the calls were made to collect debts owed or guaranteed by the United States government, and it set limits on the number of calls that could legally be made during a month. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 31 FCC Red 9074, 9088-92, 2016 WL 4250379 (Aug. 11, 2016). The problem with Plaintiff's position, however, is that the FCC elected not to have any of the proposed regulations take effect prior to approval from the Office of Management and Budget. *See Schneider v. Navient Solutions*

*LLC*, 2018 WL 2739437 at n.4 (M.D. Tenn. June 7, 2018) (concluding that proposed regulations in FCC Order never went into effect); *Sanford v. Navient Solutions, LLC*, 2018 WL 4699890 (S.D. Ind. Oct. 1, 2018); *Whalen v. Navient Solutions, LLC*, 2018 WL 1242020.

Accordingly, the Court will grant Defendants' motion for summary judgment on all TCPA claims for telephone calls made to Plaintiff after the 2015 amendment as exempted by the TCPA.

**2. Calls Made Prior to the November 2, 2015 Amendment**

**a. Withdrawal of Consent**

The Court turns next to the calls placed to Plaintiff prior to the November 2015 TCPA amendment. The evidence of record indicates that in each of Plaintiff's deferment requests, he provided his 3733 number and gave express authorization consenting to automated dialing equipment or artificial or prerecorded voice or text messages. Although Plaintiff gave his authorization to allow Defendants to contact him, there is a genuine issue of material fact as to whether he withdrew or revoked that consent. Plaintiff contends that he did, while Defendants argue that Plaintiff may not unilaterally do so.

It is permissible under the TCPA to place a call to a cellular phone using an automated telephone dialing system or artificial or prerecorded voice if the caller has the prior express consent of the called party. *See* 47 U.S.C. § 227(b)(1)(A). Defendants rely upon *Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51 (2d Cir. 2017), to support their position that Plaintiff could not unilaterally revoke consent to be contacted under the TCPA. In *Reyes*, the Second Circuit stated, "The TCPA does not expressly permit a party who agrees to be contacted as part of a bargained-for exchange to unilaterally revoke that consent," and declined to "read such a provision into the act." *Id.* at 56. The *Reyes* Court held that under the common law of contracts, it "is clear that consent to another's actions can become irrevocable when it is provided in a legally binding agreement ... in which case any attempted termination is not effective." *Id.* at 57 (internal quotations and citations omitted). The *Reyes* Court founds that the plaintiff had not "provided [his consent] gratuitously as it was included as an express provision of a contract" and held that "[u]nder such circumstances, 'consent,' as that term is used in the TCPA, is not revocable." *Id.* The Second Circuit distinguished between the kind of consent granted in the case before it,

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 23 of 95

Franklin v. Navient Corporation, Not Reported in Fed. Supp. (2019)

and consent "not given in exchange for any consideration, [ ] which is not incorporated into a binding legal agreement." *Id.* at 57. It held that the latter kind of consent "may be revoked by the consenting party at any time." Whatever the merits of *Reyes,* Third Circuit precedent is to the contrary.

In *Gager v. Dell Fin. Services, LLC,* 727 F.3d 265, 268 (3d Cir. 2013), the Court of Appeals held that, based upon common law principles, the TCPA affords a consumer the right to revoke his prior express consent to be contacted on his cellular phone via an autodialing system and there is no temporal limitation on that right. *See also Daubert v. NRA Group, LLC,* 861 F.3d 382, 390 (3d Cir. 2017) ("we reaffirm that Congress 'did not intend to depart from the common law understanding of consent.' "). The *Gager* court explained that under the common law understanding of consent, the basic premise of consent is that it is "given voluntarily" and under common law consent may be withdrawn. *Gager,* 727 F.3d at 270-71. In addition, the *Gager* court rejected the creditor's position that "a creditor will want to know in advance whether a credit applicant will consent to automated phone calls and that this knowledge is part of the 'consideration' that the applicant offers in support of her application." *Id.* at 273. The Third Circuit explained, "Although [the creditor] is correct that the level of contact that a debtor will consent to may be relevant to the negotiation of a line of credit, the ability to use an autodialing system to contact a debtor is plainly not an essential term to a credit agreement." *Id.* at 273-74. The Third Circuit explicitly rejected the contract law argument that the Second Circuit accepted in *Reyes. Id.* Hence, under Third Circuit precedent, Plaintiff may unilaterally withdraw or revoke his express consent under the TCPA.

**\*6** While it is undisputed that Plaintiff consented when he executed deferment requests, forbearance requests, and updated his information, in dispute is whether Plaintiff revoked that consent and when he did so.

In his affidavit with its supporting telephone log, Plaintiff states that he instructed Defendants to stop calling his cellular phone and for them to communicate only in writing. Plaintiff points to two letters to support his position that he asked Defendants to communicate only in writing (*see* D.I. 37 at 7, 11 (citing Exh. E (D.I. 37-6), letters dated 18 March 2014, and 18 March 2015)), but a review of the letters reveals that they make no reference to telephone calls. Nor do they ask Defendants to stop calling. Instead, they speak to written verification of Plaintiff's debt.

Defendants contend that Plaintiff's evidence of dates consists of hearsay that would be inadmissible at trial and that his affidavit is self-serving. Defendants argue that their business records show when the calls were made to Plaintiff's 3733 number and there is no evidence to the contrary. The "Supreme Court [has] rejected the view that the non-moving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.,* 909 F.2d 1524, 1542 (3d Cir. 1990). "[H]earsay evidence ... may be considered if the out-of-court declarant could later present the evidence through direct testimony, *i.e.,* in a form that 'would be admissible at trial.' " *Id.* There is no indication that Plaintiff would not be able to testify at trial that he orally told Defendants' representatives not to contact him.

As such, there is a factual dispute as to when and if Plaintiff revoked his prior express consent. *Gillard v. Receivables Performance Mgmt., LLC,* 2015 WL 3456751, at \*10-11 (E.D. Pa. June 1, 2015) (denying summary judgment on a prior express consent claim of a TCPA case where the plaintiff testified that he was "sure [he] had" told defendant to stop calling him, yet there was nothing in defendant's account notes to show that plaintiff ever told them not to contact him). Therefore, this ground for summary judgment will be denied.

**b. Use of Automated Telephone Dialing System as Defined by the TCPA**

Defendants argue that Plaintiff has no evidence that they placed calls to the 3733 number using an automated telephone dialing system. They further argue that the calls made with the Interactive Intelligence system in preview mode and LiveVox were not made using an automated telephone dialing system. Plaintiff relies upon information from a regulatory agency to show the system used by Defendants is an "auto-dialer." (D.I. 37 at 15).

The Third Circuit initially construed the term "automatic telephone dialing system" to mean "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1); *See also Dominguez v. Yahoo, Inc. ("Dominguez I"),* 629 F. App'x 369, 371-72 (3d Cir. 2015) (noting that the statute's reference to a "random or sequential number generator" was initially understood in relation to telemarketers' use of autodialing equipment that either called numbers in large

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 24 of 95

sequential blocks or dialed random 10-digit strings, but that this interpretation changed as such technology evolved and dialing from stored databases of numbers became more cost effective). However, the Third Circuit revisited the issue and reverted to the statutory definition of autodialer that had governed before the issuance of a 2015 FCC Declaratory Ruling. *See Dominguez on Behalf of Himself v. Yahoo, Inc., 894 F.3d 116, 119 (3d Cir. 2018).* Under *Dominguez,* what makes a device an automated telephone dialing system is not its "latent or potential capacity to function as an autodialer," but its "present capacity to function as [an] autodialer." *Id.*; *See also King v. Time Warner Cable Inc., 894 F.3d 473, 481 (2d Cir. 2018)* ("In sum, we conclude that the term 'capacity' in the TCPA's definition of a qualifying autodialer should be interpreted to refer to a device's current functions, absent any modifications to the device's hardware or software.").

 **\*7** Defendants state that Plaintiff has failed to produce any evidence that he received a phone call made using an automated telephone dialing system. However, Defendants do not indicate if the Interactive Intelligence system used in 2015 was an autodialer under the TCPA. Of concern to the Court is that Defendants make a distinction that the calls made in 2017 used the Interactive Intelligence (or "ININ") system in the preview mode, which requires human intervention to make the call. (*See* D.I. 33 at 5; D.I. 34 at 3, ¶¶ 14-18). Defendants, however, made no such distinction as to the 2015 calls. (*See* D.I. 33 at 3; D.I. 38 at 5; D.I. 34 at 3, ¶ 6). As noted, Defendants' log does not indicate the 2015 calls were made in the preview mode. Given the lack of evidence, the Court finds that there remains a material dispute of fact as to whether the Interactive Intelligence system used to make calls to Plaintiff's cellular phone 2015 used an automated telephone dialing system as defined under the TCPA. Therefore, Defendants' motion seeking summary judgment on the grounds that Plaintiff has no evidence that Defendants used an automated telephone dialing system and that the 2015 calls were not made using such a system will be denied.

### B. Fair Debt Collection Practices Act

Defendants move for summary judgment on the FDCPA claim on the grounds that they are not "debt collectors" as defined under the FDCPA. Plaintiff responds that Defendants cannot have it both ways; claiming they are protected by calling on the government's behalf and at the same time stating that they are collecting their own debt.

The FDCPA, *15 U.S.C. § 1692, et seq.,* "prohibits 'debt collector[s]' from making false or misleading representations and from engaging in various abusive and unfair practices." *Heintz v. Jenkins, 514 U.S. 291, 292 (1995).* "Because the FDCPA is a remedial statute, the Third Circuit has construed its language broadly so as to give effect to its purpose." *Brown v. Card Serv. Ctr., 464 F.3d 450, 453 (3d Cir. 2006).* A plaintiff bringing an FDCPA claim must show that "(1) [ ]he is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Jensen v. Pressler & Pressler, 791 F.3d 413, 417 (3d Cir. 2015).* The Act is limited to "consumer debt," defined as those debts "arising out of ... transaction[s]" that are "primarily for personal, family, or household purposes." *15 U.S.C. § 1692a(5)*; *Heintz, 514 U.S. at 293.*

Under *15 U.S.C. § 1692d,* a debt collector may not engage in "any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." The statute enumerates, without limitation, certain acts which are a violation, including "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." *Id. at § 1692d(5).*

The FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." *15 U.S.C. § 1692a(6).* The term "debt collector" does not include "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) concerns a debt which was not in default at the time it was obtained by such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor." *Id. at § 1692a(6)(F).* "All that matters is whether the target of the lawsuit regularly seeks to collect debts for its own account or does so for 'another.' " *Henson v. Santander, Consumer USA Inc., 137 S.Ct. 1718, 1721, 1724 (2017).*

The Court takes judicial notice that on May 1, 2014, SLM Corporation, known to consumers as Sallie Mae, went

through a corporate reorganization, creating (1) a restructured SLM Corporation, which continued operating as a separate publicly traded company and included Sallie Mae Bank, and (2) Navient Corporation, of which defendant Navient Solutions, Inc. is a subsidiary. *See Levy-Tatum v. Navient & Sallie Mae Bank*, 2016 WL 75231, at *6 (E.D. Pa. Jan. 7, 2016). In addition, the Court notes that on numerous occasions Courts have found that Navient is not a "debt collector" under the FDCPA. *See Levy-Tatum*, 2016 WL 75231 (dismissing the plaintiff's complaint which failed to include any factual assertions to establish that Navient is a debt collector under the FDCP A); *Spyer v. Navient Sols., Inc.*, 2016 WL 1046789, at *3 (D.N.J. Mar. 15, 2016), *reconsideration denied*, 2016 WL 5852849 (D.N.J. Oct. 4, 2016) (holding that Navient is not a debt collector because it commenced servicing before the loan's default); *See also Haysbert v. Navient Sols., Inc.*, 2016 WL 890297, at * 11 (C.D. Cal. Mar. 8, 2016) (explaining that numerous courts have found that student loan servicers that begin servicing before a loan goes into default are not debt collectors under the FDCPA); *Caione v. Navient Corp.* 2016 WL 4432687, at *5 (D.N.J. Aug. 18, 2016) ("Navient began servicing the loans prior to any default. Plaintiff has failed to allege any facts to support an allegation that Navient was a debt collector and the facts that are alleged suggest otherwise."); *Marek v. Navient Corp.*, 2017 WL 2881606, at *5 (N.D. Ohio July 6, 2017) (finding Navient was not a "debt collector" within the meaning of the FDCPA); *Valletta v. Navient Corp.*, 2017 WL 1437563, at *3 (D. Ariz. Aug. 24, 2017) (finding Navient not a FDCPA debt collector as a matter of law).

**\*8** Notably Plaintiff has not refuted the Reinhart affidavit that Navient serviced Plaintiff's loan during the relevant time-frame and Student Assistance Corporation assisted in the servicing of Plaintiff's student loan during the relevant time-frame. Instead, Plaintiff argues that Defendants are "debt collectors" because they made telephone calls on the government's behalf. Plaintiff's position does not suffice to defeat summary judgment on this issue. The Court finds that Plaintiff has not shown that Defendants are "debt collectors" within the meaning of the FDCPA, and thus his attempt to bring a claim under the FDCPA fails as a matter of law. *See, e.g.*, *Cooper v. Pressler & Pressler, LLP*, 912 F.Supp.2d 178, 184-84 (D.N.J. 2012) (finding that the plaintiff had not demonstrated that the bank that originated the plaintiff's loan was a "debt collector" under the Act). Defendants' motion for summary judgment will be granted as to Count I, the FDCPA claim.[2]

## IV. CONCLUSION

Based upon the above discussion, the Court will: (1) grant in part and deny in part Defendants' motion for summary judgment. (D.I. 32). Summary judgment is granted as to Count I (FDCPA claim) and Counts II and III (TCPA claims as to all telephone calls that took place after November 2, 2015 as exempt). The matter proceeds on the remaining TCPA claims in Counts II and III related to telephone calls made January through March 2015.

An appropriate order will be entered.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4222681

Footnotes

1    The LiveVox system is a form of manual dialing in which an agent of Defendants logs into an online portal housed and maintained by LiveVox (a separate company from Navient or Student Assistance Corporation) on a remote server. (D.I. 34 at ¶ 10). When using the LiveVox system, Navient or Student Assistance Corporation is presented with a phone number to dial, and the agent either clicks on the telephone number to place the call, or chooses to skip the number. (*Id.* at ¶ 11). If a LiveVox call is placed and connects with a customer, it is transferred to a second Navient or Student Assistance Corporation agent, known as a "closer agent," who speaks with the customer about the account and then ends the call by noting the result of the call in Navient's or Student Assistance Corporation's system of record. (*Id.* at ¶ 12). According to the Director of "IT Service Delivery, Data Networks," Sherry Highfield, a call made using the LiveVox platform cannot be made without human intervention to place the call. (*Id.* at ¶ 13).

2    Because a debt collector is a necessary element of a FDCPA claim, the Court does not address the remaining argument Defendants raise in seeking summary judgment on the FDCPA claim.

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 26 of 95

**Franklin v. Navient Corporation, Not Reported in Fed. Supp. (2019)**

**End of Document**                                              © 2026 Thomson Reuters. No claim to original U.S.
                                                                      Government Works.

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 26 of 95

Franklin v. Navient Corporation, Not Reported in Fed. Supp. (2019)

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 27 of 95

McBride v. Ally Financial, Inc., Not Reported in Fed. Supp. (2017)

KeyCite Yellow Flag

Declined to Extend by Thompson-Harbach v. USAA Federal Savings Bank, N.D.Iowa, January 9, 2019

2017 WL 3873615

Only the Westlaw citation is currently available.

United States District Court, W.D. Pennsylvania.

John MCBRIDE, Plaintiff,

v.

ALLY FINANCIAL, INC., Defendant.

Civil Action No. 15-867
|
Signed 09/05/2017

**Attorneys and Law Firms**

Craig T. Kimmel, Richard J. Albanese, Rachel Stevens, Kimmel & Silverman P.C., Ambler, PA, for Plaintiff.

Ann McClure, Troutman Sanders LLP, New York, NY, Jason E. Manning, Jonathan M. Kenney, Troutman Sanders LLP, Virginia Beach, VA, for Defendant.

## ORDER

Cathy Bissoon, United States District Judge

**\*1** Defendant's Motion for Summary Judgment (Doc. 69) will be granted in part and denied in part. Specifically, the Motion will be granted regarding Defendant's Counterclaim, and summary judgment will be entered, in favor of Defendant and against Plaintiff, as to liability, with the amount of damages to be determined at trial. Defendant's Motion for Summary Judgment will be denied as to Plaintiff's TCPA claims. Finally, Defendant's Motions regarding supplementation of the record (Docs. 73 & 76) will be granted, although this does not change the substance of the Court's other determinations.

Defendant's Counterclaim seeks to recover the value of the vehicle that Plaintiff ceased making payments on, and then "totaled." Plaintiff does not dispute liability, but quibbles with Defendant's proofs as to damages. *See* Pl.'s Opp'n (Doc. 71) at 9. Defendant's opening-brief and evidence did not meaningfully address the precise amount owed by Plaintiff (although it seems inevitable that the final tally will be slightly-in-excess of $20,000), and the Court does not believe it properly can reach a final determination based on Defendant's submissions in reply. Accordingly, summary judgment will be entered as to liability, and the final amount of the Counterclaim judgment will be determined at trial.

As to Plaintiff's TCPA claim, the Court agrees with his counsel that disputed issues of material fact remain regarding the revocation of consent. Defendant initially sought summary judgment under the "no reasonable juror" standard, and although the constellation of largely undisputed facts-presented comes awfully close,[1] it falls just short. Plaintiff has testified that he verbally-revoked consent in September 2014, and, although Defendant says this is inconsistent with its records, a credibility determination is required to know which side to credit (*i.e.*, Plaintiff's sworn statements versus the completeness and accuracy of Defendant's records). *Cf., e.g.*, Reyes v. Lincoln Auto. Fin. Servs., 861 F.3d 51, 55 (2d Cir. June 22, 2017) (reversing district court's grant of summary judgment regarding revocation-of-consent, finding that court engaged in impermissible credibility determinations). Furthermore, it appears undisputed that Defendant continued to contact Plaintiff after his counsel sent a cease-and-desist letter in April 2015. *See* Pl.'s Opp'n (Doc. 71) at 7-8. Although Defendant retorts that Plaintiff's counsel sent the letter to the wrong address (*i.e.*, the Ally-corporate family's "General Bank Correspondence" address, as opposed to the account-inquiry address), the Court cannot imagine how this discrepancy properly may be read in *Defendant's* favor as relates to summary judgment. *Cf.* Reyes at 55 (rejecting district court's reliance on the fact that the plaintiff could "not recall the address" to which he purportedly mailed a revocation-letter).[2]

**\*2** Under the circumstances, the Court is constrained to deny Defendant's request for summary judgment regarding the TCPA. Any impressions regarding the believability of the evidence notwithstanding, the Court cannot usurp the role of the jury.[3]

Finally, the Court declines to apply the Court of Appeals for the Second Circuit's holding in Reyes, under the circumstances presented. To be sure, the Court is less-than-enamored with Plaintiff counsels' technicality-tinged objections to Defendant's requests to supplement the record to reflect the (post-briefing) issuance of Reyes. While it may be true that Defense counsel could have advanced the same arguments in its absence, the issuance of a precedential

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 28 of 95

McBride v. Ally Financial, Inc., Not Reported in Fed. Supp. (2017)

Court of Appeals decision certainly changes the larger legal-landscape.

Nevertheless, the Court is not entirely persuaded by Defendant's (and the Reyes's Court's) efforts to distinguish the binding, Third Circuit precedent in Gager v. Dell Financial Services. *Id.*, 727 F.3d 265 (3d Cir. 2013). Gager is one of the strongest statements, in terms of interpreting revocation-of-consent consistently with the remedial purposes of the TCPA; and the Court cannot lightly cast-aside language in Gager supporting a contrary conclusion. *Compare* Reyes at 56-59 (finding that consent-to-be-called was an "essential," "bargained-for [term of] consideration in a bilateral contract" that could not be unilaterally revoked) *with* Gager at 273-74 (holding that a debatably-similar consent provision "plainly [was] not an essential term," and that, "[m]ore importantly, [the company's] argument that its contractual relationship with [the customer] somehow waive[d] her rights under the TCPA is incorrect") (emphasis added); *see also, e.g.*, Wright v. Target Corp., 2015 WL 8751582, *7 (D. Minn. Dec. 14, 2015) (rejecting "bilateral-contract" argument, later endorsed in Reyes, in reliance on Gager).[4]

**\*3** For the reasons above, it hereby is ORDERED that: Defendant's Motion for Summary Judgment (*see* **Doc. 69**) is **GRANTED** regarding its Counterclaim, and **JUDGMENT IS ENTERED, IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF**, as to liability, with the final damage-amount to be determined at trial; Defendant's summary-judgment request regarding the TCPA is (*see* **Doc. 69**) is **DENIED**; and Defendants' Motions (**Docs. 73 & 76**) regarding supplementation are **GRANTED**.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3873615

Footnotes

1    *See* Def.'s Br. (Doc. 70) at 9 (citing record evidence indicating that Plaintiff was in regular communication with Defendant regarding his vehicle-loan; as a result, Defendant assisted him with terms of repayment and gave him 58 payment-extensions; and in June 2015, Plaintiff specifically instructed Defendant to contact him on the cellular-telephone number in question).

2    Accepting Defendant's "wrong address" argument would appear to invite line-drawing difficulties, *e.g.*, what if a corporate-defendant demonstrated that the plaintiff's attempted verbal-withdrawal of consent was uttered to a corporate-representative obviously lacking the authority or knowhow to remove the person's telephone-number from the company's system? While the aptness of this analogy may be debated, it emphasizes the difficulties associated with attempting to resolve such matters, as a matter of law, on summary judgment.

3    Given the seeming weaknesses of Plaintiff's positions, not to mention his substantial counterclaim-liability, one may question his decision to proceed to a jury-trial. While the annoyance of unwanted telephone calls is a part of the modern human condition, certainly not-everyone would endorse the prospect of using the TCPA as a "sword," rather than a "shield," to leverage one's collections-position regarding monies admittedly owed. Perhaps this is why, on the eve of his deadline for opposing summary judgment, Plaintiff's counsel contacted Chambers asking for another round of court-facilitated settlement negotiations. The entreaty was rejected, given that Defendant did not join it, and because the Court (and Defendant) not-long-before had expended substantial good-faith efforts to settle the case. Whether, and the extent to which, a desire for attorney fees (and, perhaps, face-saving) has been weighed against the best interests of the Plaintiff, the litigants remain where the aforementioned decisions leave them.

4    Admittedly, the detailed common-law and statutory interpretations in Reyes are not without logical appeal, and they appear at least somewhat persuasive. Honestly, it is difficult to predict whether the Court of Appeals for the Third Circuit would, or would not, find Reyes convincing (including the Second Circuit Court's purported harmonizing of its case with Gager). All the undersigned can say at this juncture is, Reyes reflects a potential sea-change in the area of TCPA-litigation, and the Court will not adopt it, through supplemental filings and at this late stage in the case, absent clearer indications in the law of this Circuit.

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 29 of 95

McBride v. Ally Financial, Inc., Not Reported in Fed. Supp. (2017)

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S.
                                                              Government Works.

🚩 KeyCite Yellow Flag

Disagreement Recognized by Wilson v. Easy Spirit, LLC, D.Conn., March 31, 2026

⎘ Cited in uploaded document as:

Mey v. Liberty Home Guard, LLC, No. 23-281, 2026 U.S. Dist. LEXIS 739, 2026 WL 486556 (N.D. WV, Jan. 5, 2026)

2026 WL 486556

Only the Westlaw citation is currently available.

United States District Court, N.D. West Virginia, Wheeling.

Diana MEY, on behalf of herself and a class of others similarly situated, Plaintiff,

v.

LIBERTY HOME GUARD, LLC, and Benjamin Joseph, Defendants.

CIVIL ACTION NO. 5:23-CV-281
|
Signed 01/05/2026

**Attorneys and Law Firms**

Andrew C. Robey, Ryan McCune Donovan, Hissam Forman Donovan Ritchie PLLC, Charleston, WV, for Plaintiff.

Ryan D. Watstein, Pro Hac Vice, Trishanda L. Treadwell, Pro Hac Vice, Watstein Terepka LLP, Atlanta, GA, Shaina L. Richardson, Steptoe & Johnson, PLLC, Morgantown, WV, William J. O'Brien, Steptoe & Johnson, PLLC, Bridgeport, WV, Grayson Noah O'Saile, Stuart A. McMillan, Bowles, Rice, McDavid, Graff & Love, Charleston, WV, for Defendants.

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

JOHN PRESTON BAILEY, UNITED STATES DISTRICT JUDGE

**\*1** Pending before this Court is Defendants' Motion for Summary Judgment [Doc. 95], filed on September 10, 2025. Plaintiff filed her Response on October 9, 2025 [Doc. 112] and defendants filed their Reply on October 27, 2025 [Doc. 121]. The Motion is now ripe for decision.

Defendant Liberty Home Guard, LLC ("Liberty") is a home warranty company that sells warranty plans for home appliances and systems. To market its products, Liberty places calls and sends text messages to prospective customers nationwide, including in West Virginia.

On February 10, 2022, plaintiff Diana Mey ("Mey") received the first call from Liberty. She did not answer, so the call was forwarded to voicemail. A live male caller indicated that he was calling on behalf of Liberty, and was trying to reach Geoff, who supposedly made a recent online inquiry. The caller requested a call back before terminating the call.

That same day, Mey received at least seven (7) additional calls from Liberty, each of which were forwarded to voicemail. Several of the callers identified themselves as Liberty representatives and/or requested to speak with the individual referenced in the first call - Geoff.

Following those calls, from February 15 to February 22, 2022, Mey received at least four (4) promotional text messages from Liberty, referencing Geoff.

On February 23, 2022, Mey received another voicemail from a Liberty representative asking for the same individual referenced in the prior calls. That call was then followed by two (2) additional promotional texts from Liberty on March 1 and 3, 2022.

On March 4, 2022, Mey emailed Liberty (service@libertyhomeguard.com), advising that she had received multiple telemarketing calls to her wireless number, which has been listed on the National Do Not Call Registry (the "DNC Registry") since 2003. Noting that the solicitations were illegal absent her prior express written consent, Mey requested an explanation for the calls and evidence of consent.

Liberty did not respond to Mey's email. Instead, it continued to send Mey promotional texts, sending her nine (9) additional text messages from March 8 through April 7, 2022.

On July 14, 2023, Mey filed this action in the Circuit Court of Ohio County. The case was removed to this Court on August 23, 2023 [Doc. 1]. On August 14, 2024, Mey filed an Amended Complaint [Doc. 44]. In Count I of the Amended Complaint, Mey alleges, individually and on behalf of a proposed class, violations of the Telephone Consumer Protection Act's ("TCPA's") Do-Not-Call Rules, 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)(2). In Count II, she

alleges individual claims under the West Virginia Consumer Credit and Protection Act ("WVCCPA"), W.Va. Code §§ 46A-6F-101, et seq. She seeks statutory damages under both the TCPA and WVCCPA.

Mey has voluntarily abandoned any claims tied to communications sent before her March 4, 2022 email notifying Liberty that her number was on the DNC Registry and that she had not consented to such outreach. Her claims are thus limited to the nine (9) promotional text messages Liberty sent after that explicit notice. Additionally, Mey voluntarily has abandoned any claim that Liberty failed to comply with the TCPA's caller-identification requirements at 47 C.F.R. § 64.1200(d)(4).

**\*2**  Defendants base their Motion for Summary Judgment on the following grounds:

1. The allegedly offending calls were placed by mistake;

2. That sufficient safeguards were in place to trigger the safe harbor provision of the TCPA;

3. That Mey is not in the zone of interest to bring this case;

4. Text messages are not calls within the TCPA;

5. That defendants are not telemarketers within the meaning of the WVCCPA; and

6. Defendants are entitled to the WVCCPA's safe harbor provisions.

With regard to defendants' claims that the calls were placed to Mey by mistake, the relevant communications fall into two (2) distinct periods: those sent before Mey's March 4, 2022 email, and those sent after. Even if the former communications can be attributed to error—intended for Geoff Skadra rather than Mey—the latter ones cannot. By March 4, Liberty had clear notice that it was contacting the wrong person, yet it chose to disregard that notice by dismissing Mey's email as a "phishing attempt." That excuse collapses under scrutiny. Even then, once Liberty made the conscious decision to ignore her complaint, its subsequent solicitations were no longer inadvertent "errors" but deliberate acts beyond the reach of any safe harbor.

First, Liberty offers no real explanation for its suspicions. It says only that Mey's email was "suspiciously worded and contained very little information." But Mey provided her phone number and identified the precise time period

in which Liberty had contacted her. Liberty's own records confirmed multiple calls to that exact number during that exact time frame. If anything, the email's accuracy should have heightened Liberty's concern, not justified dismissing it as fraudulent.

Second, Liberty's supposed suspicion was unreasonable on its face. Mey's email contained no links, no request for money, and no demand for sensitive personal information. It simply stated that she had received calls despite being on the DNC Registry and asked that Liberty explain its basis for contacting her. That is not a plausible phishing attempt but a textbook do-not-call complaint. Liberty's fallback justification—that it could not provide the requested consent without divulging Mr. Skadra's private information—fares no better. Liberty did not need to disclose Mr. Skadra's information to Mey in order to confirm internally that it was calling the wrong number and stop.

Third, if Liberty truly needed more information (it never says what), the obvious first step would have been to respond to Mey's email and request clarification. It did not. Instead, Liberty excluded the single most reliable source of information—Mey herself—from its supposed investigation. Worse still, Mey sent her email on a Friday, and by the following Tuesday Liberty had resumed sending her promotional texts. Whatever "investigation" Liberty claims to have undertaken was either perfunctory or entirely nonexistent.

Fourth, even if Liberty's concerns were genuine—a factual question for the jury—the ensuing communications were not "errors." Liberty weighed the risk that Mey's email was genuine, chose to disregard that risk, and pressed ahead with further solicitations. That was a deliberate judgment call, not an inadvertent mistake. The decision may have been wrong, but poor judgment is not an "error" that the TCPA's safe harbor was designed to excuse.

**\*3**  Ultimately, the text messages that followed Mey's March 4 email were deliberate and not inadvertent errors. It is for the jury to decide whether Liberty's "phishing" theory reflects a genuine concern or a post hoc excuse. A reasonable jury could reasonably find the latter foreclosing any reliance on the TCPA's safe harbor and supporting a finding that the violations were willful and knowing.

With respect to the TCPA's safe harbor defense, because the solicitations between March 8 and April 7, 2022, were not a

product of justifiable error, this Court's safe harbor analysis could end there. But even if those communications were a product of justifiable error, Liberty has not demonstrated that it had implemented the minimum compliance requirements at § 64.1200(c)(2)(1). *See Benzion v. Vivint, Inc.*, 2014 WL 11531368, at *6 (S.D. Fla. Jan. 17, 2014) (providing that the safe harbor is an affirmative defense for which defendant has the burden of proof).

**"Written Procedures":** Liberty must demonstrate that "[i]t has established and implemented written procedures to comply with the national do-not-call rules." 47 C.F.R. § 64.1200(c)(2)(i)(A). To satisfy this element, Liberty relies upon the Declaration of Benjamin Joseph and its attached exhibits. [Doc. 95-4]. But the declaration raises more questions than it answers. For example, Joseph claims that Liberty "consistently implemented" compliance policies since its founding, yet concedes that Liberty "did not formally memorialize *all* of its policies and procedures" until 2023, after the calls in question. [Id. at ¶ 12 (emphasis in original)]. Notably, Joseph does not identify which, if any, written procedures existed in Spring 2022, leaving it unclear whether Liberty had the required written policies during the relevant period.

**"Training of Personnel":** Liberty must demonstrate that "[i]t has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules." 47 C.F.R. § 64.1200(c)(2)(i)(B). Again, Liberty's motion and declaration embrace strategic ambiguity.

Liberty points to the Sales Training Manual, which "represents the training manual provided to salespersons in early 2021." [Id. at ¶ 16]. The unredacted portions of the manual, however, do not actually reflect training on DNC compliance or evidence any written DNC compliance procedures. [Id. at 7–31]. Rather, they simply describe the capabilities and features of Liberty's lead routing and customer management platforms. [Id. at 20–22]. The remainder of the manual is heavily redacted without explanation, preventing any verification that DNC training existed within the withheld sections.

Liberty points to a 15-slide training presentation, which, according to it, "represents the training presentation provided to salespersons since late 2021." [Id. at ¶ 17]. Yet, one slide carries an embedded 2024 copyright watermark. [Id. at 52]. Joseph explains that the watermark "indicates when the pdf of the document was compiled, not when the document itself

was created or came into use." [Id. at ¶ 17]. But that makes little sense. Converting a PowerPoint to a PDF would not alter a copyright date embedded on a slide or simply add one from scratch. The more likely explanation is that the presentation—or at least the slide carrying the 2024 mark—was created or modified in 2024 or later. Even then, regardless of when the presentation was actually created, the content of the presentation has nothing to do with DNC compliance training. Aside from the cover slide and table of contents, only two (2) substantive slides are unredacted. One (1) of those (the one (1) containing the 2024 copyright) is simply a screenshot of the VanillaSoft user interface, and the second simply defines the various lead result descriptions used within that platform. [Id. at 52-53]. As the title "VanillaSoft/Sales Syco System Training" suggests, the presentation appears to train sales staff on Liberty's lead-management system, not DNC compliance.

**\*4** Like the declaration, the motion itself is notably ambiguous as to what, if any, training was provided to its salesforce in Spring 2022. [Doc. 96 at 14–15]. The question is not whether TCPA compliance training is currently implemented, but whether it was implemented in Spring 2022 when the offending solicitations were made. Notably, Liberty's own expert noted in her report that Liberty reported to her "via telephone that [Liberty] trains its agents and employees on TCPA compliance but could not locate records of such trainings." [Doc. 112-8 at n.1].

**"Recording":** Liberty must demonstrate that "[i]t has maintained and recorded a list of telephone numbers that the seller may not contact." 47 C.F.R. § 64.1200(c)(2)(i)(C). Though it has demonstrated the technical ability to create an internal do-not-call list, Liberty's motion is devoid of any records or written procedures demonstrating actual creation and implementation of an internal do-not-call list in Spring 2022. Joseph's isolated statement—that "Liberty has always maintained an internal do-not-call list for individuals who request not to be contacted or to be removed from the call list"—standing alone is insufficient to satisfy this element as a matter of law. [Doc. 95-4 at ¶ 7].

**"Accessing the National Do-Not-Call Database":** Liberty must demonstrate that "[i]t uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and maintains records documenting this

process." 47 C.F.R. § 64.1200(c)(2)(i)(D). Liberty admits it did not subscribe to the DNC Registry until 2024—long after the calls and texts to Mey. [Doc. 95-4 at ¶ 13]. Its fallback, that scrubbing was unnecessary because it never cold-called consumers, is belied by its failure to attach a single consent record for any putative class member.

**"Purchasing the National Do-Not-Call Database**": Finally, Liberty must show that it lawfully purchased access to the DNC Registry from the administrator and did not participate in prohibited cost-sharing arrangements. 47 CFR § 64.1200(c)(2)(i)(E). Again, Liberty admits it did not purchase access to the DNC Registry until 2024 [id.], and the failure to do so is fatal to its safe harbor defense. *See Morris v. Hornet Group*, 2018 WL 4781273, at *8 (E.D. Tex. Sept. 14, 2018) ("Defendant has not and cannot present any evidence ... that it 'purchases access to the relevant do-not-call data from the administrator of the national database' as required by the TCPA error defense regulations.").

In sum, Liberty has not shown compliance with any—let alone all—of the statutory or regulatory prerequisites of the safe harbor defense. As the party asserting this affirmative defense, Liberty bears the burden of proving that it fully satisfied each element of the defense. On this record, it has not come close. At a minimum, the existence of factual disputes as to when Liberty's compliance measures were adopted, implemented, and applied preclude summary judgment.

With regard to Mey's falling within the zone of interest, it is strange that Liberty's Motion begins by patronizingly commending Mey for her consumer advocacy, only to quickly pivot and argue that this very advocacy disqualifies her from the TCPA's protections. According to Liberty, consumers enjoy only a finite allotment of TCPA claims, and once they have exhausted that allotment, they somehow lose the right to enforce them ever again. The contradiction is glaring: under Liberty's theory, the more effective a consumer is in enforcing the TCPA's protections, the sooner they forfeit them—eventually leaving themselves exposed to unlawful solicitations without any recourse. Courts, including this one, have repeatedly rejected the notion that an individual's standing diminishes with each successive lawsuit. *See, e.g., Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) (rejecting "the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders."); *Dobronski v. Fam. First Life, LLC*, 2024 WL 1342668, at *5 (E.D. Mich. Mar. 29, 2024) (Goldsmith, J.) ("Adopting [defendant's] position

would require drawing lines regarding when a TCPA plaintiff becomes a 'professional' litigant and loses standing to bring any claims based on alleged violations of the statute"); *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F.Supp.3d 1187, 1195 (M.D. Tenn. 2017) (Crenshaw, C.J.) ("Litigation is not college athletics: there is no 'amateurs only' rule"); *Abramson v. Oasis Power LLC*, 2018 WL 4101857, at *5 (W.D. Pa. July 31, 2018) ("the Court rejects any suggestion that [plaintiff's] prolific history of filing TCPA lawsuits distinguishes this case and demonstrates the lack of an injury-in-fact"); *Mey v. Venture Data, LLC*, 245 F.Supp.3d 771, 784 (N.D. W.Va. 2017) (Bailey, J.) ("While defendant is understandably frustrated by Ms. Mey's efficacy, she is doing exactly what Congress intended—enforcing the law").

**\*5** Liberty likens this case to *Stoops v. Wells Fargo Bank, N.A.*, 197 F.Supp.3d 782 (W.D. Pa. 2016), where the plaintiff openly admitted that she bought a shoe box full of phones solely to manufacture TCPA lawsuits. That extreme scenario bears no resemblance to this case. Mey did not invite, solicit, or manufacture Liberty's calls or texts. To the contrary, she warned Liberty of its mistake, and Liberty ignored her. Even under Liberty's own theory of the case, the solicitations were the result of its own error—not some trap laid by Mey.

In any event, this Court has already declined to follow *Stoops. See Mey v. Venture Data, LLC*, 245 F.Supp.3d at 784 ("This Court declines to follow *Stoops*."). Undeterred, Liberty urges the Court to revisit *Venture Data*, asserting that Mey's "lawsuit mill has grown in both size and sophistication" since that decision. [Doc. 96 at n.7]. Liberty doesn't actually explain how it arrived at that conclusion (not that it would matter), suggesting only that Mey has filed additional cases since *Venture Data.* Yet, that argument simply repackages the same flawed premise this and other courts have rejected before: that standing diminishes with each successive enforcement. That premise was illogical in 2017, and it remains illogical today.

What Liberty lacks in reasoned analysis, it makes up for in rhetoric, branding Mey a "professional plaintiff" who sets "flytraps" then "lies in wait" to "snare" and "entrap" "legitimate businesses." [Id. at 18–19]. Such caricatures do not reflect legal analysis, but rather frustration with the proficiency with which Mey enforces the TCPA once those protections have been violated. The TCPA does not immunize offenders simply because their targets are vigilant. And Mey's enforcement record shows persistence, not bad faith. This Court has consistently rejected attempts to discredit Mey for

successfully invoking the TCPA's protections and strip her of standing. The result here is no different.

With respect to the argument that text messages are not actionable under § 227(c), Congress authorized the Federal Communications Commission ("FCC") to establish the National Do Not Call Registry and, in doing so, expressly delegated rulemaking authority to prescribe regulations necessary "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c). Congress then created a private right of action for any person "who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of [those regulations]." 47 U.S.C. § 227(c)(5). Since the statute's enactment, courts across the country have consistently held that a text message constitutes a "call" within the meaning of § 227(c)(5). Liberty nonetheless urges this Court to revisit that settled question in light of the recent decisions in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) and *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025). Regardless of the level of deference afforded, the result is the same: a text message is a "call" under the TCPA.

In *Loper Bright*, the Supreme Court overturned the *Chevron* deference doctrine, holding that courts must exercise independent legal judgment to determine the meaning of statutes and need not defer to an agency's interpretation of an ambiguous statute. 603 U.S. at 402. In *McLaughlin*, the Supreme Court held that the Hobbs Act does not preclude district courts in enforcement proceedings from independently assessing whether an agency's interpretation of a relevant statute is correct and that district courts should interpret the TCPA under ordinary principles of statutory interpretation, *"affording appropriate respect* to the agency's interpretation." 606 U.S. at 152 (emphasis added).

 **\*6** First, the statutory text supports treating texts the same as calls. Section 227(c) concerns "telephone solicitations," protecting consumers' "privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). The TCPA defines "telephone solicitation" as "the initiation of a telephone call *or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. 227(a)(4) (emphasis added). By explicitly including "messages," Congress made clear that the statute's protections extend beyond traditional voice calls. *See Hudson v. Palm Beach Tan, Inc.*, 2024 WL

4190513, at \*7 (M.D. N.C. Aug. 12, 2024) (Peake, M.J.) (explaining that the statutory text of the TCPA supports the conclusion that text message are actionable under Section 227(c)), *recommendation adopted*, 2024 WL 4188310 (Sept. 13, 2024) (Osteen, J.).

Second, the broader TCPA structure confirms that calls are inclusive of texts. The Supreme Court has assumed, and other courts have held, that "calls" under Section 227(b) encompass text messages. *See Facebook, Inc. v. Duguid*, 592 U.S. 395,400 n.2 (2021) (assuming that the TCPA's prohibitions extend to text messages); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."); *Norton v. 1863 PAC, LTD.*, 2019 WL 5866102, at \*2 (N.D. W.Va. July 9, 2019) (Groh, J.) (relying on *Campbell-Ewald* to conclude that "text messages are included in the definition of 'calls' under the TCPA"); *Blow v. Bijora, Inc.*, 855 F.3d 793, 798 (7th Cir. 2017) ("It is uncontested that text messages to a cellular phone constitute 'calls' "); *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 356 (7th Cir. 2020) ("Text messages to a cellular telephone qualify as a 'call' within the meaning of the statute"); *Breda v. Cellco P'shlp*, 934 F.3d 1, n.1 (1st Cir. 2019); *Hall v. Xanadu Mktg., Inc.*, 682 F. Supp. 3d 1278, 1285 (N.D. Ga. 2023) ("A text message to a cellular telephone qualifies as a "call" under the TCPA"). There is no reason to assign the same word a different meaning in Section 227(c), given that both provisions protect the same core interest: the consumer's right to be free from unwanted intrusions. *See Gulden v. Liberty Home Guard LLC*, 2021 WL 689912, at \*5 (D. Ariz. Feb. 23, 2021) ("[Liberty] fails to cite any law in support of its position that a text message is not a 'telephone solicitation.' ").

Third, the FCC's interpretation remains entitled to respect. Consistent with its delegated authority, the FCC has long confirmed that text messages fall within the TCPA's restrictions on calls. *See Hudson*, 2024 WL 4190513, at 7 (detailing history of FCC regulations and guidance); *Dawson v. Porch.com*, 2024 WL 4765159, at 4 (W.D. Wash. Nov. 13, 2024) (same). Congress expressly empowered the FCC to "evaluate alternative methods and procedures" and "develop proposed regulations" necessary to protect consumers' privacy, including "do-not-call systems." 47 U.S.C. § 227(c)(1)-(3). The FCC's inclusion of text messages is therefore not an expansion of statutory text, but a reasonable implementation of Congress's mandate.

Under *Loper Bright*, when Congress expressly empowers an agency to decide how to apply a statutory term to specific facts found by the agency—as here—the agency interpretation is entitled to "deferential review." *Loper Bright*, 603 U.S. at 388. Even if the FCC's interpretation were not entitled to "deferential review" under *Loper Bright*, this Court must, at a minimum, afford "appropriate respect to the agency's interpretation" under *McLaughlin.*

 **\*7** Fourth, the ordinary meaning of "call" also encompasses texts. As the Ninth Circuit observed, the FCC's conclusion that text messages are encapsulated with Section 227(b)'s use of the term "call" is consistent with the dictionary's definition of "call" in that it is defined as "to communicate with or try to get into communication with a person by telephone." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) (citing Webster's Third New International Dictionary 318 (2002)). Text messaging is indisputably communication by telephone. Courts applying ordinary-meaning principles have thus reached the same result "regardless whether deference to the agency's interpretation is appropriate or not." *Dawson*, 2024 WL 4765159, at 6.

Fifth, the TCPA's purpose compels the same result. Congress enacted the TCPA "to address a growing number of telephone marketing calls and certain telemarketing practices thought to be an invasion of consumer privacy." *Wilson v. Skopos Fin., LLC*, 2025 WL 2029274, at *4 (D. Ore. July 21, 2025). Section 227(c) recognizes "the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." § 227(c)(1). "With those goals in mind, the 'basis' for the FCC's conclusion becomes abundantly clear: unsolicited text messages invade the privacy and disturb the solitude of their recipients." *Wilson*, 2025 WL 2029274, at *4. They should therefore be included within the purview of the do-not-call protections. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (holding that invasion of privacy arising out of unwanted text messages is "the very harm that the Act is designed to prevent"); *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690 (5th Cir. 2021) ("Telemarketing text messages present the precise harm and infringe the same privacy interests Congress sought to protect in enacting the TCPA") (cleaned up).

Finally, the overwhelming consensus is unchanged. Liberty suggests that "multiple" federal courts have revisited Section 227(c)(5) and concluded that text messages are not actionable, citing *Jones v. Blackstone Med. Servs., LLC*, 2025 WL

2042764, at *4 (C.D. Ill. July 21, 2025) and *Davis v. CVS Pharmacy, Inc.*, 2025 WL 2491195, at *1 (N.D. Fla. Aug. 26, 2025). On the other hand, a greater number of federal courts have come to the opposition conclusion since *Loper Bright. See Wilson*, 2025 WL 2029274, at *4; *Barton v. Delfgauw*, 2025 WL 2402131, n.1 (W.D. Wash. Aug. 18, 2025); *Hudson*, 2024 WL 4190513, at *7; *Dawson*, 2024 WL 4765159, at *5.

This Court agrees that a text message is a call within the ambit of the TCPA.

With respect to the claims under the WVCCPA, Liberty fares no better. To begin with, Liberty seeks refuge from the WVCCPA based on an exception that doesn't actually exist. The WVCCPA broadly precludes any "telemarketer" from engaging in abusive telemarketing practices. W.Va. Code §§ 46A-6F-101, *et seq.* A "telemarketer" is broadly defined as "any person who initiates or receives telephone calls to or from a consumer in this state for the purpose of making a telemarketing solicitation as defined in section one hundred twelve of this article." W.Va. Code § 46A-6F-113(a). That definition contains several limited exclusions. Relevant here, Liberty maintains that it falls within the exception at Subsection (d), which provides that "[a] telemarketer does not include a *salesperson* as defined in section one hundred fourteen of this article." (emphasis added). Yet, at no point does Section 114 define "salesperson." Id. at § 114.

Instead, Section 114 defines "telemarketer in good standing"—an entirely different term and concept—which means "a telemarketer who, during the previous two years has continually been engaged in the business of telemarketing and who has not been convicted, or pled guilty or nolo contendere to racketeering, embezzlement, fraudulent conversion, misappropriation of property or any violations of state or federal securities laws, a theft offense, or any consumer protection law or telemarketing law." Id. at § 114. The term "salesperson" does not even appear within the definition of "telemarketer in good standing." Nor does the term "salesperson" appear to be defined anywhere else within Article 6F ("Telemarketing").

 **\*8** Nevertheless, Liberty borrows the phrase "telemarketer in good standing" and substitutes it for "salesperson," effectively rewriting the statute to exclude itself from the WVCCPA's reach. As the party seeking shelter under one of the statute's exceptions, Liberty bears the burden of proving its entitlement to it. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 694 (2025) (noting the "well-settled" rule of

Case 1:26-cv-00155-JKM   Document 49-1   Filed 07/30/26   Page 36 of 95

statutory construction that the burden of proving an exception is upon the one asserting it). Liberty has not—and cannot—meet that burden here.

In short, Liberty cannot rely upon an exception that does not actually exist. And it certainly cannot create one, particularly when that proposed exception would gut the overarching act, turning a statute meant to curb abusive telemarketing into one that polices only the recently convicted. For these reasons, this Court declines Liberty's invitation to create an exception where one does not exist.

Liberty claims in passing that Mey is not a "consumer," which is defined alongside "purchaser," as "a person who is solicited to become or does become obligated to pay for consumer goods or services offered by a telemarketer through telemarketing." W.Va. Code § 46A-6F-103. Liberty reasons that it intended to contact Mr. Skadra and therefore did not solicit Mey. But Mey was plainly "solicited" when Liberty directed telemarketing calls and texts to her number, regardless of Liberty's supposed intent to reach Mr. Skadra. The statute turns on the fact of solicitation, not the telemarketer's subjective belief about who was on the receiving end.

With regard to the West Virginia statutory safe harbor provision, the four (4) requirements under the WVCCPA's safe harbor are nearly identical to the TCPA's safe harbor requirements. For the same reasons that it failed to satisfy the TCPA safe harbor defense, Liberty failed to satisfy the WVCCPA's safe harbor defense. Liberty's discussion of the WVCCPA safe harbor defense is equally unclear as to when written procedures and compliance trainings were actually implemented—in Spring 2022 or more recently. Liberty's discussion of personnel training and maintenance of an internal DNC list is conspicuously in the present tense. But safe harbor compliance must exist at the time of the offending communications, not adopted afterward. The statute makes this clear: only where "any *subsequent* call is the result of error" following implementation of the required compliance measures does the defense apply. W.Va. Code § 46A-6F-601(b) (emphasis added).

For the reasons stated above, Defendants' Motion for Summary Judgment **[Doc. 95]** is **DENIED.**

It is so **ORDERED.**

**All Citations**

Slip Copy, 2026 WL 486556

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Disagreed With by Stockdale v. Skymount Property Group, LLC, N.D.Ohio, March 3, 2026

Cited in uploaded document as:

Mujahid v. Newity, LLC, No. 25-8012, 2025 U.S. Dist. LEXIS 221088, 2025 WL 3140725, at *2 (N.D. Ill. Nov. 10, 2025)

2025 WL 3140725

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Sana MUJAHID, Plaintiff,

v.

NEWITY, LLC, Defendant.

No. 25 C 8012

|

Signed November 10, 2025

**Attorneys and Law Firms**

Anthony Paronich, Paronich Law, P.C., Hingham, MA, for Plaintiff.

Aaron Paul Heeringa, Manatt, Phelps & Phillips, LLP, Chicago, IL, Joshua James Cauhorn, Burke, Warren, Mackay & Serritella, P.C., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

JORGE L. ALONSO, United States District Judge

 **\*1**  Plaintiff alleges that Newity violated 47 U.S.C. § 227(c) (5) of the Telephone Consumer Protection Act ("TCPA") because Plaintiff's cell phone number is on the national do-not-call registry, and Plaintiff received at least two text messages that identified Newity by name and promoted Newity's financial offerings. R. 20 ¶¶ 2, 13–20. Newity moves to dismiss on two grounds: first, that § 227(c)(5) does not apply to text messages, and second, that Plaintiff failed to allege a theory of liability against Newity. R. 22. Newity's motion is denied.

**Legal Standard**

A Rule 12(b)(6) motion "tests whether the complaint states a claim on which relief may be granted." Richards v. Mitcheff, 696 F.3d 635, 637 (7th Cir. 2012). A complaint must provide "a short and plain statement of the claim" and must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009) (citations omitted). Facial plausibility exists when the plaintiff pleads factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. In deciding a motion to dismiss, the Court "accept[s] the well-pleaded facts in the complaint as true and draw[s] reasonable inferences in the plaintiff's favor." Esco v. City of Chicago, 107 F.4th 673, 678 (7th Cir. 2024).

**Discussion**

 **1. Section 227(c)(5)**

The TCPA imposes restrictions on telephone solicitations. Under § 227(b)(1)(A), for example, it is prohibited "to make any call" using an "automatic telephone dialing system" to "any emergency telephone line." Under § 227(b)(1)(B), for example, it is prohibited "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." And under § 227(c) (5), the TCPA provides a private right of action for a person to seek damages if she has "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." The TCPA authorizes the Federal Communications Commission ("FCC") to "prescribe regulations to implement methods and procedures for protecting the privacy rights" set forth in the TCPA. 47 U.S.C. § 227(c)(2). Relevant to § 227(c)(5), the FCC promulgated 47 C.F.R. § 64.1200(c)(2) which states that "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government."

There is no dispute that Plaintiff is a residential telephone subscriber registered with the do-not-call registry, and that she received at least two text messages. Newity argues that the private right of action under § 227(c)(5) does not apply to text messages because § 227(c) mentions "telephone call[s]" but "does not mention text messages or SMS messages, and

nowhere does the TCPA define 'telephone call' to include text and/or SMS messages." R. 23 at 10 (citations omitted). In essence, Newity argues that the phrase "telephone call" encompasses only voice calls. *See id.*

**\*2** The Court finds that the phrase "telephone call," as used in § 227(c), encompasses "text messages" for the following reasons. First, interpreting § 227(c) to include text messages is supported by the statute's plain language. The "starting point for interpreting a statute is the language of the statute itself." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987) (citations omitted). And "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). Although Newity is correct that § 227(c) does not use the term "text message," this is hardly surprising given that the statute was enacted in 1991, before the first-ever text message was sent in 1992. *See Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015) ("[T]he first text message was not sent until December 3, 1992, almost a full year *after* the December 20, 1991, enactment of the TCPA."). As such, the Court examines the plain meaning of the phrase "telephone call." Webster's Dictionary defines a "call" in this context as " 'to communicate with or try to get into communication with a person by a telephone.' " *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953–54 (9th Cir. 2009) (citing Webster's Third New International Dictionary 318 (2002)). The Court finds that a text message falls within this definition.

Second, interpreting § 227(c) to include text messages is consistent with the text of § 227 as a whole. *See River Road Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 649 (7th Cir. 2011) (citations omitted) ("When interpreting statutory language, the meaning attributed to a phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."). The Supreme Court has held that when a "text message [is sent] to a cellular telephone, it is undisputed [that it] qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016). And the Seventh Circuit has held more broadly, though still in the context of § 227(b), that "[t]ext messages to a cellular telephone qualify as a 'call' within the meaning of the statute." *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 356 (7th Cir. 2020). The fact that the term "call" as used in § 227(b) encompasses "text messages," supports the interpretation that the term "call" as used in § 227(c) also encompasses "text messages." *See Pulsifer v. United States*,

601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning.").

Third, interpreting § 227(c) to include text messages is confirmed by the purpose and context of the TCPA. "The TCPA was enacted to 'protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile machines and automatic dialers.' " *Satterfield*, 569 F.3d at 954 (citing S. Rep. No. 102–178, at 1 (1991)). The core of § 227(c) is its prohibition of "telephone solicitations." *See* 47 U.S.C. § 227(c)(1). And the statute defines "telephone solicitations" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4). "This language makes clear that Congress was more concerned with the purpose of the telephone communications it proscribed in the TCPA than the form in which those communications are transmitted." *Wilson v. MEDVIDI Inc.*, 2025 WL 2856295, at \*3 (N.D. Cal. Oct. 7, 2025); *see also Abboud v. Circle K Stores Inc.*, 731 F. Supp. 3d 1094, 1102 (D. Ariz. 2024) ("The purpose of a text or call determines whether it qualifies as a telephone solicitation."). Given Congress's expressly stated goal "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object," 47 U.S.C. § 227(c)(1), "it strains belief to suggest that Congress silently determined that [ ] oral messages were more invasive or objectionable than written ones." *Wilson*, 2025 WL 2856295, at \*3.

**\*3** Fourth, interpreting § 227(c) to include text messages is consistent with guidance from the FCC. *See McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155 (2025) ("District courts are not bound by the agency's interpretation, but instead must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation."). The FCC has stated that § 227(b) " 'encompass[es] both voice calls and text calls.' " *Sagar v. Kelly Auto. Group, Inc.*, 2021 WL 5567408, at \*4 (D. Mass. Nov. 29, 2021) (citing In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C.R. 14014, 14115 (2003)). Likewise, the FCC has stated that § 227(c) includes text messages. *See In the Matter of Emanuel "Manny" Hernandez*, 2018 WL 6830220 at \*1 (F.C.C. Dec. 21, 2018) (finding that Hernandez violated § 227(c) because it is "illegal for persons or entities, including advertisers and marketers, to make

marketing calls to telephone numbers listed on the [do-not-call registry and this] prohibition includes both voice calls and text messages.").

Fifth, interpreting § 227(c) to include text messages is consistent with numerous decisions by other district courts on this issue. *See, e.g., Pariseau v. Built USA, LLC*, 619 F. Supp. 3d 1203 (M.D. Fla. 2022); *Wilson*, 2025 WL 2856295; *Sagar*, 2021 WL 5567408. It is true that certain district courts have addressed this issue and found otherwise. *See, e.g., Jones v. Blackstone Med. Servs., LLC*, 2025 WL 2042764 (C.D. Ill. July 21, 2025). But other district courts have taken for granted that § 227(c) encompasses text messages without an in-depth analysis. *See, e.g.*, *Evers v. CampaignSidekick, LLC*, 2025 WL 2896818, at *4 (N.D. Ill. Oct. 10, 2025) ("[Defendant] concedes that a text message is also a "call" for [the § 227(c)(5)] claim."); *Connor v. Servicequick Inc.*, 2025 WL 2855393, at *2 (D. Colo. Oct. 8, 2025) (citations omitted) (reading § 227(c)(5) as providing a private right of action for a "person who has received more than one telephone call [or text message]."). Ultimately, the Court's interpretation is consistent with the weight of authority.

In sum, nothing in the text, structure, or purpose of the TCPA suggests a distinction between an unsolicited voice call and an unsolicited written text message. The Court concludes that a "telephone call" as used in § 227(c) encompasses the types of text messages received by Plaintiff.

### 2. Allegations of Liability

As stated above, § 227(c)(5) of the TCPA provides a private right of action for a person to seek damages if she has "received more than one telephone call within any 12-month period *by or on behalf* of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5) (emphasis added). As alleged and as shown by a screenshot in the amended complaint, the text messages identified Newity by name and promoted Newity's financial offering by containing a link to a webpage managed by Newity. R. 20 ¶ 15. As stated above, the Court must accept well-pleaded facts as true and draw reasonable inferences in a plaintiff's favor when deciding a motion to dismiss. Here, the Court makes a reasonable inference either that Newity sent the text messages or that another entity did so on Newity's behalf.

### Conclusion

For the reasons stated above, Defendant's motion to dismiss [22] is denied. The parties shall file a joint status report by 11/17/25 setting forth proposed next steps and dates for this case.

### SO ORDERED.

### All Citations

Slip Copy, 2025 WL 3140725

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

⊞ Cited in uploaded document as:

Newell v. Children's Dental Health Assocs., LLC, No. 25-5238, 2026 U.S. Dist. LEXIS 74360, at *24 (E.D. Pa. Apr. 6, 2026)

2026 WL 927378
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Jourey NEWELL, individually and
on behalf of a class of all persons
and entities similarly situated

v.

CHILDREN'S DENTAL
HEALTH ASSOCIATES, LLC

CIVIL ACTION NO. 25-5238
|
Filed 04/06/2026

**Attorneys and Law Firms**

Anthony Paronich, Pro Hac Vice, Paronich Law, P.C., Hingham, MA, Jeremy C. Jackson, Bower Law Associates, PLLC, State College, PA, for Jourey Newell.

Benjamin Richard Wilson, Holland & Knight LLP, Philadelphia, PA, Lindsey Cook, Fox Rothschild LLP, Blue Bell, PA, Jill Heather Fertel, Cipriani & Werner, P.C., Blue Bell, PA, Sarah Adams, Blue Bell, PA, for Children's Dental Health Associates, LLC.

**MEMORANDUM**

MURPHY, J.

**\*1** This is one of Jourey Newell's many federal cases brought under the Telephone Consumer Protection Act. Mr. Newell received two text messages from Children's Dental Health Associates asking if he wished to book an appointment for a named individual. According to Mr. Newell, he had never done business with the dental office nor contacted them for any purpose. And he had placed his phone number on the national Do Not Call registry. If a person elects to place their residential phone number on the national Do Not Call registry, that preference must be honored. Under the TCPA, violations can amount to $500 per mode of contact or triple

that if the violation was willful. Mr. Newell brings this class action claim under the TCPA and requests injunctive relief. And things begin with Children's Dental's motion to dismiss, which challenges Mr. Newell's standing to seek injunctive relief, and whether he can state a claim about text messages when the statute says "calls." These are familiar issues to courts. Because we find that unsolicited texts are governed by the TCPA, Mr. Newell's claim survives for now. But Mr. Newell's two isolated text messages are insufficient to state a claim for injunctive relief. For the following reasons, defendant's motion to dismiss is denied in part and granted in part.

**I. BACKGROUND**

Plaintiff Jourey Newell received two unsolicited text messages from defendant Children's Dental Health Associates, LLC: one on May 6, 2025, and one on June 25, 2025. DI 1 at ¶ 21. Mr. Newell received these messages despite never being a customer, never inquiring about their services, and never providing consent to be contacted. *Id.* at ¶¶ 20, 23, 25. Mr. Newell had placed his residential telephone number on the national Do Not Call (DNC) registry on March 19, 2025, to avoid being contacted by businesses without his consent. *Id.* at ¶ 19. The complaint includes both messages as screenshots. *Id.* at ¶ 22. The first message from Children's Dental offered to "[b]ook an appt [sic] that fits your family's availability" with a link and signature identifying the sender as "Children's Dental Health – Downington" and continued, "[t]o unsubscribe, reply STOP." *Id.* Mr. Newell did not respond. The next message, sent seven weeks later from the same sender, identified a particular patient, stating "[m]ake Lailynn's smile shine bright this summer! Let's get your kiddo scheduled for a check-up ..." and again included a link to book an appointment, identified themselves as Children's Dental, and instructed how to unsubscribe from further communications. *Id.* The complaint does not say whether Mr. Newell is related to anyone named Lailynn. Mr. Newell responded to the second message by asking the sender to "[c]ease and desist all communications." *Id.* As pleaded, Mr. Newell did not receive any additional text messages from Children's Dental.

On September 11, 2025, Mr. Newell sued, seeking "injunctive relief and money damages." *Id.* at ¶ 38. Mr. Newell found the two messages to be "frustrating, obnoxious, annoying, were a nuisance and disturbed [his] solitude." *Id.* at ¶ 31. Mr. Newell believes that the same dental office has contacted numerous others in the same manner and "reasonably believes Class members number, at minimum, in the hundreds." *Id.* at

¶ 40.[1] Mr. Newell alleges that he and other similarly situated plaintiffs "were temporarily deprived of legitimate use of their phones because the phone line was tied up, and their privacy was improperly invaded. Furthermore, the calls unnecessarily used battery life, storage space, bandwidth, and wear and tear." *Id.* at ¶ 30. Throughout his complaint, Mr. Newell refers to the texts as "calls." *Id.* at ¶¶ 3-4, 25, 28-31, 51, 53-54.

## II. MOTION AT ISSUE

**\*2** Children's Dental filed a motion to dismiss plaintiff's class action complaint, citing lack of standing for injunctive relief under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6). DI 18. Children's Dental argues that Mr. Newell lacks standing for injunctive relief because he does not sufficiently plead that a future call or text message from Children's Dental is imminent or likely. DI 18-1 at 11-13. Children's Dental argues that the class action complaint should be dismissed because the alleged text messages are not "calls" for the purposes of the TCPA. *Id.* at 2, 4-7. In the alternative, Children's Dental argues that even if texts were considered calls, the text messages are exempt from the TCPA because they are not advertisements or solicitations, but rather informative messages that fall under a healthcare exemption. *Id.* at 7-11. Additionally, defendant asks us to apply a narrow interpretation of "telephone solicitation" based on the content of the text messages, pursuant to the national DNC registry which is governed by 47 C.F.R. § 64.1200(c)(2). DI 18-1 at 10-11. Specifically, Children's Dental argues that the texts received by plaintiff were not for "the purpose of persuading [him] to pay for certain services," nor for "encourag[ing] a 'purchase.' " *Id.*

Mr. Newell filed a memorandum in opposition to Children's Dental's motion to dismiss. DI 21. In his opposition memo, Mr. Newell alleges that the text messages he received were "unsolicited marketing text messages" and "promotional advertisement[s]" to use Children's Dental's services. *Id.* at 7-8, 20-25. As pleaded, Mr. Newell was never a customer of and never inquired about the dental service, so the messages, he argues, were sent "to initiate a new commercial service relationship—not to confirm or remind him of any existing appointment." *Id.* at 25. Additionally, Mr. Newell added a new allegation that Children's Dental continued to send texts "after Plaintiff demanded that Defendant cease communications." *Id.* at 26. Children's Dental responded to Mr. Newell's opposition, reiterating its arguments that plaintiff failed to establish standing for injunctive relief; that texts are outside the scope of § 227(c); and, even if texts could be regulated

within the bounds of the statute, plaintiff's claim fails because the messages were not solicitations. DI 22 at 1-8.

## III. STANDARD OF REVIEW

### A. Rule 12(b)(1): standing for injunctive relief

"A plaintiff bears the burden of establishing that he has Article III standing for each type of relief sought." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 301 (3d Cir. 2012) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)). To establish standing for injunctive relief, "a plaintiff must show: (1) that he is under a threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable judicial decision will prevent or redress the injury." *Id.* (citation modified) (citation omitted). "Even if the plaintiff has suffered a previous injury due to the defendant's conduct, the equitable remedy of an injunction is 'unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]' " *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)) (other citation omitted). "Accordingly, a plaintiff may have standing to pursue damages, but lack standing to seek injunctive relief." *Id.* (citing *Lyons*, 461 U.S. at 105, 103 S.Ct. 1660).

### B. Rule 12(b)(6): failure to state a claim

When considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678, 129 S.Ct. 1937. A court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [plaintiff]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citation omitted).

### C. The Telephone Consumer Protection Act

**\*3** The TCPA is a consumer protection statute that seeks to protect consumers from invasions of privacy from debt collectors, telemarketers, and spammers alike. *See* 47 U.S.C. § 227. Subsections 227(b) and (c) provide private rights of action for violations of relevant federal regulations. *See* 47 U.S.C. §§ 227(b)(3) and (c)(5). Those regulations are prescribed and updated by the Federal Communications Commission (FCC). *See* 47 C.F.R. § 64.1200. Congress likewise authorized the FCC to create and maintain a national database of consumers who elect to register their residential phone numbers on the national Do Not Call (DNC) registry. 47 U.S.C. § 227(c)(3).

## IV. DISCUSSION

### A. Plaintiff lacks standing to seek injunctive relief

Mr. Newell alleges that he received two text messages, each on a different date. DI 1 at ¶ 21. Mr. Newell does not allege that Children's Dental continued to contact him after he requested that they "cease and desist all communications." *Id.* at ¶ 22. Mr. Newell later claimed in his opposition to defendant's motion to dismiss that Children's Dental "sent at least two solicitation texts within a 12-month period, including after Plaintiff demanded that Defendant cease communications." DI 21 at 26. However, Mr. Newell failed to include in his complaint that he was contacted by Children's Dental after asking them to stop contacting him. "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citation omitted). Because Mr. Newell did not plead any factual basis to conclude that he is at risk of any "real or immediate threat that [he] will be wronged again" by another text message, his claim does not establish standing for injunctive relief. *Lyons*, 461 U.S. at 111, 103 S.Ct. 1660. Accordingly, defendant's motion to dismiss the claim for injunctive relief is granted without prejudice.

### B. Plaintiff states a claim under 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)

The TCPA provides a private right of action for individuals who have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). The relevant regulation, 47 C.F.R. § 64.1200(c)(2), bars "any telephone solicitation to [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry[.]" *Id.*

An individual is entitled to "receive up to $500 in damages for each such violation" or treble damages if the violation was willful. 47 U.S.C. § 227(c)(5)(B)-(C). The TCPA defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person[.]" 47 U.S.C. § 227(a)(4).

For a claim to survive under this section, a plaintiff "must plead that (1) they receive[d] multiple calls within twelve months, (2) by or on behalf of the same entity, (3) on a residential phone registered on the [Do Not Call] List." *Camunas v. Nat'l Republican Senatorial Comm.*, 541 F. Supp. 3d 595, 604 (E.D. Pa. 2021) (citation omitted).

Mr. Newell received two texts from defendants less than two months apart (on May 6, 2025, and June 25, 2025). DI 1 at ¶ 21. Both texts were from defendant ("Children's Dental Health – Downington"), who identified itself as such, and were sent from the same phone number. *Id.* at ¶ 22. Mr. Newell's phone that received the texts "is a residential telephone line ... for consumers and is not assigned to a telephone exchange service for business." *Id.* at ¶ 17. Mr. Newell had placed his residential number on the national Do Not Call (DNC) registry in March 2025. *Id.* at ¶ 19. That checks most of the relevant boxes to state a claim. The remaining pertinent questions are (1) whether texts may be considered "calls" for the purposes of the statute and (2) if so, might the texts possibly be solicitations?[2] We answer affirmatively as to both inquiries.

### 1. A commonsense interpretation of the statutory text and purpose of the TCPA shows that texts should be considered calls

**\*4** In *McLaughlin Chiropractic Assoc., Inc. v. McKesson Corp.*, the Supreme Court held that district courts are not "absolutely bound by the FCC's interpretation of the TCPA." 606 U.S. 146, 152, 145 S.Ct. 2006, 222 L.Ed.2d 405 (2025).[3] Instead, district courts "must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *Id.* at 155, 145 S.Ct. 2006 (citation omitted); *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 402, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024).

"As in all cases of statutory interpretation, our inquiry begins with the language of the statute[.]" *United States v. Abbott*, 574 F.3d 203, 206 (3d Cir. 2009) (citation omitted). The

TCPA's stated intent is "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). It provides a private right of action for "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed[.]" *Id.* at § 227(c)(5). Congress authorized the FCC authority to "prescribe regulations to implement methods and procedures for protecting the privacy rights described[.]" *Id.* at § 227(c)(2). In doing so, Congress recognized that those regulations "may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase." *Id.* at § 227(c)(3). Those regulations also "prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in such database[.]" *Id.* at § 227(c)(3)(F). The FCC determined such a database was necessary and enacted the national DNC registry in 2003.[4] Both the TCPA and the Federal Regulations define a "telephone solicitation" as "a telephone call *or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services[.]" 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15) (emphasis added).

**a. The plain meaning of the statute suggests that "call[s]" include text messages**

Because the TCPA does not define a "call" anywhere in the statutory text, we first examine the plain meaning of the term as it was understood when the statute was enacted in 1991.[5] *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 284, 138 S.Ct. 2067, 201 L.Ed.2d 490 (2018) ("[I]t's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning ... at the time Congress enacted the statute." (citation modified) (citation omitted). The Ninth Circuit helpfully examined "the ordinary, contemporary, and common meaning of the verb 'to call,' " which has the same meaning today as it did in 1991: "to communicate with or try to get into communication with a person by a telephone." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953-54 (9th Cir. 2009) (citing Webster's Third New International Dictionary 318 (2002)); *see also Cole v. C/T Install America LLC*, 2026 WL 916582, at *1 n.1, 2026 LEXIS 63254, at *1 n.1 (E.D. Pa. March 23, 2026) (only available on Lexis) ("Based upon the definition of 'call' at the time of the TCPA's passage, there was no requirement that the communication via telephone

be oral."); *Wilson v. Better Mortg. Corp.*, 811 F. Supp. 3d 631, 637 (S.D.N.Y. 2025) ("the ordinary public meaning of 'telephone call' when the TCPA was enacted in 1991 was a communication made by telephone.") (citation omitted). We agree with these courts. Today, there are numerous modes of communicating by telephone; texting is just one such way "to communicate with or try to get into communication with a person by a telephone." *Satterfield*, 569 F.3d at 953-54. Therefore, texting fits comfortably within the understood meaning of "call."

**b. The full picture of the statutory text also supports treating texts as a form of "call"**

**\*5** The "interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning." *Essintial Enter. Sols. LLC v. United States SBA*, 166 F.4th 380, 385 (3d Cir. 2026) (citing *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414, 137 S.Ct. 1002, 197 L.Ed.2d 354 (2017)). In one of the TCPA's other subsections, § 227(b), Congress addressed the problem of robocalls by placing "[r]estrictions on use of automated telephone equipment." 47 U.S.C. § 227(b). Subsection (b) prohibits "any person" from "mak[ing] any call ... using any automatic telephone dialing system or an artificial or prerecorded voice" or "initiat[ing] any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party[.]" § 227(b)(1)(A), (B). Despite mentioning "calls" rather than "texts," courts have understood § 227(b) to apply to text messages. In *Campbell-Ewald Co. v. Gomez*, the Supreme Court remarked that "it is undisputed" that a text message "qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." 577 U.S. 153, 156, 136 S.Ct. 663, 193 L.Ed.2d 571 (2016) (citation omitted). And the Third Circuit came to the same conclusion a few years before in *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 269 n.2 (3d Cir. 2013) ("The TCPA's prohibition on automated dialing applies to both voice calls and text messages.").[6]

We agree with courts in this district that have held consistently with the Supreme Court's remark in *Campbell-Ewald* to conclude that the restrictions placed on "calls" also govern texts pursuant to both §§ 227(b) and (c). *See Cole*, 2026 WL 916582, *1 n.1, 2026 LEXIS 63254, *1 n.1 (finding that "nothing in the text, structure or purpose of the TCPA suggests the barring of text messages under § 227(c)"); *Shelton v. Pro Source Lending Grp. LLC*, 2025 WL 817485, at *4 n.4 (E.D. Pa. Mar. 14, 2025) (concluding that "text

messages are considered 'calls' " for the purposes of § 227(c) and its implementing regulations);[7] *Perrong v. Chase Data Corp.*, 2024 WL 329933, at \*2 (E.D. Pa. Jan. 26, 2024) (holding that texts are calls for the purposes of §§ 227(b) and (c)); *King v. Bon Charge*, 2025 WL 3764039, at \*11, 814 F.Supp.3d 497 (D. Del. Dec. 30, 2025) ("A text message counts as a 'call[ ]' " under § 227(c)); *see also Newell v. RxLink Inc.*, No. 2:25-cv-4270 (E.D. Pa. Mar. 12, 2026) (*mem.*) (order denying defendant's motion to dismiss in another one of Mr. Newell's cases alleging he received unsolicited texts in violation of § 227(c)). Not every district court sees it the same way, but our conclusion finds ample support here and around the country.[8]

**\*6**  Defendant urges us to rely on the thoughtful opinions in *Davis v. CVS Pharmacy*, Inc., 797 F. Supp. 3d 1270 (N.D. Fla. 2025), and *Jones v. Blackstone*, 792 F. Supp. 3d 894 (C.D. Ill. 2025). But we are not persuaded. *Davis* focused on modern parlance rather than considering the broader meaning of a "telephone call" at the time the statute was enacted in 1991, as we think is appropriate. 797 F. Supp. 3d at 1273 ("no ordinary person would think of a text message as a '*telephone* call.' ") (emphasis in original). Similarly, *Jones* acknowledged that "[t]ext messaging was not an available technology in 1991," but then focused the analysis on "today's American parlance," concluding that " 'telephone call' means something entirely different from 'text message.' " 792 F. Supp. 3d at 899. We disagree and think the more expansive view of "call" follows from correctly focusing on 1991.[9] As the Supreme Court has often held, we should "interpret[ ] a statute in accord with the ordinary public meaning of its terms *at the time of its enactment.*" *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 654, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020) (emphasis added); *see also Wis. Cent.*, 585 U.S. at 284, 138 S.Ct. 2067; *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979).

Children's Dental also points to a 2018 amendment to the TCPA, where Congress added specific "text message" language to § 227(e) but not to §§ 227(c) or (b). DI 22 at 3. According to Children's Dental, this confirms that Congress did not mean for §§ 227(c) or (b) to include texts. *Id.* We disagree, and it starts right in the language of the subsection. Section 227(e) is titled "Prohibition on provision of misleading or inaccurate caller identification information" and reads: "[i]t shall be unlawful for any person ... in connection with any voice service or text messaging service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller

identification information[.]" 47 U.S.C. § 227(e). Congress expressly addresses its concerns about "*caller* identification information" to both "voice" and "text" services. *Id.* (emphasis added). Thus, the face of § 227(e) further confirms our view that a "call" can implicate a voice conversation or a text conversation.

Holding, as Children's Dental urges, that "telephone calls" encompasses texts under some subsections, but not others, would yield potentially absurd inconsistencies. The statute nowhere appears to suggest that consumers should lack a private right of action to address unsolicited marketing text messages after registering for the DNC registry. And that result would cut directly against express guidance provided by the FCC. "Statutory interpretations 'which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.' " *First Merchants Acceptance Corp. v. J.C. Bradford & Co.*, 198 F.3d 394, 402 (3d Cir. 1999) (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)). Accordingly, we agree with the district court in *Wilson*, that "[l]imiting § 227(c)'s reach to telephone voice calls while § 227(b) [and § 227(e)] cover[ ] voice as well as text messages would create an irrational asymmetry at odds with the statute's text and structure." 811 F. Supp. 3d at 641.

**\*7**  Contrary to Children's Dental's proposal, it is considerably more likely that the 2018 amendment reflects an understanding that the "telephone call" language in subsections (b) and (c) includes texts and remains inclusive of other ways that telephone users reach out and communicate with each other. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) ("As we have said before, the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (citation modified) (citation omitted). *See also In re Nickelodeon*, 827 F.3d at 287 (When Congress "empower[s] an administrative agency to augment the definition of [a term] in light of changing circumstances or new technologies[,]" it is a way of "buil[ding] flexibility into the statute to keep pace with evolving technology.").

**c. The TCPA's purpose as a consumer protection statute is consistent with treating texts as calls**

Understanding calls to include texts under the TCPA is consistent with the statute's stated purpose: a consumer protection law designed to protect individuals' privacy. 47 U.S.C. § 227(c)(1). "Congress enacted the TCPA in an effort

to address a growing number of telephone marketing calls and certain telemarketing practices thought to be an invasion of consumer privacy and even a risk to public safety." 18 F.C.C. Rcd. at 14018, ¶ 4;[10] *see also Mims v. Arrow Financial Services, LLC*, 565 U.S. 368, 372, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012) (describing the Act's purpose). Those unsolicited communications, whatever form they may take, "are not distinguishable in terms of being an invasion of privacy." *Satterfield*, 569 F.3d at 954; *see also Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 88 (2d Cir. 2019) ("the nuisance and privacy invasion attendant on spam texts are the very harms with which Congress was concerned when enacting the TCPA."); *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 390 (3d Cir. 2017) ("Turning to the TCPA's purpose we reiterate that the statute is remedial in nature and should be construed to benefit consumers.") (citation modified) (citation omitted). "[I]t strains belief to suggest that Congress silently determined that such oral messages were more invasive or objectionable than written ones." *Wilson*, 2025 WL 2856295, at \*3. Congress authorized the Federal Communications Commission (FCC) to prescribe regulations.

Mr. Newell asks us to adopt the FCC's interpretation of the TCPA — that it applies broadly to texts. DI 21 at 18-20. Children's Dental argues that the FCC is incorrect, urging us to set aside its interpretations as we are authorized to do under *McLaughlin.* DI 18-1 at 5 (citing *McLaughlin*, 606 U.S. 146, 145 S.Ct. 2006, 222 L.Ed.2d 405). We find no reason to disagree with the FCC's persuasive reading of the TCPA — a reading with which, as this memorandum highlights, several courts across the country also have agreed. Moreover, Congress entrusted the FCC with an active role in the TCPA's enforcement[11] and with the authority to prescribe regulations as codified in §§ 227(b)(2), (c)(2), (d)(2)-(3), and (e)(3). *Newell v. JR Capital, LLC*, 791 F. Supp. 3d 571, 576 (E.D. Pa. 2025). The FCC has broad discretion under the statute, including "ample flexibility to exclude robocalls from TCPA's scope through the administrative process." *Perrong v. Bradford*, 157 F.4th 251, 258 (3d Cir. 2025); 47 U.S.C. § 227(b)(2)(B)-(C).[12] This discretion appears entirely consistent with the need to address ever-changing technologies while also protecting legitimate business interests.[13]

**\*8** The FCC has explicitly stated that "under the TCPA, it is unlawful to make any call" in violation of its subsections. 18 F.C.C. Rcd. at 14115. "This encompasses both voice calls and

text calls to wireless numbers including, for example, short message service (SMS) calls[.]" *Id.*[14] More recently, the FCC reaffirmed that text messages should be regulated under the DNC registry just the same as telephone calls:

> The Commission adopts the proposal to codify the National DNC Registry's existing protections to text messages. Texters must have the consumer's prior express invitation or permission before sending a marketing text to a wireless number in the DNC Registry. The Commission previously concluded that the national database should allow for the registration of wireless telephone numbers and that such action will further the objectives of the TCPA and the Do-Not-Call Act. The Commission's action is consistent with Federal court opinions and will both deter illegal texts and make DNC enforcement easier.

*Targeting and Eliminating Unlawful Text Messages, Implementation of the TCPA of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, 89 FR 5098-1, 5099, ¶ 6 (2024). Thus, while we are not bound by nor deferential to the FCC's interpretation of the TCPA,[15] we find its interpretation amply supported by the statute's text and purpose, as well as by the reasoning of numerous courts that have tackled this interpretive question.

**2. The text messages are "solicitations" sufficient to survive dismissal**

A telephone solicitation is "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services[.]" 47 U.S.C. § 227(a)(4). Excluded from that definition are "call[s] or message[s]" sent with the receiver's "prior express invitation or permission," sent "to any person with whom the caller has an established business relationship," or sent by "a tax exempt nonprofit organization." *Id.*

Children's Dental argues that the messages it allegedly sent to Mr. Newell were not solicitations because they were meant to persuade him to "use" its dental services rather than "pay" for those services. DI 22 at 5. Perhaps if Children's Dental offered free services, as was the case in *Hulce v. Zipongo Inc.*, then it would not be so clear that the text messages were solicitations encouraging the purchase of a service. 132 F.4th 493, 500-01 (7th Cir. 2025) (Affirming summary judgment for defendant who contacted plaintiff about "free services available through his state and Medicaid funded healthcare plan."). But nothing in the record (nor in the arguments by Children's Dental) indicates that the services promoted by Children's Dental in

its texts to Mr. Newell would be free of charge. We thus find it plausible, at the pleading stage, that these texts were intended to persuade Mr. Newell to pay for defendant's services — not merely to use them.

**\*9** Children's Dental further argues that those messages were sent to inform a patient of an upcoming appointment and that "a prior relationship" is fairly evident from the texts themselves because the texts addressed a named individual. DI 22 at 6. But the mere provision of a name in a call or message does not end all inquiry into whether a prior relationship existed. *See Wilson v. Skopos Financial, LLC,* 2025 WL 2029274, at \*3 (D. Or. July 21, 2025) (denying defendant's motion to dismiss and inferring that texts sent to the wrong name were "pretext" to form a commercial relationship).

From the facts alleged, which we must consider as true at this time, Mr. Newell stated he has no prior relationship with Children's Dental, has never been a patient, nor even inquired about Children's Dental's services. Determining whether a regulatory exception applies at this stage is therefore premature. "With some preliminary discovery, the true purpose and intended recipient of the text messages will be better evaluated." *Wilson,* 2025 WL 2029274, at \*3.

## V. CONCLUSION

"Experience teaches that a statute's fixed meaning is not obvious in every instance. For example, questions can pop up about the meaning of statutory text when 'new *applications* ... arise in light of changes in the world.' " *Essintial,* 166 F.4th at 384 (citing *Wis. Cent.,* 585 U.S. at 284, 138 S.Ct. 2067) (emphasis in original). This is certainly true in the field of telecommunications, where laws inevitably survive through generations of new technology. We agree with the FCC and many courts that have considered the question that the statutory language "calls" includes text messages. And having resolved the other sufficiency questions, we conclude that the plaintiff stated a claim, other than his request for injunctive relief. Defendant's motion to dismiss is granted in part and denied in part. An appropriate order accompanies this memorandum.

## All Citations

Slip Copy, 2026 WL 927378

## Footnotes

1    Because plaintiff has not submitted a motion for class certification pursuant to Rule 23, we do not address the issue here. *See* Fed. R. Civ. P. 23.

2    We do not rule on whether the text messages were solicitations at the motion to dismiss stage, where plaintiff need only plead factual allegations that "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

3    *McLaughlin* concerned whether courts are bound by the FCC's interpretation of the TCPA in the context of pre-enforcement proceedings under the Hobbs Act. 606 U.S. 146, 145 S.Ct. 2006, 222 L.Ed.2d 405 (2025).

4    The 2003 order revised the TCPA and established the DNC registry with the Federal Trade Commission. *In Re Rules & Regulations Implementing the TCPA of 1991,* 18 F.C.C. Rcd. 14014, 14017 (2003). *See also* 47 C.F.R. § 64.1200(c)(2) ("No person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry[.]").

5    Children's Dental points out that text messages did not exist in 1991 (when the TCPA was enacted). True enough, but that is not dispositive. When the Act was signed into law, its drafters could not have imagined any number of today's technological advancements. But courts do not give up in that sort of situation; rather, they interpret the language as best they can using all available tools. *See In re Nickelodeon Consumer Priv. Litig.,* 827 F.3d 262, 284 (3d Cir. 2016) ("[w]hen technological change has rendered literal terms ambiguous, [a law] must be construed in light of [its] basic purpose.") (citing *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975)).

6    *Gager* cited to both *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, SoundBite Communications, Inc.,* 27 FCC Rcd. 15391 (2012) (*SoundBite*), and *Satterfield,* 569 F.3d at 952, in support of the notion that the TCPA's prohibition on autodialers applies to both voice calls and text messages. *Gager,* 727 F.3d at 269 n.2. *SoundBite* was a Declaratory Ruling in which the FCC held that under the TCPA a business is permitted

to send one final text confirming that a consumer wishes to opt-out of receiving messages. 27 FCC Rcd. at 15394, ¶ 7. *See also Satterfield*, 569 F.3d at 952 ("[A] text message is a 'call' within the meaning of the TCPA.").

7      For ease of reference, the *Shelton* Court chose to "address the 5 calls and 3 texts at issue as an aggregate of 8 calls." *Id.* So plaintiff is not alone referring to his two texts as "calls" throughout his complaint and response.

8      *Alvarez v. Fiesta Nissan, Inc.*, 2026 WL 202930, at *5 (S.D. Tex. Jan. 26, 2026) ("A text message therefore falls reasonably within the literal language of [§ 227(c)(5)]."); *Wilson v. MEDVIDI Inc.*, 2025 WL 2856295, at *4 (N.D. Cal. Oct. 7, 2025) (same); *Mey v. Liberty Home Guard, LLC*, 2026 WL 486556, at *5-6, 2026 LEXIS 739, at *15-18 (N.D.W. Va. Jan. 5, 2026) (same) (collecting cases) (only available on Lexis); *Bosley v. A Bradley Hosp. LLC*, 2025 WL 2686984, at *5 (S.D. Fla. Sept. 19, 2025) ("a text message constitutes a 'call' under the TCPA"); *Hudson v. Palm Beach Tan, Inc.*, 2024 WL 4190513, at *7-8 (M.D.N.C. Aug. 12, 2024), *report and recommendation adopted*, 2024 WL 4188310 (M.D.N.C. Sept. 13, 2024) (same); *Williams v. Myler Disability LLC*, 2020 WL 6693134, at *5 (W.D.N.C. November 12, 2020) (same).

9      We likewise find unpersuasive the supplemental authority submitted by defendant, which consists of four additional district court decisions from other jurisdictions. DI 24 at 1-5 (discussing *Radvansky v. 1-800-Flowers.com, Inc.*, 2026 WL 456919 (N.D. Ga. Feb. 17, 2026), *Stockdale v. Skymount Property Group, LLC*, 2026 WL 591842 (N.D. Oh. Mar. 3, 2026), *Richards v. Fashion Nova, LLC*, 2026 WL 847568 (S.D. Ind. Mar. 26, 2026), and *Richards v. Shein Distribution Corporation*, 2026 WL 847584 (S.D. Ind. Mar. 26, 2026)). As explained in this memorandum, we find that the broader reading of "call" is the better view.

10      When the FCC seeks to amend a federal rule or explain a decision not to amend, its formal decision is written in a Report & Order (R&O). The FCC issues the R&O after providing opportunities for the public to ask questions and comment on the topic. The FCC Record (cited as Rcd.) is the commission's official publication of decisions like R&O's and accompanying documents. When a rule is finalized, that rule along with any explanations are then published in the Federal Register (FR). A deeper look into the FCC's process for drafting R&Os is available here: https://www.fcc.gov/general/understanding-fcc-processes (last accessed April 2, 2026).

11      Even in a non-private action, if "a legal officer of a State" or other authorized official brings an action on behalf of that State's residents, the FCC has the authority "to intervene in the action," "to be heard on all matters arising therein," and "to file petitions for appeal." 47 U.S.C. § 227(e)(6)(C).

12      "And this flexibility was central to the successful passage of the Act." *Perrong*, 157 F.4th at 258 (citing *Statement on Signing the Telephone Consumer Protection Act of 1991*, 27 Weekly Comp. Pres. Doc. 1877 (Dec. 20, 1991) ("I have signed the bill because it gives the Federal Communications Commission ample authority[.]")).

13      "The Commission recognizes that telemarketing is a legitimate method of selling goods and services, and that many consumers value the savings and convenience it provides." *Implementing the TCPA of 1991*, 18 F.C.C. Rcd. at 14018, ¶ 3.

14      The FCC explained that SMS "provides the ability for users to send and receive text messages[.]" 18 F.C.C. Rcd. at 14115, ¶ 165 n.606 (citing *Section 6002(B) of the Omnibus Budget Reconciliation Act of 1993*, 17 F.C.C. Rcd 12985, 13051 (2002)).

15      *Loper Bright*, 603 U.S. at 392, 144 S.Ct. 2244 (holding that "agency interpretations of statutes ... are not entitled to deference" and that courts must "decide whether the law means what the agency says.") (citation omitted); *McLaughlin*, 606 U.S. at 152, 145 S.Ct. 2006 (explaining the district court is not "absolutely bound by the FCC's interpretation of the TCPA" and that it "should interpret the TCPA under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation").

---

**End of Document**      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 48 of 95

Cited in uploaded document as:
Pero v. Brown-Daub Chevrolet of Nazareth, No. 25-7016, 2026 U.S. Dist. LEXIS 134498, at *10 (E.D. Pa. June 17, 2026)

2026 WL 1747214
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Catherine PERO, Individually and on behalf of all others similarly situated

v.

BROWN-DAUB CHEVROLET OF NAZARETH

CIVIL ACTION NO. 25-7016
|
Filed June 17, 2026

**Attorneys and Law Firms**

Eric Lechtzin, Andrew J. Lapat, Edelson Lechtzin LLP, Newtown, PA, for Catherine Pero.

James J. Scanlon, Micah Brown, Norris McLaughlin, P.A., Allentown, PA, for Brown-Daub Chevrolet of Nazareth.

## MEMORANDUM OPINION

Savage, J.

**\*1** The threshold issue in this case is whether a text message is a "telephone call" for purposes of Section 227(c) of the Telephone Consumer Protection Act (TCPA), which prohibits telephone solicitations to numbers on the National Do Not Call Registry (DNCR). Considering the statutory language and the Federal Communications Commission's (FCC) regulations and interpretations, we conclude that text messages are calls for purposes of Section 227(c) of the TCPA.

Plaintiff Catherine Pero brought this putative class action against defendant Brown-Daub Chevrolet of Nazareth for violating Section 227(c) of the TCPA.[1] Pero alleges she received multiple unwanted text messages from Brown-Daub on her cell phone number which was registered on the

DNCR. Brown-Daub moves to dismiss, arguing that the TCPA regulates telephone calls and not text messages.

**Factual Background**

In 2021, Pero registered her phone number with the DNCR, a national list of persons who do not want to receive unsolicited telemarketing messages.[2] In October 2024, Pero gave Brown-Daub her number to receive information about trucks for sale.[3] She later opted out of receiving texts.[4] After Brown-Daub had initially confirmed that she was unsubscribed,[5] a Brown-Daub employee overrode her opt-out request.[6] She received six unwanted texts from January 8, 2025 to March 28, 2025,[7] and an additional two undated texts.[8]

Pero claims a text message alerts and disturbs her.[9] Additionally, she contends the texts are an ongoing nuisance, an invasion of her privacy, and a distraction.[10] Pero claims the texts violated Section 227(c) of the TCPA.

**Analysis**

The FCC includes text messages within the ambit of prohibited telephone communications. For years, applying *Chevron* deference, which directed courts to defer to an agency's interpretation of a statute, courts relied on the FCC's determination that text messages were calls for purposes of the TCPA.

*Chevron* deference has been abolished. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). When conducting statutory interpretation, courts are no longer obligated to defer to an agency's interpretation. *Id.* at 413. Instead, they must exercise their independent judgment. *Id.* at 412.

Although they are no longer bound by an agency's interpretation, courts must respect it. *Id.* at 394. Courts may still consider an agency's interpretations because those interpretations are the product of a "body of experience and informed judgment." *Id.* at 394 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). This is especially true where, as here, Congress explicitly directs an agency to implement the goals of the statute. *See id.* at 413 ("[W]hen a particular statute delegates authority to an agency consistent

with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it.").

 **\*2**  In *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, a case where the FCC interpreted the TCPA's definition of "telephone facsimile machine", the Supreme Court instructed district courts to use ordinary principles of traditional statutory interpretation when deciding civil enforcement proceedings. 606 U.S. 146, 168 (2025). Where an agency has interpretated a statute, district courts should give it appropriate respect, but they are not bound by it and need not interpret the statute the same way. *Id.*

Guided by these principles, we now decide whether a text message solicitation to a number on the DNCR violates the TCPA. We begin with statutory construction.

Statutory Language

When interpreting a statute, we start with the text itself, giving ordinary words their ordinary meaning. *Artis v. District of Columbia*, 583 U.S. 71, 83 (2018) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). The words of a statute are interpreted in accordance with their ordinary meaning at the time of the statute's enactment. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

Text messages did not exist when the TCPA was enacted.[11] Congress could not have contemplated text messages when it passed the TCPA. But, Congress intended to prohibit more than solicitations by telephone. It also included communications "by message." Clearly, the prohibition was not limited to telephone calls.

Section 227(a)(4) defines telephone solicitation as the "initiation of a telephone call or *message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C.A. § 227(a)(4) (emphasis added).

The telephone solicitation definition does not include text messages specifically. But, it is not limited to a telephone call. It includes solicitation by message. Congress intended to prohibit intrusive and unwanted contacts using a telephone line.

The TCPA does not define "telephone call or message." So, we must examine its meaning as it was commonly and ordinarily used when Congress enacted the statute in 1991. *Wis. Cent. Ltd.*, 585 U.S. at 284. When the TCPA was enacted, "telephone" was defined as "[a]n instrument, apparatus, or device for conveying sound to a distance."[12] A "call" meant "[a] summons or communication by telephone; a telephone conversation."[13] "Message" was defined as "[a] communication transmitted through a messenger or other agency; an oral or written communication sent from one person to another."[14]

A text message is a communication (message) transmitted by a telephone (an agency). Thus, it is a "message" within the scope of the TCPA's prohibition of unwanted telephone solicitations.

FCC Interpretation of Sections 227(c) and (b)

Congress directed the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object" and to "prescribe regulations" to protect their privacy rights. 47 U.S.C.A. §§ 227(c)(1)–(2).

 **\*3**  There is no doubt that Congress delegated broad power to the FCC to implement Congress's goal to protect telephone subscribers from intrusive and unwanted telephone calls and messages. The FCC did not intrude on Congressional prerogative or exceed its mandate. Thus, we accord its interpretation considerable weight in our analysis.

The FCC codified its DNCR regulations in 47 C.F.R. § 64.1200, titled "Delivery Restrictions." The regulations provide that no person or entity shall initiate any telephone solicitation to a residential telephone subscriber registered with the DNCR. 47 C.F.R. § 64.1200(c)(2). A "do not call" registration must be honored either indefinitely, until the registration is canceled by the consumer, or until the phone number is removed by the database administrator. *Id.* A person making telephone solicitations is not liable if they can demonstrate the violation was an error and they have routine business practices for complying with the DNCR. *Id.* § 64.1200(c)(2)(i)(A)–(E).

The FCC has clarified that the DNCR's protections extend to text messages. In *Targeting and Eliminating Unlawful Text Messages, Implementation of the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, the FCC "codifie[d] that the National Do-Not-Call (DNC) Registry's protections extend to text messages." 89 FR 5098-01, 2024 WL 283571 (F.R.), 5098 (Jan. 26, 2024). It warned that "[t]exters must have the consumer's prior express invitation or permission before sending a marketing text to a wireless number in the DNC Registry." *Id.* at 5099. The Commission explained that the regulation was consistent with court opinions and would "both deter illegal texts and make DNC enforcement easier." *Id.* Additionally, the FCC has explicitly ruled that sending text messages can violate the DNCR provisions of the TCPA. *In The Matter of Emanuel "Manny" Hernandez; Click Cash Mktg., LLC; and Rock Solid Traffic*, No. DA 18-1291, 2018 WL 6830220 at *1 (F.C.C. Dec. 21, 2018).

In 2024, the FCC amended the regulations to clarify that Section 227(c) applies to any person or entity making telephone solicitations or telemarketing calls or text messages as described in the specific regulations cited above. 47 C.F.R. § 64.1200(e); 89 FR 5104 (Jan. 26, 2024).

The FCC has included a text in the definition of a "telephone call" in regulations implementing other TCPA sections. In a regulation interpretating Section 227(b) of the TCPA, the FCC explained that the TCPA's prohibition on making calls using an autodialer "encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls, provided the call is made to a telephone number assigned to such service." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C. Rcd. 14014, 14115 (2003).

The Supreme Court and lower courts have acknowledged this interpretation and have not rejected it. See *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 615 n.1 (2020) (identifying the regulation as an example of the robocall restriction barring both automated voice calls and text messages); *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 874 (9th Cir. 2014), *aff'd*, 577 U.S. 153 (2016); *Satterfield v. Simon and Shuster, Inc.*, 569 F. 3d 946, 952 (9th Cir. 2008).

**\*4** The FCC issued a ruling in 2012 where it considered whether a confirmation text violated the TCPA automatic dialing system prohibitions. *In the Matter of Rules and Regulations Implementing the Telephone Consumer*

*Protection Act of 1991, SoundBite Communications, Inc. Petition for Expedited Declaratory Ruling*, 27 F.C.C. Rcd. 15391, 15392 (2012) ("*SoundBite* decision"). The Commission noted it "had concluded that the TCPA's prohibition on autodialers encompasses both voice and text calls, including short message service (SMS) calls," citing its 2003 regulation. *Id.*

Although this interpretation applies to Section 227(b), it shows the FCC has determined that a "text message" is a "telephone call" for purposes of the TCPA. The same phrases are included in both Sections 227(b) and (c), so we presume they have the same meaning and will conclude the interpretation applies to both sections. *See Pereira v. Sessions*, 585 U.S. 198, 211 (2018) (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 571 (2012)); *Cellco P'ship v. White Deer Twp. Zoning Hearing Bd.*, 74 F.4th 96, 105 (3d Cir. 2023).

When evaluating Section 227(b), the Third Circuit held that the TCPA's prohibitions on using automatic dialing systems included text messages. *Gager v. Dell Fin. Servs., L.L.C.*, 727 F.3d 265, 269 n.2 (3d Cir. 2013). In a footnote, the Court approvingly cited the FCC's *Soundbite* decision and the Ninth Circuit's *Satterfield* decision. *Id.* However, *Gager* predated *McLaughlin* and *Loper Bright*. It was decided before *Chevron* deference was abolished. The Third Circuit has not yet considered the issue applying statutory interpretation principles post-*Chevron*.

Six Circuits have determined that a text is a call. *See Breda v. Cellco P'ship*, 934 F.3d 1, 4 n.1 (1st Cir. 2019); *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690 (5th Cir. 2021); *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 463 (7th Cir. 2020); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 986 (9th Cir. 2023); *Insurance Marketing Coalition Ltd. v. Fed. Commc'ns Comm'n*, 127 F.4th 303, 307 n.2 (11th Cir. 2025).

All but one of these cases were decided while *Chevron* was alive. They all predated *McLaughlin*. Additionally, the *Breda, Cranor, Keating, Gadelhak*, and *Insurance Marketing Coalition* cases analyzed Section 227(b), not Section 227(c). Nevertheless, their reasoning is persuasive.

*Hall*, decided post-*Chevron*, considered whether the plaintiff who had received unwanted text messages had standing to bring an action under Section 227(c). The Ninth Circuit held

that the owner and subscriber of a phone number on the DNCR suffered an injury-in-fact for Article III purposes when unsolicited telemarketing calls or text messages were sent to the number. *Hall*, 72 F. 4th at 985–986.

District courts addressing this issue after *McLaughlin* have held that a text is a call for purposes of Section 227(c). *See Wilson v. MEDVIDI INC.*, 5:25-cv-03996, 2025 WL 2856295, at *1, *4 (N.D. Cal. Oct. 7, 2025) ("nothing in the text, structure, or purpose of the TCPA suggests [a] distinction between written and oral communications"); *Bosley v. A Bradley Hosp. LLC*, 25-cv-22336, 2025 WL 2686984, at *1, *5 (S.D. Fl. Sep. 19, 2025) ("a text message constitutes a 'call' under the TCPA"); *Wilson v. Skopos Fin., LLC*, 6:25-cv-00376-MC, 2025 WL 2029274, at *1, *4 (D. Or. July 21, 2025) ("It cannot be argued in good faith that text messages are so categorically different from phone calls that the former cannot be considered an invasion of consumer privacy when directed at numbers on the DNC Registry"); *Duron v. Kings Cap. Holding LLC*, 3:25-cv-00149-DCG, 2026 WL 319779, at *1, *6 (W.D. Tex. Jan. 13, 2026) ("the Court's interpretation aligns with the weight of authority, confirming that text messages are actionable under § 227(c)(5)").

**\*5** Courts in this district have held that a text is a call for purposes of Section 227(c). *See e.g., Newell v. Children's Dental Health Assocs., LLC*, Civil Action No. 25-5238, 2026 WL 927378, at *1, *9 (E.D. Pa. Apr. 6, 2026) (Murphy, J.) ("We agree with the FCC and many courts that have considered the question that the statutory language 'calls' includes text messages"); *Cole v. C/T Install America, LLC*, Civil Action No. 25-3531, 2026 WL 916582, at *1 n.1 (E.D. Pa. March 23, 2026) (Henry, J.) ("[N]othing in the text, structure, or purpose of the TCPA suggests the barring of text messages under § 227(c)…[the Court] conclude[s] that § 227(c) includes text messages within its definition of a 'telephone call.' ").

## Conclusion

Considering the statutory language, the FCC regulations, and the decisions of an overwhelming majority of courts, we hold that a text message is a call for purposes of 47 U.S.C. § 227(c). Thus, we will deny Pero's motion to dismiss.

## All Citations

Slip Copy, 2026 WL 1747214

## Footnotes

1      Section 227(c)(5) provides a private right of action for a person who "has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed[.]" 47 U.S.C.A. § 227(c)(5).

2      Compl. ¶¶ 12–13, ECF No. 1.

3      *Id.* ¶ 14.

4      *Id.* ¶ 16.

5      *Id.* ¶ 17.

6      *Id.* ¶ 19.

7      *Id.* ¶¶ 19, 21–24.

8      *Id.* ¶ 25.

9      *Id.* ¶ 26.

10      *Id.*

11      The first text message was sent on December 3, 1992. *This Day in History*, History.com (https://www.history.com/this-day-in-history/december-3/first-sms-text-message-sent) (last visited June 12, 2026).

**WESTLAW**   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 52 of 95

12    *Telephone*, Oxford English Dictionary (1989), https://www.oed.com/oedv2/00248465 (last visited June 12, 2026).

13    *Call*, Oxford English Dictionary (1989), https://www.oed.com/oedv2/00031625 (last visited June 12, 2026).

14    *Message*, Oxford English Dictionary (1989), https://www.oed.com/oedv2/00144966 (last visited June 12, 2026).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

⚑ KeyCite Yellow Flag

Disagreed With by Cole v. C/T Install America, LLC, E.D.Pa., March 23, 2026

2026 WL 456919
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

Ethan RADVANSKY, on behalf of himself
and others similarly situated, Plaintiff,

v.

1-800-FLOWERS.COM, INC., Defendant.

CIVIL ACTION FILE NO. 1:25-CV-2811-TWT
|
Signed February 17, 2026

**Attorneys and Law Firms**

Anthony I. Paronich, Paronich Law, P.C., Hingham, MA, Valerie Lorraine Chinn, Chinn Law Firm, LLC, Atlanta, GA, for Plaintiff.

Jeffrey Allen Zachman, Leanne Elizabeth Sunderland, Mark Adam Silver Dentons US, LLP, Atlanta, GA, for Defendant.

**OPINION & ORDER**

THOMAS W. THRASH, JR., United States District Judge

**\*1** This is an action under the Telephone Consumer Protection Act ("TCPA"). It is before the Court on the Defendant 1-800-Flowers.com, Inc.'s Motion to Dismiss [Doc. 14]. For the following reasons, the Defendant's Motion to Dismiss [Doc. 14] is GRANTED.

**I. Background**[1]

This action arises from text messages the Plaintiff alleges he received from the Defendant without his consent. (Compl. ¶¶ 12-13). The Plaintiff's phone number is his "personal residential telephone number," and it has been registered on the National Do Not Call Registry ("DNC") since 2015. (Id. ¶¶ 8-11). The text messages were intended for someone other than the Plaintiff, and the purpose of the messages was to advertise the Defendant's flower business. (Id. ¶¶ 14-15). The

Plaintiff did not give the Defendant "prior express consent or permission to deliver, or cause to be delivered, advertisement or marketing text messages" to his telephone number. (Id. ¶ 16). As a result, the Plaintiff alleges that he "suffered an invasion of privacy, an intrusion into his life, and a private nuisance." (Id. ¶ 18).

The Plaintiff seeks to certify a representative class as follows:

**National Do Not Call Registry Class:** All persons throughout the United States (1) who did not provide their telephone number to the Defendant, (2) to whom the Defendant delivered, or caused to be delivered, more than one voice message or text message within a 12-month period, promoting the Defendant's goods or services, (3) where the person's residential or cellular telephone number had been registered with the National Do Not Call Registry for at least thirty days before the Defendant delivered, or caused to be delivered, at least two of the voice messages or text messages within the 12-month period, (4) who did not submit their telephone number to the Defendant, (5) within four years preceding the date of this complaint and through the date of class certification.

(Id. ¶ 20). The Plaintiff alleges that his claims and the class members' claims originate from the same conduct, practice, and procedure of the Defendant and are based on the same theories. (Id. ¶¶ 28-29). The Defendant moved to dismiss the sole Count in the Plaintiff's Complaint, which alleges a violation of 47 U.S.C. § 227(c)(5) via 47 C.F.R. § 64.1200(c). (Id. ¶¶ 48-56); [Doc. 14]. This Motion is presently before the Court.

**II. Legal Standards**

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983); see also Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir.

1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination"). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

### III. Discussion

**\*2** The Defendant argues that the Plaintiff's claim fails for three reasons: (1) the Plaintiff is not a "residential telephone subscriber" as that phrase is defined in the TCPA; (2) even if he is, 47 U.S.C. § 227(c)(5) does not apply to text messages; and (3) the Plaintiff has not plead facts suggesting that the Defendant "willfully" or "knowingly" violated the TCPA, to support his treble damages claim. (Def.'s Mot. to Dismiss, at 4-17). It also contends that the Plaintiff fails to demonstrate an imminent threat of future harm that would justify injunctive relief. (*Id.* at 17-19). And in the alternative, the Defendant asserts that the class allegations should be dismissed because the proposed class's claim here does not involve an issue of common proof, since whether each subscriber's phone number is residential and whether individual numbers were registered on the DNC would be a member-specific, fact intensive inquiry. (*Id.* at 19-25). The Court will address each argument in turn.

### A. Whether the Plaintiff is a "Residential Telephone Subscriber" Under the TCPA

The Defendant argues that the Plaintiff's cellphone is not considered a "residential telephone" under the TCPA. In support of this argument, the Defendant notes that courts in the Eleventh Circuit previously deferred to the FCC's interpretation in determining that cellphones are residential telephones, but that the legal landscape has now changed in the wake of the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). (Def.'s Mot. to Dismiss, at 5-13). Under the *Loper Bright* decision, the Defendant argues, the Court is bound by the TCPA's language at the time it was enacted, which was not meant to cover cellphones. (*Id.* at 7-9). The Plaintiff responds that, even post *Loper Bright*, cellphones are considered residential telephones because the use of the phrase "residential" was simply meant to distinguish personal or household use of a

telephone from business use. (Pl.'s Resp. in Opp'n to Mot. to Dismiss, at 5-7).

Under 47 U.S.C. § 227(c)(5), "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of [the TCPA]" may bring an action based on such violations. The TCPA, in turn, prohibits any person or entity from initiating a telephone solicitation to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). The question of whether the term "residential subscriber" included cellphone users was settled law prior to the Supreme Court's *Loper Bright* decision and, more recently, *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 606 U.S. 146 (2025). In *McLaughlin*, the Supreme Court reiterated *Loper Bright*'s holding that district courts are not bound by an agency's interpretation of a statute and instead must apply ordinary principles of statutory interpretation while "affording appropriate respect to the agency's interpretation." *McLaughlin Chiro. Assocs., Inc.*, 606 U.S. at 155. But it further held that the Hobbs Act does not preclude district courts from disagreeing with the FCC's interpretations of the TCPA. *Id.* at 168 ("The District Court is not bound by the FCC's interpretation of the TCPA. The District Court should interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation.").

Post-*McLaughlin*, courts have been left to decide whether "residential telephone subscribers" includes cellphone users. In *Isaacs v. USHealth Advisors, LLC*, Chief Judge May held that it does, relying on the definitions of subscriber and residence in the Oxford and Black's Law dictionaries. 2025 WL 2268359, at *2-3 (N.D.Ga. Aug. 7, 2025). Putting these definitions together, Chief Judge May concluded that "a residential subscriber is a person who uses their phone for activities associated with their private, domestic life." *Id.* at *3. The Court further noted that this interpretation of "residential subscriber" aligned with the TCPA's purpose of "protect[ing] residential privacy." *Id.* at *4 ("Regardless of whether a person receives a call to their home phone or a personal cell phone, the negative impact to their residential privacy remains the same."). The result of the defendant's proposed interpretation, Chief Judge May found, was that these residential privacy interests would be tied "to an obsolete and disappearing phone technology"—a home

landline. *Id.* Judge Jones found similarly in *Radvansky v. Bubolo Medical, LLC*, explaining that "the type of technology —i.e., cellular or landline—is not determinative" of the issue; instead, the plaintiff's purpose for using the phone line is. 2025 WL 3306417, at *2 (N.D.Ga. Aug. 15, 2025) (noting that the plaintiff had alleged he used his cellphone for personal rather than business or commercial purposes). And Judge Totenberg recently came to the same conclusion in *Loudermilk v. Maelys Cosmetics USA, Inc.*, 2025 WL 3625779, at *2-3 (N.D.Ga. Dec. 11, 2025). The Court here joins the Northern District of Georgia bench in holding that the term "residential telephone subscriber" includes cellphone users. As Judge Totenberg aptly stated, "[t]he reality is that most individuals today utilize cell phones as the primary, and sometimes only, telephone in their residence. If the TCPA were to only apply to a landline user but not a cell phone user, a tremendous number of individuals' privacy interests would remain unprotected." *Loudermilk,* 2025 WL 3625779, at *3. Surely, that cannot be the result Congress intended.

 **\*3**  Here, the Plaintiff alleged that he was the regular and sole user of the telephone number at issue prior to the time the Defendant allegedly sent the offending text messages at issue here. (Compl. ¶ 8). He also alleged that he at all times used the telephone number "as his personal residential telephone number" and that he has not used it for business or commercial purposes. (*Id.* ¶¶ 8-9). Therefore, the Court finds that the Plaintiff has properly alleged he is a residential telephone subscriber under 47 C.F.R. § 64.1200(c)(2). "As such, the fact that the solicitations to a telephone number on the do-not-call registry came to a cellular telephone does not preclude Plaintiff's claim for a violation of the TCPA." *Radvansky*, 2025 WL 3306417, at *2. Accordingly, the Defendant's Motion to Dismiss will be denied on this ground.

 **B. Whether 47 U.S.C. § 227(c)(5) Applies to Text Messages**

Next, the Defendant argues that even if the Plaintiff is considered a residential telephone subscriber under the TCPA, the text messages he received are not actionable because the TCPA applies only to telephone calls post-*McLaughlin.* (Def.'s Mot. to Dismiss, at 13-15). The Plaintiff asserts that nearly every court to have considered this issue has found that text messages are "telephone calls" as that term is defined under the TCPA and that this Court should follow suit. (Pl.'s Resp. in Opp'n to Mot. to Dismiss, at 7-30).

By its plain language, 47 U.S.C. § 227(c)(5) applies to "telephone call[s]," and prior to *Loper Bright*, it was settled law that telephone calls included text messages based on a 2003 FCC order to that effect. *See* 18 FCC Rcd. 14014, 14116 para. 165 (2003). But *McLaughlin* upended this issue by relying on *Loper Bright* to hold that "[d]istrict courts are not bound by the agency's interpretation, but instead must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *McLaughlin Chiro. Assocs., Inc.*, 606 U.S. at 155. And in *Loper Bright*, the Supreme Court reiterated its precedent that "every statute's meaning is fixed at the time of enactment." *Loper Bright Enters.*, 603 U.S. at 400.

This sea change in the legal landscape has left district courts to decide, with fresh eyes, whether § 227(c)(5)'s reference to "telephone call[s]" also encompasses text messages. Thus far, courts have been split on the issue. The three district courts in this Circuit that have addressed the issue have each concluded that the phrase "telephone call" in § 277(c)(5) does not include text messages, and this Court will follow suit. *See Radvansky v. Kendo Holdings, Inc.*, 3:23-cv-00214-LLM, slip op. at 3-7 (N.D.Ga. Feb. 12, 2026); *Sayed v. Naturopathica Holistic Health, Inc.*, 2025 WL 2997759, at *2 (M.D.Fla. Oct. 24, 2025); *Davis v. CVS Pharmacy, Inc.*, 797 F. Supp. 3d 1270, 1272-73 (N.D. Fla. 2025).

Statutory interpretation must "start with the text"—and, if the text is clear, the analysis "end[s] there as well." *Young v. Grand Canyon Univ., Inc.*, 980 F.3d 814, 818-19 (11th Cir. 2020). The statutory text here is clear that only telephone calls are actionable under § 227(c)(5), not text messages. As one district court noted, "in common American English usage, a telephone call and a text message are separate and distinct forms of communication." *Sayed*, 2025 WL 2997759, at *2. True, the meaning of these terms should be considered as they were understood at the time the TCPA was enacted, prior to the invention of text messages. *See Loper Bright Enters.*, 603 U.S. at 400. But "[w]here the language Congress chose to express its intent is clear and unambiguous, that is as far as we go to ascertain its intent because we must presume that Congress said what it meant and meant what it said." *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998). And as Judge May aptly pointed out, Congress has amended the TCPA as recently as 2019 to add the phrase "text message" in a neighboring provision, § 227(e)(8)(C), and chose to leave § 227(c)(5) unamended. *Radvansky*, 3:23-cv-00214-LLM, slip op. at 6. This distinction leads the Court to presume that

Congress intended § 227(c)(5) to encompass only telephone calls because "when a statute uses one term in one place and a distinct term elsewhere, the difference matters—that is, the distinct words have different meanings." *Sunshine State Reg'l Ctr., Inc. v. Dir., U.S. Citizenship & Immigr. Servs.*, 143 F.4th 1331, 1344 (11th Cir. 2025) (citation modified).

 **\*4**  This same concept defeats the Plaintiff's argument that elsewhere in the TCPA, "telephone solicitations" refers to both calls and text messages, so "telephone call" in § 227(c)(5) must refer to both, too. *See, e.g.*, 47 U.S.C. § 227(c)(1). But construing these distinct phrases identically would render superfluous the different terms Congress chose to use in each subsection, a result which would violate the canon against surplusage. *Sunshine State Reg'l Ctr.*, 143 F.4th at 1343 ("The canon against surplusage means we read statutes in a way that if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (citation modified)). Likewise, "Congress's use of the phrase 'telephone call or message' in a neighboring provision only undermines [the plaintiff's] position" because "[i]t shows that Congress does not use the term 'telephone call' to encompass all 'messages.' " *Davis*, 797 F. Supp. 3d at 1274.

The Plaintiff relies on the Supreme Court's decision in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) and a host of other either pre-*McLaughlin* or wholly irrelevant decisions in support of his position that text messages qualify as telephone calls under § 227(c)(5). As the *Davis* court noted, the Supreme Court assumed but did not actually decide that issue in *Campbell-Ewald* and did not address the "telephone call" language at issue in § 227(c)(5) but the broader prohibition on "any call" in § 227(b)(1)(A)(iii). *Campbell-Ewald*, 577 U.S. at 156. The Plaintiff's reliance on *Drazen v. Pinto*, 74 F.4th 1336 (11th Cir. 2023) is entirely misplaced because that case addressed only whether an unwanted text message was sufficiently injurious to confer Article III standing, again in the context of § 227(b)(1)(A)(iii). *Drazen*, 74 F.4th at 1345. Likewise, *Insurance Marketing Coalition Limited* v. FCC, 127 F.4th 303 (11th Cir. 2025) is irrelevant because it dealt with interpreting "prior express consent" in § 227(b)(1).

The Plaintiff's last argument urges the Court to rely on the 2003 FCC order concluding that text messages constitute telephone calls under the TCPA, asserting that *Loper Bright* permits such reliance because Congress expressly delegated to the FCC the authority "to give meaning to a particular statutory term" in this case and to "fill up the details of [the]

statutory scheme." *See Loper Bright*, 603 U.S. at 395 (citation modified). As one district court noted, this delegation did not authorize the FCC to determine that "telephone call" includes text messages:

> That would not be "filling up the details." Determining whether "telephone call" in § 227(c)(5) includes text messages would likely more than double the number of private causes of action authorized by the TCPA. Doubling the scope of the provision is not "filling up the details." In actuality, § 227(c)(1)(E) may run afoul of the nondelegation doctrine, since there are no delimitations on the discretion it grants the Commission.... we [thus] reject Plaintiff's request that we use § 227(c)(1)(E) to resurrect *Chevron* out of the grave. § 227(c)(1)(E) does not require this Court to defer to the Commission's interpretation of § 227(c)(5). And we remind Plaintiff that "agencies have no special competence in resolving statutory ambiguities. Courts do." *Loper Bright*, 603 U.S. at 373.

*McGonigle v. Pure Green Franchise Corp.*, 2026 WL 111338, at \*2 (S.D.Fla. Jan. 15, 2026).

Finally, the Court is not persuaded by the several district court decisions the Plaintiff provides concluding that "telephone call" in § 227(c)(5) does include text messages because the reasoning underlying these decisions is inherently flawed. For example, in *Alvarez v. Fiesta Nissan, Inc.*, 2026 WL 202930 (S.D. Tex. Jan. 26, 2026), the district court acknowledged that "no ordinary person would use the word 'telephone call' to refer to a text message" before concluding that "a usage which seems obvious now is not always a reflection of the original meaning of the statute," even though text messages did not yet exist when the statute was originally enacted. *Alvarez*, 2026 WL 202930, at \*4. In *Wilson v. MEDVIDI Inc.*, 2025 WL 2856295, (N.D. Cal. Oct. 7, 2025), the district court reached beyond the statute's plain text to find support for its conclusion in a 2024 edition of Black's Law dictionary, which defies both the first rule of statutory interpretation and *Loper Bright*'s instruction that a statute's meaning is fixed at the time of enactment. *Wilson*, 2025 WL 2856295, at \*2; *Young*, 980 F.3d at 818-19; *Loper Bright Enters.*, 603 U.S. at 400. And in *Mujahid v. Newity, LLC*, 2025 WL 3140725 (N.D. Ill. Nov. 10, 2025), the district court's conclusion that "interpreting § 227(c) to include text messages is consistent with the text of § 227 as a whole" ignores the meaningful-variation canon —the idea that Congress must have intended distinct words in a statute to have different meanings. *Mujahid*, 2025 WL 3140725, at \*2; *Sunshine State Reg'l Ctr., Inc.*, 143 F.4th at 1344. *Wilson v. Better Mortgage Corp.*, 2025 WL 3493815 (S.D.NY Dec. 5, 2025) applied similarly faulty reasoning.

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 57 of 95

**\*5** For all of these reasons, the Court agrees with the decisions in this Circuit concluding that the phrase "telephone call" in 47 U.S.C. § 227(c)(5) does not encompass text messages. Because the Plaintiff pled only that the Defendant violated 47 U.S.C. § 227(c)(5) through sending text messages in violation of 47 C.F.R. § 64.1200(c), his claim fails as a matter of law. As a result, his class allegations likewise fail. Accordingly, the Court will grant the Defendant's Motion to Dismiss [Doc. 14].

**IV. Conclusion**

For the foregoing reasons, the Defendant's Motion to Dismiss [Doc. 14] is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant and to close the case.

SO ORDERED, this 17th day of February, 2026.

**All Citations**

Slip Copy, 2026 WL 456919

---

Footnotes

1    The Court accepts the facts as alleged in the Complaint as true for purposes of the present Motion to Dismiss. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1122 (11th Cir. 2019).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Cited in uploaded document as:
Rubin v. Staples, Inc., No. 2:25-45515, 2026 U.S. Dist. LEXIS 70359 (D.N.J. Mar. 31, 2026)
2026 WL 881651
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Joshua RUBIN, on Behalf of Himself and All Others Similarly Situated, Plaintiff,
v.
STAPLES, INC., Defendant.

Civ. No. 2:25-15515 (WJM)
|
Signed March 31, 2026

**Attorneys and Law Firms**

Daniel Zemel, Zemel Law LLC, Paterson, NJ, for Plaintiff Joshua Rubin.

Lauri A. Mazzuchetti, Whitney Morgan Smith, Kelley Drye & Warren LLP, Madison, NJ, for Defendant Staples, Inc.

**OPINION**

WILLIAM J. MARTINI,United States District Judge

**\*1** This is a putative class action filed by Plaintiff Joshua Rubin ("Plaintiff") on behalf of recipients of unsolicited marketing text messages from Defendant Staples, Inc. ("Defendant" or "Staples") for violations of the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227 et seq. Defendant moves to dismiss Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. Rule 12(b)(6), or in the alternative, for a more definite statement pursuant to Fed. R. Civ. P. Rule 12(e). ECF No. 14. The Court decides the motion without oral argument pursuant to Fed. R. Civ. P. 78(b). Having carefully considered the parties' submissions, Defendant's motion to dismiss is **granted**. Defendant's motion for a more definite statement is **denied as moot**.

**I. BACKGROUND**

Plaintiff initially sued in state court on September 12, 2025. ECF No. 1. This action was then removed to this Court on

September 12, 2025 under 28 U.S.C. § 1331 and the Class Action Fairness Act, 28 U.S.C. §§ 1332(d), 1441(a)-(b), and 1453. In the Amended Complaint, filed November 11, 2025, Plaintiff contends that within the last four years, Staples engaged in "a solicitation text message campaign" in which Staples sent him "numerous" text messages to his cell phone trying to sell items such as paper or ink at a discount. Am. Compl. ¶¶ 8-10, 19, ECF No. 10. Those texts did not identify the name of the sender or the telephone number or address at which the sender could be contacted. Id. ¶¶ 11, 14, 47-48, 52-53.

Plaintiff alleges violations of both the two main provisions of the TCPA — § 227(b) and § 227(c). In Count I, Plaintiff claims that Staples violated the do-not-call ("DNC") restrictions in 47 U.S.C. § 227(c)(5) by texting his "residential" cell phone "on at least two separate occasions" within a 12-month period and more than 30 days after his specific instruction to cease texting him. Id. ¶¶ 13, 17-18. Plaintiff also pleads that Defendant failed to keep a DNC list or otherwise comply with implementing regulations, 47 C.F.R. § 64.1200(d)(1)-(6). Id. ¶¶ 41-42. In Counts II and III, Plaintiff alleges that Defendant sent advertising text messages to his cell phone without his consent utilizing an "artificial or prerecorded template" and "artificial or prerecorded voice" in violation of 47 U.S.C. § 227(b) and 47 C.F.R. § 64.1200(a). For each violation, Plaintiff seeks statutory damages and treble damages pursuant to 47 U.S.C. § 227(c)(5). Id. ¶¶ 44-45, 49-50, 54-55. Plaintiff asserts allegations on behalf of two classes: recipients of Staples' 1) telemarketing texts despite do-not-call requests; and 2) text messages sent without prior express consent that contained artificial or prerecorded messages. Id. at ¶ 28.

In moving to dismiss, Staples argues that that § 227(b) and (c) of the TCPA do not prohibit text messages to cell phones because § 227(b) proscribes artificial or prerecorded *voice* calls and § 227(c) protects only "*residential* telephone subscribers" who are on a DNC registry. Staples also claims that Plaintiff's factual allegations fail to support any inference that Staples failed to adhere to § 64.1200(d)'s requirements. Alternatively, Defendant seeks a more definite statement requiring Plaintiff to provide the phone number where he claims to have received the text messages at issue.

**II. DISCUSSION**

A. Standard for Motion to Dismiss

**\*2**  On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "[c]ourts are required to accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008) (internal citations omitted). Courts must "determine whether, under any reasonable reading of the complaint, the Plaintiff may be entitled to relief." *Pinker v. Roche Holdings, Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir. 2002). However, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Courts are not required to credit bald assertions or legal conclusions draped in the guise of factual allegations. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429 (3d Cir. 1997). A pleading that offers "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 555). Additionally, in evaluating a plaintiff's claims, generally "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir. 1994).

B. Prerecorded Calls, 47 U.S.C. § 227(b) and 47 C.F.R. § 64.1200(a)

The TCPA, enacted in 1991, is a "remedial statute that was passed to protect consumers" from "intrusive and unwanted" automated telephone calls and "should be construed to benefit consumers." *Gager v. Dell Fin. Servs., LLC,* 727 F.3d 265, 268, 271 (3d Cir. 2013). Specifically, § 227(b)(1) prohibits "any call" (other than for emergency purposes or made with the prior express consent of the recipient) using any 1) automatic telephone dialing system ("ATDS") or 2) an artificial or prerecorded voice to any telephone number including a cellular telephone service. 47 U.S.C. § 227(b)(1)(A); *see also* 47 C.F.R. § 64.1200(a) (barring "any telephone call" that is not made for emergency purposes or with prior express consent of the called party "using an automatic telephone dialing system or an artificial voice."). The TCPA prohibitions are to act "in the interest of [ ] privacy rights." *Susinno v. Work Out World Inc.,* 862 F.3d 346, 351 (3d Cir. 2017) (citing 47 U.S.C. § 227(b)(2)(C)). "[A] voice message or a text message are not distinguishable in terms of being

an invasion of privacy." *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 954 (9th Cir. 2009). Thus, § 227(b)'s restriction on any "call" has been deemed to encompass text messages. *See Dominguez on Behalf of Himself v. Yahoo, Inc.,* 894 F.3d 116, 118, n.3 (3d Cir. 2018); *Campbell-Ewald Co. v. Gomez,* 577 U.S. 153, 156 (2016), *as revised* (Feb. 9, 2016) ("A text message to a cellular telephone, [ ] qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)"); *see also Howard v. Republican Nat'l Comm.,* __ F.4th __, No. 23-3826, 2026 WL 90273, at \*4 (9th Cir. Jan. 13, 2026) (noting that even in absence of agency deference under *Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984), statutory construction supports conclusion that text constitutes a "call" within meaning of TCPA). Hence the text messages Plaintiff received constitute "calls" for purposes of § 227(b)(1)(A).

Likewise, the "TCPA's prohibition on automated dialing applies to both voice calls and text messages." *Gager v. Dell Financial Servs., LLC,* 727 F.3d 265, 268-69 n.2 (3d Cir. 2013); *Barr v. Am. Ass'n of Pol. Consultants, Inc.,* 591 U.S. 610, 615 n.1 (2020); *see also In the Matter of Rules & Reguls. Implementing the Tel Consumer Prot. Act of 1991, SoundBite Communications, Inc.,* 27 F.C.C. Red. 15391, 15392 (2012). However, because Plaintiff does not allege that Staples sent texts using an automatic dialing system, that prong is not at issue.

**\*3**  Rather, Plaintiff posits that Staples violated the statute by utilizing an "artificial or prerecorded template," which he maintains satisfies the "artificial or prerecorded voice" requirement. *See* Am. Compl. ¶ 47; Pl. Opp'n. Br. 9. Staples responds that "voice" is an audible communication produced by vocal cords and therefore, prewritten or "template" text messages do not count as "an artificial or prerecorded voice" under § 227(b). On this dispositive inquiry, the Court agrees with Staples.

"As in all cases of statutory interpretation, our inquiry begins with the language of the statute and focuses on Congress' intent." *Susinno v. Work Out World Inc.,* 862 F.3d 346, 348-49 (3d Cir. 2017) (citing *United States v. Abbott,* 574 F.3d 203, 206 (3d Cir. 2009)). The Court is to "independently determine for itself" the "meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *McLaughlin Chiropractic Assoc, Inc. v. McKesson Corp.,* 606 U.S. 146, 155 (2025) (citing *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 402 (2024)). "Where the statutory language is plain and unambiguous,

further inquiry is not required." *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001).

In § 227(b), certain "calls" (which include texts) are barred only where they either utilize an ATDS (not alleged here) or an artificial or prerecorded voice. The plain and unambiguous meaning of "voice" is an audible sound produced by a person's vocal cords. *See* https://www.merriam-webster.com/dictionary/voice. A text message is not an audible sound and thus is not an "artificial or prerecorded voice." While the Third Circuit has not addressed this question, other courts have squarely concluded that a text message does not constitute use of an "artificial voice." *See e.g., Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1161 (9th Cir. 2023) ("Congress clearly intended 'voice' in 47 U.S.C. § 227(b)(1)(A) to encompass only audible sounds, because the ordinary meaning of voice and the statutory context of the TCPA establish that voice refers to an audible sound."); *Soliman v. Subway Franchisee Advert. Fund Tr., LTD.*, 101 F.4th 176, 187 (2d Cir. 2024) (holding that text is not an "artificial voice" under § 227(b)(1)(A) because "voice" ordinarily refers to "a sound produced by a human being" and that "Congress meant 'voice' to mean something audible, not a text message").

Plaintiff would have the Court interpret "voice" to include a "template" despite no evidence that Congress intended to do so. Nor does Plaintiff cite any caselaw that has held that a text message satisfies the artificial or prerecorded "voice" prong of § 227(b)(1)(A). Instead, Plaintiff insists his interpretation prevents "selective enforcement" of a statute. PL Opp'n. Br. 9. That is, if unsolicited marketing text messages that use an ATDS are precluded by § 227(b) but those that do not use an ATDS are not, Plaintiff maintains that that would lack "uniformity" in the statute's enforcement. *Id.* However, reading § 227(b) to bar text messages only if they either use ATDS or use "voice" is not "selective enforcement," but rather, giving effect to every word that Congress uses. *See Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001); *see also Howard*, __ F.4th __, 2026 WL 90273, at *5 (noting rejection of broader meaning of "voice" that includes symbolic or poetic uses because then "all text messages would already be covered by the phrase 'call made using a voice service,' thereby rendering the additional language concerning 'text messages' as surplusage"). The statute expressly limits its proscriptions to calls that utilize an ATDS or a "voice." Because Plaintiff has not alleged that he received texts utilizing either, Plaintiff's § 227(b) and § 64.1200(a) claims are **dismissed without prejudice**.

## C. Do-Not-Call List, 47 U.S.C. § 227(c)(1-5) and 47 C.F.R. § 64.1200(d)

**\*4** The TCPA provides that a "person who has received more than one *telephone call* within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" may sue to recover up to $500 in damages for each violation. 47 U.S.C. § 227(c)(5) (emphasis added). The implementing regulation that Staples purportedly violated, 47 C.F.R. § 64.1200(d), provides in relevant part: "No person or entity shall initiate ... any call for telemarketing purposes to a *residential telephone subscriber* unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(d) (emphasis added). Those § 64.1200(d) procedures include requiring telemarketers to: maintain a DNC list and have available upon demand a related written policy; train telemarketing staff on use of the DNC list; record and honor DNC requests within a reasonable amount of time from when the request is made; and identify the seller's name and number during pre-recorded or artificial calls. 47 C.F.R. § 64.1200(d)(1)-(6)).

### 1. Residential Telephone Subscribers

Staples contends that subsection (d) is inapplicable to cell phone users because Congress intended that provision to apply only to residential telephones that are "hardwired into the building" or "used by individuals in the home, and not a cellular telephone, which can be used anywhere." Def. Br. 17-18. To show that Congress meant to exclude cell phone users in § 227(c), Staples notes that that provision makes no mention of cell phone users in contrast to other sections of the TCPA, such as § 227(b) and § 64.1200(a)(1)(iii) where "cellular telephone service" is expressly mentioned. Staples concludes that because this shows that "both Congress and the FCC were aware of the distinction between a cellular telephone and a residential telephone," Congress "purposely protected only 'residential telephone subscribers' under § 227(c), § 64.1200(c) and (d)." Def. Br. 19.

The Court disagrees and rejects this *expression unius est exclusio alterius* canon of interpretation ("the expression of one thing implies the exclusion of others") as evidence of congressional intent to exclude cell phone users as "residential subscribers" in § 277(c)(5). *See e.g., Jackson v.*

*Direct Building Supplies*, No. 23-01569, 2024 WL 184449, at *6 (M.D. Pa. Jan. 17, 2024); *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 204 (S.D.N.Y. 2024). As explained by the Supreme Court, "[t]he *expressio unius* canon applies only when 'circumstances support[ ] a sensible inference that the term left out must have been meant to be excluded.' " *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (citing *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002)). The canon "does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (citing *United States v. Vonn,* 535 U.S. 55, 65 (2002)).

Section 227(b) "forbids the use of artificial and prerecorded messages to enumerated categories of phone *technologies.*" *Cacho*, 739 F. Supp. 3d at 204 (emphasis added). Those prohibited categories include calls to a "cellular telephone service."[1] *See* 47 U.S.C. § 227(b)(1)(A) and § 64.1200(a)(1)(iii). Separately, subsection (b)(1)(B) precludes non-emergency artificial or prerecorded voice calls to "any residential telephone line" absent prior express consent or under certain limited exceptions. 47 U.S.C. § 227(b)(1)(B); § 64.1200(a)(3). In contrast, § 227(c) "protect[s] residential telephone *subscribers'* privacy rights." 47 U.S.C. § 227(c)(1) (emphases added). Indeed, § 227(c) is aptly titled "Protection of subscriber privacy rights" and addresses exactly that – the privacy rights of the "residential telephone *subscriber*." *See* § 227(c)(1). Thus, § 227(b) and (c) do not address members of the same category. *Cacho,* 739 F. Supp. 3d at 204-05. Section (c)(5) authorizes a private right of action to a "person who has received more than one telephone call" without regard to what type of line or telephone technology receives those calls. As explained in *Jackson*, § "227(c)'s focus on the telephone subscriber demonstrates that the term 'residential' is a 'functional term not tethered to a particular technology,' focusing instead on the subscriber's privacy rights ... rather than his telephone's technological capabilities." *Jackson,* 2024 WL 184449, at *7. The specific kind of telephone or communications technology, *e.g.,* a cellular telephone, is distinct from and does not identify the "type or identity of the subscriber to the technology," *i.e.,* a residential subscriber. *Cacho*, 739 F. Supp. 3d at 204-205; *Wilson v. Belter Mortgage Corp.*, __ F. Supp. 3d __, 2025 WL 3493815, at *8 (S.D.N.Y. Dec. 5, 2025) ("The statute's text and context thus show that Congress, in enacting § 227(c), was focused on protecting

subscribers from telephone solicitations, not on any one form of such solicitations.").

 **\*5** "Had Congress wished to limit section 227(c) to specified telephone technologies rather than specified telephone subscribers, it would have indicated somewhere in that section that the [DNC] registry is limited to a 'residential telephone *line\** as Congress used that term in the preceding subsection." *Jackson,* 2024 WL 184449, at *6. Similarly, had Congress sought to address different subscribers in § 227(b), it would have distinguished between "residential" and "business or commercial" subscribers. *See Cacho,* 739 F. Supp. 3d at 207 ("Congress's definition of 'established business relationship' ... expressly distinguishes between a business subscriber and a residential subscriber." (citing 47 U.S.C. § 227(a)(2)(A)); *see Shelton v. Fast Advance Funding, LLC,* 805 Fed. App'x. 156, 159 (3d Cir. 2020) (holding plaintiff had standing under TCPA because there was no evidence plaintiff used cell phone for business rather than for personal purposes).

Moreover, Congress specifically mandated that the FCC "initiate a rulemaking proceeding concerning *the need to protect residential telephone subscribers' privacy rights* to avoid receiving telephone solicitations to which they object." § 227(c)(1) (emphasis added). The FCC was also tasked to "prescribe regulations to implement methods and procedures for protecting" those privacy rights. § 277(c)(2). Acknowledging the "growing number of consumers who no longer maintain wireline phone service, and rely only on their wireless telephone service," the FCC "presume[d] wireless subscribers who ask to be put on the national do-not-call list to be "residential subscribers." 2003 FCC Order at ¶¶ 35, 36. Consistent with this presumption and its rulemaking authority, the FCC implemented § 64.1200(e), which expressly makes both subsection (c), which prohibits telephone solicitations to numbers on a national DNC registry, and subsection (d), which governs an entity's internal DNC registry, "applicable to any person or entity making telephone solicitations or telemarketing calls *or text messages to wireless telephone numbers* to the extent described in the [2003 FCC Order]." 47 C.F.R. § 64.1200(e) (emphasis added). According to the 2003 FCC Order, "wireless subscribers may participate in the national do-not-call list." 2003 FCC Order at ¶ 36. *See e.g., Izor v. Abacus Data Sys., Inc.,* No. 19-01057, 2019 WL 3555110, at *2 (N.D. Cal. Aug. 5, 2019) (rejecting contention that "residential telephone subscriber" excludes cell phone users because § 64.1200(e) by its terms incorporates solicitations to wireless numbers").

While courts need not defer to an agency's interpretation of a statute, the FCC's sustained interpretation that "residential" subscribers can include cell phone subscribers is consistent with § 227(c)'s text and purpose, as described above.

Finally, excluding a cell phone subscriber from being a "residential" subscriber would have "sweeping practical consequences." *Cacho*, 739 F. Supp. 3d at 203-04 (cleaned up). "For more than two decades, cellphone users have been permitted by the FCC to register for the National Do Not Call Registry as 'residential subscribers." *Id.* at 203. Additionally, the consensus in court decisions "in this Circuit is that Do Not Call claims may apply to cell phones." *Dudley v. Vision Solar, LLC*, No. 21-659, 2021 WL 3077557, at *5 (E.D. Pa, July 21, 2021) (citing cases and denying motion to dismiss § 227(c) claim where plaintiff alleged cell phones were for "residential purposes"); *Atkinson v. Choice Home Warranty*, No. 22-04464, 2023 WL 166168, at *4–5 (D.N.J. Jan. 11, 2023) (same); *Cacho*, 739 F. Supp. 3d at 203 ("[A]n individual who registers her cellphone with the Do Not Call Registry is a residential telephone subscriber."); *Shelton*, 805 Fed. App'x. at 159 (affirming that plaintiff had standing to bring TCPA suit where unsolicited telemarketing calls were to personal cell phone); *Jackson*, 2024 WL 184449, at *8 (agreeing with majority of cases that cell phone users may be "residential" telephone subscribers under § 227(c)).[2]

 **\*6**  For these reasons, the Court concludes that "residential" telephone subscribers encompass wireless subscribers for purposes of § 227(c) and 47 C.F.R. § 64.1200(d).

*2. Text Messages*

The TCPA is meant to "protect residential telephone subscribers' privacy rights to avoid receiving *telephone solicitations* to which they object," 47 U.S.C. § 227(c)(1) (emphasis added). The phrase "telephone solicitation," includes "the initiation of a telephone call or *message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4) (emphasis added). Staples argues that § 227(c)(5)'s right of action protects recipients of at least two "telephone calls," *not* "telephone solicitations" and also maintains that because Congress defined a "text message" to exclude a "real time, two-way voice communication," *see* § 227(e)(8)(C)(iii), it recognized text messages as a distinct mode of communication that Congress did not include as "calls" in § 227(c).

Subsection (e)(8)'s definitions are, however, expressly for purposes of subsection (e), which addresses prohibitions on misleading or inaccurate caller identification information. In contrast, the definition of "telephone solicitations" applies to the entire section rather than just subsection (a). Staples fails to show that Congress's definition applicable only to subsection (e) undermines Congress's express intent to protect residential telephone subscribers from unwanted "telephone solicitations," which include both calls and messages.

Further, as noted above, the term "call" has been held to include text messages in § 227(b). Unlike the distinction between "residential" as used in § 227(b) to refer to a type of line, and "residential" as used in § 227(c) to describe the type of subscriber, there is no basis to ascribe different meanings to the term "call" by interpreting the same term more narrowly in § 227(c) than in § 227(b). *See Wilson*, 2025 WL 3493815, at *7 (noting "weight of [ ] authority concerning § 227(b) strongly suggests that § 227(c)'s parallel usage of 'telephone call[s]' applies to text messages"); *Pariseau v. Built USA, LLC*, 619 F. Supp. 3d 1203, 1207 (M.D. Fla. 2022) (agreeing with "several persuasive decisions" that "telephone call" in § 227(c) includes text message because context of statutory text does not distinguish "telephone call" in subsection (c) from "telephone call" in subsection (b), which has been interpreted to include both voice call and text messages). The plain meaning of "telephone call" in 1991 was "a communication made by telephone" without distinction between an oral or vocal communication as the first text message was not sent until 1992. *Wilson*, WL 3493815, at *5. "[A]lthough modern parlance tends to distinguish between phone calls and text messages, the meaning of 'telephone call' in 1991—when the TCPA was enacted—was broad enough to encompass text messages." *Id.*

Notably, the majority of courts also consider § 277(c)(5)'s protection against "calls" to include text messages. *See Bradshaw v. CHW Group, Inc.*, 763 F. Supp. 3d 641 n.5 (D.N.J. 2025) ("Text messages are considered 'calls' for [§ 227(c)(5)] purposes."); *Champion v. Credit Pros Int'l Corp.*, No. 21-10814, 2025 WL 3452354 (D.N.J. May 15, 2023) (denying motion to dismiss § 227(c)(5) claim based on receipt of text messages); *Zelma v. Penn LLC*, No. 19-8725, 2020 WL 278763, at *6-7 (D.N.J. Jan. 17, 2020) (assuming that sending text messages to number on DNC registry was claim under § 227(c)(5)); *see also Hall v. Smosh Dot Com., Inc.*, 72

F.4th 983, 986 (9th Cir. 2023) (holding that under § 227(c), "Congress granted residential phone subscribers the right to create a private line, free from unsolicited calls and intrusive texts"). Consistent with these cases, the Court concludes that "telephone call" can encompass text messages for purposes of § 227(c)(5) and 47 C.F.R. § 64.1200(d).

### 3. Sufficiency of Pleading

**\*7** The parties dispute whether the Amended Complaint pleads facts that plausibly show that Defendant has failed to comply with 47 C.F.R. § 64.1200(d). At the outset, Plaintiff alleges that his cell phone is used as his residential phone. Am. Compl. ¶ 13. Additional facts elaborating on the residential nature of Plaintiff's cell phone are not needed to sufficiently state a claim. *See Atkinson*, 2023 WL 166168, at \*5. However, Plaintiff's allegations as to the remaining elements of the claim are merely conclusory recitations. *Compare Somogyi v. Freedom. Mortg. Corp.*, No. 17-6546, 2018 WL 3656158, at \*8 (D.N.J. Aug. 2, 2018) (finding alleged violation of TCPA's internal DNC restrictions sufficiently pled where plaintiffs alleged "specific manner" in which they requested that defendant stop calls as well as "detailed factual allegations" as to how defendant failed to comply with internal DNC list requirement), *with Sterling v. Securus Techs., Inc.*, No. 18-1310, 2020 WL 2198095, at \*5 (D. Conn. May 6, 2020) (finding to be threadbare recitals of elements of cause of action where plaintiffs provided no additional allegations regarding maintenance or procedures for a DNC list). Plaintiff contends that Staples did not maintain DNC procedures based solely on his bare assertion that he requested but did not receive a copy of Staples' internal DNC procedures, and that

he continued to receive solicitations beyond the statutory 30 days for a telemarketer to comply with a DNC request despite his requests to cease texting him. *See* Am. Compl. ¶¶ 17, 22-24. Plaintiff provides no factual details regarding these claims such as where he sent his stop request given that the marketing texts did not provide any identification or contact information. *See id.* at ¶ 11. Because Plaintiff has not pleaded sufficient factual allegations to support a claim that Staples violated 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(d), Defendant's motion to dismiss is granted; Count I is **dismissed without prejudice**.

### D. Motion for More Definite Statement

Given the disposition above, the Court does not reach Defendant's alternative request for a more definite statement although the Court does expect that such information will be provided during the course of discovery.

### III. CONCLUSION

For the reasons noted above, Defendant's motion to dismiss is **granted**. Counts I, II, and III are **dismissed without prejudice**. The request for a more definite statement is **denied as moot**. Plaintiff may file an amended pleading curing the defects noted herein within 20 days of the date of the accompanying Order.

**All Citations**

Slip Copy, 2026 WL 881651

### Footnotes

1    Section 227(b)(1)(A) prohibits any ATDS non-emergency calls to other specified phone lines as well including: i) emergency telephone lines, ii) hospital, health care, or similar establishment room lines, or iii) any "paging service, cellular telephone service, specialized mobile radio service." 47 U.S.C. § 227(b)(1)(A)(i–iii).

2    None of these cases deferred to FCC's interpretation in reaching their decisions. Moreover, the decisions cited by Staples to support its position involve claims under § 227(b) and are thus inapposite. *See* Def. Br. 18-19.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Sagar v. Kelly Automotive Group, Inc., Not Reported in Fed. Supp. (2021)

🚩 KeyCite Yellow Flag

Distinguished by Escamilla v. Dyck-O'Neal, Inc., D.Mass., May 22, 2026

2021 WL 5567408
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Yogendra SAGAR, individually and on behalf
of all others similarly situated, Plaintiff,

v.

KELLY AUTOMOTIVE
GROUP, INC., Defendant.

Civil Action No. 21-cv-10540-PBS
|
Filed 11/29/2021

**Attorneys and Law Firms**

Jason R. Campbell, Charlestown, MA, Manuel S. Hiraldo, Pro Hac Vice, Hiraldo P.A., Fort Lauderdale, FL, for Plaintiff.

Howard M. Cooper, Joseph M. Cacace, Rebecca M. O'Brien, Todd & Weld, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER ON MOTION TO DISMISS AND MOTION TO STRIKE

Saris, D.J.

## INTRODUCTION

**\*1** Plaintiff Yogendra Sagar has brought this proposed class action, alleging that Defendant Kelly Automotive Group, Inc. (Kelly Auto) sent text messages in violation of the federal Telephone Consumer Protection Act, 47 U.S.C., § 227 (TCPA). Sagar has proposed two classes: (1) all persons in the United States whom Kelly Auto, or someone on its behalf, texted more than one time within a twelve-month period within the four years prior to the filing of this action despite the telephone number being listed on the National Do Not Call Registry for at least thirty days and despite the person not transacting with Kelly Auto in the prior eighteen months or inquiring with Kelly Auto in the prior three months (Do Not Call Registry Class), and (2) all persons in the United States whose residential telephone number Kelly Auto, or someone on its behalf, texted within the four years prior to the filing of

this action after the person requested not to receive texts and/or calls from Kelly Auto (Internal Do Not Call Class).

Kelly Auto has moved to dismiss this action. It first argues that Sagar lacks Article III standing because he fails to allege a cognizable, concrete injury in fact based on the receipt of three text messages. Kelly Auto next argues that the TCPA provisions in question do not apply to text messages and that Sagar failed to plausibly allege that he was a "residential telephone subscriber" or "residential subscriber." Kelly Auto also moved to strike Sagar's class action allegations pursuant to Fed. R. Civ. P. 12(f), 23(c)(1)(A), and 23(d)(1)(D).

After hearing, Defendant's Motion to Dismiss (Dkt. 18) and Motion to Strike Class Allegations (Dkt. 21) are **DENIED**.

## FACTUAL BACKGROUND

Sagar alleges the following facts. Kelly Auto owns and operates eight motor vehicle dealerships in Massachusetts. In February and March of 2021, it sent at least three marketing text messages to Sagar's cellular telephone. One of the messages included a picture with the words "Presidents' Day Sale *Your New 2021 Rogue is Here*" and a message saying: "Hi Yogendra! Kelly Nissan of Lynnfield is having a [sic] extended Presidents' Day this weekend. When is a good time to set up a VIP appointment? To opt out type stop[.]" Dkt. 16 at ¶ 10.

Sagar alleges that the cell phone number that was texted is used by him "for personal purposes only and the number is Plaintiff's residential telephone line." Id. at ¶ 13. The number has been registered on the National Do Not Call Registry since December 15, 2004. Sagar has had no business dealings with Kelly Auto since 2015 when he made a request to one of its managers to be placed on its internal do-not-call list. Sagar alleges that Kelly Auto's continued text messages are indicative of a lack of a written policy for maintaining internal do-not-call procedures, a failure to maintain an internal do-not-call list, and a failure to train its personnel in the existence and use of such a list. Sagar further alleges, "[u]pon information and belief" that Kelly Auto sent similar text messages to individuals residing within this judicial district. Id. at ¶ 19.

**\*2** Sagar alleges that the text messages caused harm, "including invasion of privacy, aggravation, and annoyance," and that they "inconvenienced Plaintiff, caused disruptions

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 65 of 95

Sagar v. Kelly Automotive Group, Inc., Not Reported in Fed. Supp. (2021)

to Plaintiff's daily life, caused Plaintiff to waste time dealing with Defendant's unsolicited text message calls, used Plaintiff's phone storage, and depleted Plaintiff's phone battery." Id. at ¶ 23. "Additionally," he alleges, "Defendant's unsolicited messages violated Plaintiff's substantive rights under the TCPA to be free from harassing calls like Defendant's." Id.

## DISCUSSION

### I. Motion to Dismiss

Kelly Auto seeks dismissal under Fed. R. Civ. P. 12(b)(1) for lack of standing and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

### A. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Two basic principles guide the court's analysis. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.

### B. Article III Standing

"The Constitution limits the judicial power of the federal courts to actual cases and controversies." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012) (citing U.S. Const. art. III, § 2, cl. 1). "A case or controversy exists only when the party soliciting federal court jurisdiction (normally, the plaintiff) demonstrates 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends.' " Id. (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)). This requirement is "standing."

"[A]t the pleading stage, the plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring the action." Hochendoner v. Genzyme Corp., 823 F.3d 724, 731 (1st Cir. 2016). But "[i]n considering the pre-discovery grant of a motion to dismiss for lack of standing 'we accept as true all well-pleaded factual averments in the plaintiff's ... complaint and indulge all reasonable inferences therefrom in his favor.' " Katz, 672 F.3d at 70 (quoting Deniz v. Mun'y of Guaynabo, 285 F.3d 142, 144 (1st Cir. 2002)).

Kelly Auto disputes that Sagar has established one of the requirements of standing: an "injury in fact." This requires "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Id. at 71 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). Kelly Auto specifically disputes the concreteness of Sagar's alleged injury in fact. "A 'concrete' injury must be 'de facto'; that is, it must actually exist" and be " 'real,' and not 'abstract.' " Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016). " 'Concrete' is not, however, necessarily synonymous with 'tangible.' " Id. at 1549. Concreteness merely requires that the plaintiff be "adversely affected" or "aggrieved," which can be established through "an identifiable trifle." United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 689 n.14 (1973).

*3 Congress cannot create a private right of action that "abandon[s] the requirement that the party seeking review must himself have suffered an injury," Lujan, 504 U.S. at 578 (quoting Sierra Club v. Morton, 405 U.S. 727, 738 (1972)), but Congress can "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law." Id. (citing Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 208–12 (1972)). In analyzing concreteness, courts look to "history and the judgment of Congress" for guidance. Spokeo, 136 S. Ct. at 1549 (holding that "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts" and that because Congress is particularly suited "to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important").

The First Circuit has not yet addressed the issue of whether unsolicited text messages, allegedly infringing on rights protected by the TCPA, can constitute a concrete injury in fact. Only one circuit court has ruled that an unsolicited text message is not a concrete injury under Spokeo, finding that the harm "differ[s] so significantly in degree" from

historical torts such as intrusion upon seclusion or trespass to chattels and that "Congress was concerned about 'intrusive invasion[s] of privacy' into the home when it enacted the TCPA" and "a single unwelcome text message will not always involve an intrusion into the privacy of the home in the same way that a voice call to a residential line necessarily does." Salcedo v. Hanna, 936 F.3d 1162, 1170–72 (11th Cir. 2019).

The Fifth and Seventh Circuits have explicitly and persuasively rejected Salcedo as to both history and the judgment of Congress, finding that "unwanted text messages can constitute a concrete injury-in-fact." Gadelhak v. AT&T Servs., 950 F.3d 458, 463 (7th Cir. 2020) (Barrett, J.); Cranor v. 5 Star Nutrition, LLC, 998 F.3d 686, 693 (5th Cir. 2021) ("Salcedo's focus on the substantiality of an alleged harm threatens to make this already difficult area of law even more unmanageable. We therefore reject it.").

As to history, each took issue with the Salcedo court's focus on the degree of harm, rather than the kind of harm. The Cranor court found that "Salcedo's view of trespass to chattels is substantially narrower than the scope of that action at common law" in the eighteenth century, given that "[a]t common law, a suit for trespass to chattels could be maintained if there was a violation of 'the dignitary interest in the inviolability of chattels.' " 998 F.3d at 693 (quoting United States v. Jones, 565 U.S. 400, 419 n.2 (2012) (Alito, J., concurring in the judgment) (quoting W. Page Keeton et. al, Prosser & Keeton on the Law of Torts § 90 at 87 (5th ed. 1984))). Moreover, "Salcedo's focus on the substantiality of the harm in receiving a single text misunderstands Spokeo" because Spokeo asked whether "an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," id. (quoting Spokeo, 136 S. Ct. at 1549), and so "[o]ur inquiry is focused on the types of harms protected at common law, not the precise point at which those harms become actionable," id. (quoting Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 654 (4th Cir. 2019)). The Gadelhak court similarly found the Salcedo court viewed the tort of intrusion upon seclusion too narrowly—"[t]he harm posed by unwanted text messages is analogous to that type of intrusive invasion of privacy." 950 F.3d at 462. And the court also took issue with Salcedo's focus on substantiality:

> **\*4** The Eleventh Circuit treated the injury in its case as abstract partly because common law courts generally require a much more substantial imposition—typically, many calls—to support liability for intrusion upon seclusion. But when Spokeo instructs us to analogize

to harms recognized by the common law, we are meant to look for a "close relationship" in kind, not degree. In other words, while the common law offers guidance, it does not stake out the limits of Congress's power to identify harms deserving a remedy. Congress's power is greater than that: it may "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law." A few unwanted automated text messages may be too minor an annoyance to be actionable at common law. But such texts nevertheless pose the same kind of harm that common law courts recognize—a concrete harm that Congress has chosen to make legally cognizable.

Id. at 462–63 (citations omitted). Unwanted text messages involve the same kind of injury as recognized in the common-law torts of trespass to chattels and intrusion upon seclusion, even if not in the same degree, and thus Congress could elevate this injury to the status of a legally cognizable harm.

As to Congress' judgment, the Cranor court held that, given the scope of other provisions of the TCPA, "[t]he text of the Act thus shows Congress sought to remediate 'nuisance and invasion of privacy' in a broader set of circumstances, not just in the home." 998 F.3d at 691 (noting that the TCPA in other provisions covers cell phones, emergency telephone lines, and hospital patient telephone lines). The Gadelhak court agreed that "the undesired buzzing of a cell phone from a text message, like the unwanted ringing of a phone from a call, is an intrusion into peace and quiet in a realm that is private and personal," which "is the very harm that Congress addressed." 950 F.3d at 462 n.1. Moreover, these individually annoying buzzes can form a swarm that carries quite the sting.

The Second and Ninth Circuits found standing in similar circumstances before Salcedo was decided. See Melito v. Experian Mktg. Sols., Inc., 923 F.3d 85, 93 (2d Cir. 2019) ("[T]ext messages, while different in some respects from the receipt of calls or faxes specifically mentioned in the TCPA, present the same 'nuisance and privacy invasion' envisioned by Congress when it enacted the TCPA"); Van Patten v. Vertical Fitness Grp., LLC, 847 F.3d 1037, 1043 (9th Cir. 2017) ("[T]he telemarketing text messages at issue here, absent consent, present the precise harm and infringe the same privacy interests Congress sought to protect in enacting the TCPA. Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients.").

This Court joins the Second, Fifth, Seventh, and Ninth Circuits in finding that, in light of the TCPA, the receipt

of unsolicited telemarketing text messages, on its own, is sufficient to establish a concrete injury in fact. "A plaintiff alleging a violation under the TCPA 'need not allege any additional harm beyond the one Congress has identified.' " Van Patten, 847 F.3d at 1043 (quoting Spokeo, 136 S. Ct. at 1459). Sagar has standing to pursue his claim.

## C. Failure to State a Claim under the TCPA

Kelly Auto argues that Sagar's claims do not fall within the scope of the TCPA because he did not receive a "telephone call" as a "residential telephone subscriber."

### i. "Telephone Call"

Kelly Auto argues that 47 U.S.C. § 227(c), under which both counts arise, does not apply to text messages. Under this provision of the TCPA, "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring a private action. 47 U.S.C. § 227(c)(5) (emphasis added).

There has been much litigation over the meaning of "call" in a neighboring provision of the TCPA: 47 U.S.C. § 227(b)(1)(A). The FCC interpreted this section, which prohibits making calls using automatic telephone dialing systems or artificial or prerecorded messages to "encompass[ ] both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls." In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C.R. 14014, 14115 (2003). The Ninth Circuit held that this interpretation was entitled to deference under Chevron U.S.A, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843–44 (1984) because it "is consistent with the dictionary's definition of call in that it is defined as 'to communicate with or try to get into communication with a person by telephone' " and because it "is also consistent with the purpose of the TCPA—to protect the privacy interests of telephone subscribers." Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 954 (9th Cir. 2009).

 **\*5** In 2016, the Supreme Court wrote, "A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 156 (2016). The Supreme Court alluded to the issue this year, citing Campbell-Ewald Co. in a

footnote, but expressly leaving the question unresolved. See Facebook, Inc. v. Duguid, 141 S. Ct. 1163, 1168 n.2 (2021) ("Neither party disputes that the TCPA's prohibition also extends to sending unsolicited text messages.... We therefore assume that it does without considering or resolving that issue."). The First Circuit has interpreted Campbell-Ewald Co. to hold that "[t]he TCPA also applies to ... text messages." Breda v. Cellco Partnership, 934 F.3d 1, 4 n.1 (1st Cir. 2019) (involving 47 U.S.C. § 227(b)(1)(A)(iii)).

The FCC has since interpreted § 227(c) to include text messages. See In re Emanuel "Manny" Hernandez; Click Cash Mktg., LLC; & Rock Solid Traffic, 2018 WL 6830220 at *1 (F.C.C. Dec. 21, 2018) ("It is illegal for persons or entities, including advertisers and marketers, to make marketing calls to telephone numbers listed on the DNC. This prohibition includes both voice calls and text messages.").

Kelly Auto has not cited any cases holding that a text message is not a "call" for the purposes of the TCPA. Given the overwhelming weight of authority, this Court finds that Sagar has stated a claim that he received a "telephone call" for the purposes of § 227(c).

### ii. "Residential Telephone Subscriber"

Kelly Auto also argues that 47 U.S.C. § 227(c), under which both counts arise, only covers "residential telephone subscribers," and that Sagar has not adequately alleged that he is a residential telephone subscriber. The TCPA authorizes the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). The relevant FCC regulations prohibit calling a "residential telephone subscriber," 47 C.F.R. § 64.1200(c)(2), 47 C.F.R. § 64.1200(d), but "[t]he rules set forth in paragraph (c) and (d) ... are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991.' " 47 C.F.R. § 64.1200(e).

The FCC considered the inclusion of wireless telephone numbers as residential telephone subscribers on the national do-not-call list in that Report and Order. The FCC concluded that "[a]llowing wireless subscribers to register

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 68 of 95

Sagar v. Kelly Automotive Group, Inc., Not Reported in Fed. Supp. (2021)

on a national do-not-call list furthers the objectives of the TCPA," considering that "it is well-established that wireless subscribers often use their wireless phones in the same manner in which they use their residential wireline phones" and "there is a growing number of consumers who no longer maintain wireline phone service, and rely only on their wireless telephone service." 18 F.C.C.R. 14014 at *14038–39. The FCC interpreted the reference to "residential telephone subscribers" to relate to the goal "to curb the 'pervasive' use of telemarketing 'to market goods and services to the home.' " Id. at 14038. "As a practical matter, since determining whether any particular wireless subscriber is a 'residential subscriber' may be more fact-intensive than making the same determination for a wireline subscriber, [the FCC] will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers,' " although this "may require a complaining wireless subscriber to provide further proof of the validity of that presumption should [the FCC] need to take enforcement action." Id. at 14039. The FCC accordingly amended the relevant regulations to include the above-quoted language.

**\*6** Kelly Auto argues that the FCC interpretation is not worthy of any deference because "the agency's interpretation was completely devoid of any statutory analysis and made no effort to explain or justify the agency's position." Dkt. 19 at 20 (quoting Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC, 982 F.3d 258, 265 (4th Cir. 2020)). The FCC interpreted the statutory focus on residential privacy rights to extend to the use of cell phones as residential lines, see 18 F.C.C.R. 14014 at 14038–39. Indeed, because of the rise in wireless-only households, the FCC reasonably concluded that a person can be disturbed in the home through their cell phone.[1] The FCC's rationale is persuasive: allowing cell phones to be registered on the DNC list furthers the interest in protecting residential privacy, even if not all calls to cell phones will reach the cell phones while they are in a residence.

Alternatively, Kelly Auto argues that Sagar has not alleged any facts supporting his "bare formulaic assertions" that his number is a residential telephone line and that he was the subscriber and sole user. This argument is a non-starter. Sagar has plausibly pleaded that he uses his cell phone for personal purposes as a residential line and that he has put it on the National Do-Not-Call Registry. See Rosenberg v. LoanDepot.com, LLC, 435 F. Supp. 3d 308, 324 (D. Mass. 2020) (finding that a plaintiff alleging he "placed his cellular phone number on the National Do Not Call registry and that

he uses his cell phone as his residential line" is sufficient to survive a motion to dismiss).

## II. Motion to Strike Class Allegations

Kelly Auto moves to strike Sagar's class action allegations. Kelly Auto argues that the "Do Not Call Registry Class" "is an impermissible fail-safe class and is overbroad" and that the "Internal Do Not Call Class" "is a revocation class that implicates a plethora of individualized issues not appropriate for class treatment." Dkt. 22 at 1. It additionally argues that "neither proposed class satisfies the numerosity, commonality and predominance requirements of Rule 23" and that "no amount of discovery or time will allow Plaintiff's two proposed classes to meet the requirements of Rule 23." Id. at 1, 8. Sagar rejects these contentions, and moreover argues that such an inquiry is premature.

### A. Legal Standard

Rule 23(c)(1)(A) requires the court to "determine by order whether to certify the action as a class action" "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1)(A). "Nothing in the plain language of Rule 23(c)(1)(A) ... prohibits a defendant from seeking early resolution of the class certification question." Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935, 939–40 (9th Cir. 2009).

Rule 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "If it is obvious from the pleadings that the proceeding cannot possibly move forward on a classwide basis, district courts [may] use their authority under Federal Rule of Civil Procedure 12(f) to delete the complainant's class allegations." Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 59 (1st Cir. 2013). This ruling "is committed to the district court's sound judgment," but "a court should typically await the development of a factual record before determining whether the case should move forward on a representative basis." Id. "[C]ourts should exercise caution when striking class action allegations based solely on the pleadings" because "such motions are narrow in scope, disfavored in practice, and not calculated readily to invoke the court's discretion," id (quoting Boreri v. Fiat S.p.A., 763 F.2d 17, 23 (1st Cir. 1985)), and "striking a portion of a pleading is a drastic remedy ... often sought by the movant simply as a dilatory

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 69 of 95

Sagar v. Kelly Automotive Group, Inc., Not Reported in Fed. Supp. (2021)

or harassing tactic," id. (quoting 5C Charles Alan Wright, et al., Federal Practice & Procedure § 1380 (3d ed. 2011)). This caution is warranted and striking class allegations "is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of ... litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." Id. (quoting Mazzola v. Roomster Corp., 849 F. Supp. 2d 395, 410 (S.D.N.Y. 2012)).

## B. Analysis

 *7  Kelly Auto argues that individualized questions, such as consent or an established business relationship, mean that common questions do not predominate as to either proposed class. Consent is an affirmative defense to a TCPA claim. See Breda, 934 F.3d at 4 n.4 (holding with respect to § 227(b)(1)(A)(iii) that consent is "an affirmative defense, which the caller has the burden to prove"). As such, a question of consent is insufficient to warrant striking either class, at least at such an early stage. See Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003) ("[W]here common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses."); see also Rosenberg, 435 F. Supp. 3d at 318 ("[Defendant's] citation of consent as a potential affirmative defense is insufficient to warrant striking the putative class solely on the pleadings."); Kristensen v. Credit Payment Servs., 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014) ("[C]ourts should ignore a defendant's argument that proving consent necessitates individualized inquiries in the absence of any evidence that express consent was actually given."). Similarly, the issue of the existence of prior business relationships is better resolved on a record.[2]

Kelly Auto also argues that the "Do Not Call Registry" Class is an impermissible "fail-safe class." A "fail-safe class" is

"a class defined in terms of the legal injury." In re Nexium Antitrust Litig., 777 F.3d 9, 22 (1st Cir. 2015). The issue is that membership in the class "cannot be defined until the case is resolved on its merits" and the liability of the defendant is determined. MSP Recovery Claims v. Plymouth Rock Assur. Corp., Inc., 404 F. Supp. 3d 470, 485 (D. Mass. 2019) (quoting Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 538 (6th Cir. 2012)). Such a class "is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those class members win or, by virtue of losing, they are not in the class and are not bound." In re Nexium, 777 F.3d at 22 n.19 (quoting Nationwide Mut. Ins. Co., 693 F.3d at 537). "To avoid such impermissible classes, in approving a proposed class definition, a court must ensure that eligibility as a class member is not dependent upon a legal conclusion." MSP Recovery Claims, 404 F. Supp. 3d at 485 (cleaned up). This class, defined by the objective fact of placing a number on the Do Not Call Registry, is not impermissibly based on a legal conclusion.[3] It is difficult to imagine how a plaintiff could define a class alleging "Do Not Call" Registry violations without requiring that class members placed their numbers on the Registry. This is a readily identifiable objective criterion that does not trigger fail-safe concerns. It would be simply inappropriate to strike the class allegations.

## ORDER

 *8  For the reasons stated above, Defendant's Motion to Dismiss (Dkt. 18) and Motion to Strike Class Allegations (Dkt. 21) are **DENIED.**

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5567408

---

Footnotes

1    This trend is even more pronounced today. According to the National Center for Health Statistics, 68.0% of adults and 79.1% of children live in wireless-only households. Steven J. Blumberg & Julian V. Luke, National Center for Health Statistics, Wireless Substitution: Early Release of Estimates from the National Health Interview Survey, January–June 2021 1, Nov. 2021, cdc.gov/nchs/data/nhis/earlyrelease/wireless202111.pdf. The percentage of households without a landline is even higher for adults aged 25–29 (85.0%), aged 30–34 (86.1%), or renting their home (81.9%). Id.

2    So too, the issue of numerosity is better resolved at the class certification stage with the benefit of a record.

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 70 of 95

3    Some courts have found similarly defined classes not to be impermissible fail-safe classes. See Johansen v. One Planet Ops, Inc., No. 16-00121, 2018 WL 1558263, at *3 (S.D. Ohio, Mar. 5, 2018) ("The class does not hinge on whether the putative class member has a claim under the TCPA. Instead, it is merely limited to those who received calls—it may include those who are entitled to relief, and it may include those who are not entitled to relief because, for example, they actually consented to receive the calls."); Waterbury v. A1 Solar Power, Inc., No. 15-2374, 2016 WL 3166910, at *5 (S.D. Cal. June 7, 2016) ("The Court can determine membership in Plaintiffs' putative classes using objective criteria"); Panacci v. A1 Solar Power, Inc., No. 15-00532, 2015 WL 3750112, at *8 (N.D. Cal. June 15, 2015) ("Membership in both of Plaintiff's proposed classes can be determined without reaching any legal conclusions: to determine whether someone is in the class, one simply needs to answer questions such as whether the person is on a DNC registry or whether the person received a certain number of phone calls from Defendants within a certain timeframe."). But see Bryant v. King's Creek Plantation, L.L.C., No. 4:20-0061, 2020 WL 6876292, at *3 (E.D. Va. June 22, 2020) ("This Court concludes that members of a TCPA class defined to include lack of consent, either explicitly or via the members' telephone listing on the National Do Not Call Registry, will automatically prevail on the TCPA ... claim.... This creates an impermissible fail-safe class.").

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

🚩 KeyCite Yellow Flag

Disagreed With by Cole v. C/T Install America, LLC, E.D.Pa., March 23, 2026

⬡ Cited in uploaded document as:

Sayed v. Naturopathica Holistic Health, Inc., No. 25-847, 2025 U.S. Dist. LEXIS 209469, 2025 WL 2997759, at *2 (M.D. Fla. Oct. 24, 2025)

2025 WL 2997759
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

Aliana El SAYED, Individually and on behalf of all others similarly situated Plaintiff,

v.

NATUROPATHICA HOLISTIC HEALTH, INC., et al, Defendants.

Case No. 8:25-cv-00846-SDM-CPT
|
Signed October 24, 2025

**Attorneys and Law Firms**

Manuel Santiago Hiraldo, Hiraldo PA, Ft. Lauderdale, FL, Michael Eisenband, Eisenband Law, P.A., Fort Lauderdale, FL, for Plaintiff.

Garrett Lane Roberts, Zumpano Castro, PLLC, Brandon, FL, for Defendants.

**ORDER**

STEVEN D. MERRYDAY, UNITED STATES DISTRICT JUDGE

**\*1** Alleging violations of the Telephone Consumer Protection Act (TCPA), Ali-ana El Sayed, in a prospective class action, sues (Doc. 9) Naturopathica Holistic Health, Inc., and Naturopathica's CEO, Catherine M. O'Brien. The defendants move (Doc. 13) to dismiss and El Sayed responds. (Doc 14)

Naturopathica sent to El Sayed a promotional text message to which El Sayed responded "STOP" on February 1, 2022. (Doc. 9 at ¶ 9) Despite receiving an auto-mated response

("You are now unsubscribed from all Naturopathica SMS marketing messages and will receive no further messages."), El Sayed received an additional promotional text message from Naturopathica on April 23, 2023, and another on April 30, 2023. (Doc. 9 at ¶ 10) When El Sayed received each text message, her num-ber was on the "National Do-Not-Call Registry." (Doc. 9 at ¶ 10)

El Sayed sues under the TCPA, which provides a "private right of action" for a "person who has received more than one telephone call within any 12-month pe-riod by or on behalf of the same entity in violation of the regulations prescribed un-der this subsection." 47 U.S.C. § 227(c)(5); *see also* 47 C.F.R. § 64.1200(d). Relying on a 2003 "Order" issued by the Federal Communications Commission, El Sayed ar-gues that paragraph 227(c)(5) of the TCPA, although textually limited to "telephone call[s]," includes text messages. *In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (The TCPA "encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls.").

Contrary to El Sayed's contention that a natural reading of the term "tele-phone call" includes a "text message," "it is only though the rulemaking authority of the FCC that the voice call provisions of the TCPA have been extended to text mes-sages." *Salcedo v. Hanna*, 936 F.3d 1162, 1169 (11th Cir. 2019), *abrogated on other grounds by Drazen v. Pinto*, 74 F.4th 1336 (11th Cir. 2023). However, a "District Court is not bound by the FCC's interpretation of the TCPA." *McLaughlin Chiropractic Asso-ciates, Inc. v. McKesson Corporation*, 606 U.S. 146, 168 (2025). Rather, "a district court must independently determine for itself whether the agency's interpretation of a stat-ute is correct. District courts are not bound by the agency's interpretation, but instead must determine the meaning of the law under ordinary principles of statutory inter-pretation." *McLaughlin Chiropractic*, 606 U.S. at 155 (citing *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 402 (2024)).

"In interpreting a statute, we start with the plain language of the provisions to be interpreted." *Pugliese v. Pukka Dev., Inc.*, 550 F.3d 1299, 1303 (11th Cir. 2008). "[U]nless otherwise defined, words will be interpreted as taking their ordinary, con-temporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42. "The canons of construction often play a prominent role in that endeavor, serving as useful tools to discern that ordinary meaning." *Heyman v. Cooper*, 31

Case 1:26-cv-00155-JKM   Document 49-1   Filed 07/30/26   Page 72 of 95

F.4th 1315, 1319 (11th Cir. 2022) (cleaned up). "But if the text is clear, the analysis begins and ends there." *Davis v. CVS Pharmacy, Inc.*, 2025 WL 2491195, at *1 (Winser, J.) (N.D.Fla., 2025) (citing *Young v. Grand Canyon Univ., Inc.*, 980 F.3d 814, 818 (11th Cir. 2020)).

**\*2**  Although some judges differ, I agree with and adopt Judge Winser's opinion that "the statutory text here is clear, and a text message is not a 'telephone call.' " *Da-vis*, 2025 WL 2491195 at *1. In addition to the fact that in common American Eng-lish usage, a "telephone call" and a "text message" are separate and distinct forms of communication, the term "text message" appears elsewhere in the TCPA and related amendments, an appearance that confirms Congress understood the pertinent dis-tinction and legislated mindful of the distinction. *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. P, § 503(a) (codified at 47 U.S.C. §§ 227(e)(8)(A)–(B)) (distinguishing between "a call made using a voice service" and "a text message sent using a text messaging service"). "[W]hen Congress uses different terms, we expect that they hold different meanings, especially when the same mean-ing would render one of the terms superfluous." *Fernandez v. Seaboard Marine Ltd.*, 135 F.4th 939, 958 (11th Cir. 2025) (citing *Pulsifer v. United States*, 601 U.S. 124, 149 (2024)). The omission of "text message" from paragraph 227(c)(5) confirms that the provision applies only to a "telephone call."

Also, El Sayed fails to adequately plead O'Brien's personal liability. "[P]er-sonal liability of an officer under the TCPA should be the exception rather than the rule." *Appelbaum v. Rickenbacker Grp., Inc.*, 2013 WL 12121104, at *3 (Ryskamp, J.) (S.D. Fla. 2013). As CEO of Naturopathica, O'Brien "is not liable unless [s]he com-mitted, directly participated in, or otherwise authorized the commission of wrongful acts within the scope of [her] employment." *Mais v. Gulf Coast Collection Bureau, Inc.*, 2013 WL 1283885, at *4 (Scola, J.) (S.D. Fla. 2013). "Some showing of intentional misconduct or gross failure to implement policies that comply with the TCPA should be required." *Appelbaum*, 2013 WL 12121104, at *3. The complaint alleges only that O'Brien "personally participated in and/or directed and authorized" the text mes-sages (Doc. 1 at ¶ 21); but "mere conclusory statements" cannot survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The defendants' motion to dismiss is **GRANTED**. No later than **NOVEM-BER 14, 2025**, El Sayed may amend the complaint.

El Sayed is reminded that all papers must comply with the Local Rules of the Middle District of Florida, https://www.flmd.uscourts.gov/local-rules, including Rule 1.08. Failure to comply with the Local Rules will result in an order striking a non-compliant paper.

ORDERED in Tampa, Florida, on October 24, 2025.

**All Citations**

Slip Copy, 2025 WL 2997759

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Disagreed With by Stockdale v. Skymount Property Group, LLC, N.D.Ohio, March 3, 2026

2025 WL 2856295
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

Chet Michael WILSON, Plaintiff,

v.

MEDVIDI INC., Defendant.

Case No. 5:25-cv-03996-BLF
|
Signed October 7, 2025

**Attorneys and Law Firms**

Anthony I. Paronich, Pro Hac Vice, Paronich Law, P.C., Hingham, MA, Dana J. Oliver, Oliver Law Center, Inc., Rancho Cucamonga, CA, for Plaintiff.

Eric Knowles, Pro Hac Vice, Paul Stephen St. Marie Jr., Pro Hac Vice, Frier & Levitt, LLC, Pine Brook, NJ, Young Woo Choi, Pleasanton, CA, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND**

[Re: ECF No. 14]

BETH LABSON FREEMAN, United States District Judge

**\*1** Before the Court is Defendant MEDVIDI Inc.'s motion to dismiss Plaintiff Chet Michael Wilson's complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 14 ("Mot."). Plaintiff filed an opposing brief, and Defendant filed a reply. ECF No. 26 ("Opp."); ECF No. 27 ("Reply"). The Court concludes that the motion is suitable for adjudication without oral argument and VACATES the hearing scheduled for October 23, 2025. *See* Civ. L.R. 7-1(b).

For the reasons below, Defendant's motion is GRANTED WITH LEAVE TO AMEND.

## I. BACKGROUND

On May 7, 2025, Plaintiff filed this instant two-count class action complaint against Defendant alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c)(5), and implementing regulations 47 C.F.R. 64.1200(c), (d). ECF 1 ("Compl."). Plaintiff alleges that he registered his phone number on the National Do Not Call Registry, did not consent to receive calls from Defendant, and received multiple telemarketing text messages from Defendant in 2022 and 2024. *Id.* ¶¶ 18–22. Defendant alleges that he continued to receive text messages even after replying "STOP" in 2022. *Id.* ¶ 22.

Count I of the complaint alleges that Defendant violated the TCPA by making telemarketing calls to numbers on the Do Not Call Registry under 47 C.F.R. 64.1200(c)(2). *Id.* ¶ 39. Count II of the complaint alleges that that Defendant violated the TCPA by "sending telemarketing calls, except for emergency purposes, to Plaintiff and members of the Internal Do Not Call Class despite previously requesting that such calls stop." *Id.* ¶ 44.

## II. LEGAL STANDARD

Dismissal is appropriate under Rule 12(b)(6) "if the complaint fails to state a cognizable legal theory or fails to provide sufficient facts to support a claim." *Sinclair v. City of Seattle,* 61 F.4th 674, 678 (9th Cir. 2023). The task when ruling on a motion to dismiss "is to evaluate whether the claims alleged [plausibly] can be asserted as a matter of law." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Upon granting a motion to dismiss for failure to state a claim, a court has discretion to allow leave to amend the complaint pursuant to Rule 15(a). "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear ... that the complaint could not be saved by amendment." *Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). In deciding whether to grant leave to amend, the Court considers the factors set forth by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v.*

*Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003). The Ninth Circuit in *Eminence Capital* identified several factors to consider, including (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment. *Id.* at 1052.

## III. DISCUSSION

**\*2** Defendant argues that section 227(c)(5) does not cover text messages, and that even if it did cover them, Plaintiff has not sufficiently pleaded factual allegations establishing direct or vicarious liability under the TCPA. The Court considers each argument in turn.

### A. Regulation of Text Messages Under Section 227(c)

The TCPA prohibits certain unsolicited telephone solicitations, including calls using automatic telephone dialing systems, *see* 47 U.S.C. § 227(b), and calls sent to residential telephone subscribers who have registered their phone numbers on the national Do Not Call registry, *see id.* § 227(c). The TCPA authorizes the Federal Communications Commission ("FCC") to prescribe regulations implementing the requirements of its prohibitions. *Id.* § 227(b)(2), (c)(2). Section 227(c) creates a private right of action for any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." *Id.* § 227(c)(5). 47 C.F.R. § 64.1200(c) prohibits the initiation of telephone solicitations to residential telephone subscribers who have registered their telephone numbers on the national do-not-call registries maintained by the federal government, and 47 C.F.R. § 64.1200(d) prohibits the initiation of "any artificial or prerecorded-voice telephone call pursuant to [enumerated exemptions] ... unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls."

Defendant argues that section 227(c) does not apply to text messages because the phrases "text message" and "SMS" message do not appear in the statutory text, asserting that Congress's choice to use the terms "telephone call" and "artificial or prerecorded-voice telephone call" manifest an affirmative intent to preclude liability for text messages. Mot. at 8. The Court disagrees. As a preliminary matter, it is unsurprising that the statute does not use the term "text message" because, as Plaintiff points out, the statute was enacted in 1991, before the first-ever text message was sent in 1992. *See Keating v. Peterson's Nelnet, LLC*, 615 F. App'x

365, 370 (6th Cir. 2015). In determining whether section 227(c) applies to text messages, the Court looks to the plain meaning of the text rather than the specific facts or technology that Congress may have had in mind in 1991 at the time of the TCPA's passage. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).

Construing the provisions of a statute requires the Court to begin with its language—the inquiry begins and ends with the text if it is clear and unambiguous. *McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir. 2008). The TCPA itself does not define the term "call," which is a "request, demand, or command, [especially] to come or assemble." Call, Black's Law Dictionary (12th ed. 2024). This definition makes clear that a "call" is distinguished from other communications such as a "lesson" or "message" by the meaning it conveys, not the form it takes. The Ninth Circuit has already held that the term refers to both oral and written communications. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953–54 & n.3 (9th Cir. 2009) (explaining that the "ordinary, contemporary, common meaning" of the "call" is "to communicate or try to get into communication with a person by a telephone" (internal quotation marks and citation omitted)).[1]

**\*3** This common-sense interpretation is confirmed by the purpose and structure of the TCPA, which was enacted to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile machines and automatic dialers." S. Rep. No. 102-178, at 1 (1991). The core of section 227(c) is its prohibition of certain "telephone solicitations," which are defined by the statute as "the initiation of a telephone call or message *for the purpose of* encouraging the purchase or rental of[ ] ... property, goods, or services." 47 U.S.C. § (a)(4), (c)(1) (emphasis added). This language makes clear that Congress was more concerned with the purpose of the telephone communications it proscribed in the TCPA than the form in which those communications are transmitted. *See Abboud v. Circle K Stores Inc.*, 731 F. Supp. 3d 1094, 1102 (D. Ariz. 2024) ("The purpose of a text or call determines whether it qualifies as a telephone solicitation[.]").

Given Congress's stated goal "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object," 47 U.S.C. § 227(c)(1), it strains belief to suggest that Congress silently determined that such oral messages were more invasive or objectionable

than written ones. *See also Los Angeles Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 799 (9th Cir. 2017) ("When Congress passed the [TCPA] it sought to protect individuals against invasions of privacy, in the form of unwanted calls (and now text messages) using automatic telephone dialing systems."). Defendant's invitation to inject a distinction between written and oral telephone solicitations is contrary both to the remedial bent of the TCPA and precedent. *See, e.g., Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' ...."); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 985–86 (9th Cir. 2023) ("We have held that the receipt of unsolicited phone calls or text messages in violation of the TCPA is 'a concrete injury in fact sufficient to confer Article III standing.' " (citation omitted)); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) ("Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients."); *Brickman v. Facebook, Inc.*, 230 F. Supp. 3d 1036, 1040 (N.D. Cal. 2017) ("A text message is a 'call' within the meaning of the TCPA.").

Defendant nonetheless seeks to overcome the plain meaning of the statute by suggesting that the FCC, in implementing regulations pursuant to its section 227(b) authority to proscribe certain calls made using automatic telephone dialing systems, somehow ratified Defendant's interpretation of the term "call" in section 227(c) as being limited to voice calls. Mot. at 8. In 47 C.F.R. § 64.1200(a)(9), the FCC specifically explained that "the term 'call' includes a text message, including a short message service (SMS) call." According to Defendant, "by limiting this definition and intent to regulate text messages outlined in Section 64.1200(a), the FCC clearly indicated that, unless otherwise specified, a 'call' does not include a 'text message' or 'SMS message.' " Mot. at 8. This tortured reasoning provides no basis to depart from the plain meaning of the statutory text as it has been understood by consumers, the FCC, and courts since the TCPA's passage.

To begin with, the Court disagrees with the premise that, by defining "call" with reference to section 227(b) the FCC somehow signaled its position that the term "call" has a different meaning in section 227(b) and section 227(c), an interpretation which in any case would be disfavored by failing to give consistent meaning to the same term. *See United States v. Paulson*, 68 F.4th 528, 555 (9th Cir. 2023) ("[A] word or phrase is presumed to bear the same meaning throughout a text ...."). Moreover, it is unsurprising that the

FCC first articulated its interpretation of "call" with reference to section 227(b) because that provision, which relates to autodialer and robocall prohibitions, uses the standalone term "call" much more extensively. It makes sense that the FCC first defined the term "call" with respect to section 227(b) because the term is more directly relevant. In any case, even if the FCC had intended to make this distinction, it could not rewrite the statute contrary to the text's plain meaning—as the Supreme Court has recently instructed, courts have an independent constitutional duty to construe the terms of the TCPA independent of the FCC's regulations. *See McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 162 (2025).

**\*4** In short, nothing in the text, structure, or purpose of the TCPA suggests the distinction between written and oral communications that Defendant urges the Court to adopt. The Court concludes that a "telephone call" as used in 47 U.S.C. § 227(c) encompasses the types of text messages Plaintiff complains of.

### B. Allegations Set Forth in the Complaint

To state a claim under the TCPA, a plaintiff must allege that "(1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). A plaintiff establishes direct liability under the TCPA by pleading that the defendant itself actually sent the offending telephone communication. *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877 (9th Cir. 2014), *aff'd*, 577 U.S. 153 (2016). On the other hand, "[a] defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship ... between the defendant and a third-party caller." *Id.* at 879. Defendant argues that the factual allegations contained in the complaint fail to plausibly establish that Defendant sent the text messages directly or through a third party. Mot. at 10–11. The Court agrees.

The complaint does not plead sufficient facts to plausibly allege that Defendant was the party directly responsible for sending the alleged improper communications. Despite Plaintiff's conclusory allegation that the text messages were sent by Defendant, *see* Compl. ¶ 19, the complaint provides no factual details plausibly suggesting that Defendant actually sent them. There is no discussion, for example, of any investigation Plaintiff conducted to form the understanding that Defendant operated the separate phone numbers from which these messages were sent. Similarly, while alleging

that "Defendant and/or its affiliates, agents, and/or other persons or entities acting on Defendant's behalf violated the TCPA," *id.* ¶ 39, the complaint fails to allege any agency relationship or identify any third parties that could have sent the text messages. Such "unadorned labels" are insufficient as a matter of law to allege any agency relationship. *Armstrong v. Investor's Bus. Daily, Inc.*, No. 18-cv-182134-MFW, 2018 WL 6787049, at *1 (C.D. Cal. Dec. 21, 2018).

Agreeing with Defendant that the complaint fails to allege direct or vicarious liability, the Court turns to Defendant's argument that the complaint should be dismissed without leave to amend. Mot. at 12. Defendant argues that "granting leave to amend would be futile as there is no indication that Plaintiff could cure these fundamental deficiencies through further amendment." *Id.* at 13. The Court disagrees. While the Court finds that amendment would be futile if the Court had agreed with Defendant's first argument that section 227(c) does not apply to text messages, for the reasons above, the Court concludes that section 227(c) does apply to text messages. Amending the complaint to provide additional factual allegations concerning the circumstances in which the text messages were sent and the identities of any third parties

may be sufficient to state a claim for relief under TCPA and would assist the parties in clarifying the legal issues in this case. Moreover, there is no indication of any undue delay, bad faith on the part of Plaintiff, or undue prejudice to Defendant, and this would be the first time Plaintiff has amended the complaint.

## IV. ORDER

**\*5** For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) Defendant's motion to dismiss is GRANTED.

(2) The complaint is DISMISSED WITH LEAVE TO AMEND. Defendant shall have twenty-eight days from the date of this order to file an amended complaint. Amendment is limited to curing the factual deficiencies identified in this order. No new claims or parties may be added without leave of court.

## All Citations

Slip Copy, 2025 WL 2856295

## Footnotes

1    The *Satterfield* court's conclusion was based in part on *Chevron* deference. *Id.* at 1041. Although *Chevron* has since been overruled, the Supreme Court has instructed that precedents relying on *Chevron* remain fully intact. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2029274
Only the Westlaw citation is currently available.
United States District Court, D. Oregon,
Eugene Division.

Chet WILSON, individually and on behalf
of all others similarly situated, Plaintiff,
v.
SKOPOS FINANCIAL, LLC d/
b/a Reprise Financial, Defendant.

Case No. 6:25-cv-00376-MC
|
Signed July 21, 2025

**Attorneys and Law Firms**

Neal Weingart, Neal Weingart, Attorney at Law, Portland, OR, Patrick Harry Peluso, Pro Hac Vice, Peluso Law LLC, Denver, CO, for Plaintiff.

Nicholas L. Dazer, Nicholas Dazer PC, Clackamas, OR, Charles Dunham Biles, Pro Hac Vice, Biles Wilson, PLLC, Heath, TX, for Defendant.

OPINION AND ORDER

Michael McShane, United States District Judge

**\*1** Plaintiff Chet Wilson brings this putative class action against Defendant Skopos Financial d/b/a Reprise Financial, alleging that Defendant violated the Telephone Consumer Protection Act ("TCPA") by sending solicitous text messages to phone numbers, like Plaintiff's, on the national do-not-call registry ("DNC Registry"). Compl. ¶ 30–36, ECF No. 1. Defendant now moves to dismiss the Complaint, arguing that the messages at issue are not "solicitations" under the TCPA and that the protections of the DNC Registry should not apply to text messages. Def.'s Mot. Dismiss 2, ECF No. 11. Defendant's Motion is DENIED, for the reasons explained below.

**BACKGROUND**[1]

Plaintiff is a resident of Florence, Oregon. Compl. ¶ 3. Defendant is an auto-loan lender based in Texas. *Id.* at ¶ 8. At least 30 days after Plaintiff registered his phone number on the DNC Registry, that number received the following four text messages from Defendant. *Id.* at ¶ 9.

> On November 14, 2024: "... BRIAN, this is Julie with Reprise Financial. We received your loan request through LendingTree. Please log in at RepriseFinancial.com to complete ..."

> On November 15, 2024: "... BRIAN, this is Julie with Reprise Financial. We received your loan request through LendingTree. Please log in at RepriseFinancial.com to complete ..."

> On November 20, 2024: "... Brian, this is Jamie with Reprise Financial with a reminder to complete your application. Please log in at RepriseFinancial.com to review ..."

> On November 22, 2024: "... Brian, this is Jamie with Reprise Financial. Just a reminder to log in at RepriseFinancial.com to complete your application and review next ..."

*Id.* at ¶ 15. Plaintiff has been the sole customary user of this phone number for at least five years, but "Brian" is not Plaintiff's name. *Id.* at ¶¶ 9, 16. Plaintiff believes Defendant sent the messages "intending to reach someone other than Plaintiff," as he has never provided his number to Defendant, never had a business relationship with Defendant, and never opted-in to receive text messages from Defendant. *Id.* at ¶ 16–19.

Plaintiff filed his Complaint on March 4, 2024, alleging that Defendant violated the TCPA by sending those four text messages to a number on the DNC Registry. *Id.* at ¶¶ 30–36. The Complaint further alleges that, "[a]s part of its business practice, Defendant sends telemarketing solicitations via text message to consumers in hopes that they will apply for auto loans through Defendant." *Id.* at ¶ 13. Without providing individual examples, Plaintiff contends that Defendant conducts "a wide-scale telemarketing campaign" where it "repeatedly sends unsolicited telemarketing text messages to consumers," including those on the DNC Registry. *Id.* at ¶¶ 14, 20. Plaintiff seeks to bring a class action on that basis, claiming the unauthorized messages caused him and others harm, like aggravation, nuisance and invasion of privacy, wear and tear on their telephones, consumption of battery life, lost cellular minutes, and loss of value. *Id.* at ¶ 21.

## LEGAL STANDARD

**\*2**  To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). When considering a motion to dismiss, the court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant. *Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

## DISCUSSION

Plaintiff's Complaint asserts one cause of action under 47 U.S.C. § 227(c)(5) for violation of 47 C.F.R. § 64.1200(c). Compl. ¶¶ 30–36. Section 227(c)(5) provides a private right of action to any person who receives "more than one telephone call within any 12-month period by or on behalf of the same entity in violation of" § 64.1200(c). § 227(c)(5); *see also Barton v. JMS Assoc. Mktg., LLC*, No. 21-35836, 2023 WL 2009925 (9th Cir. Feb. 15, 2023) (finding a private right of action under § 227(c)(5) for violation of § 64.1200(c)(2)). Section 64.1200(c) provides that "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do -not-call registry." § 64.1200(c)(2). "The term *telephone solicitation* means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." § 64.1200(f)(15); § 227(a)(4) (emphasis in the original). It does not include calls or messages sent to someone with their "prior express invitation or permission." *Id.*

Defendant moves to dismiss the Complaint, arguing Plaintiff has failed to state a claim for relief because: (1) the text messages at issue do not constitute "telephone solicitations" as defined by the TCPA and (2) § 227(c) creates a cause of action for "telephone calls," not text messages. Taking each argument in turn, the Court denies Defendant's Motion. Def.'s Mot. 8–11.

## I. The Complaint sufficiently alleges that Plaintiff received "telephone solicitations."

Whether a contact is a "solicitation" turns "on the purpose of the message." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012) (citing *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14098 ¶ 141 (June 26, 2003)). Courts are to "approach the problem with a measure of common sense." *Id.* In *Chesbro*, the plaintiff received "robot-calls" that "urged the listener to 'redeem' his Reward Zone points, directed him to a website where he could further engage with the [points], and thanked him for 'shopping at Best Buy.' " *Id.* The Ninth Circuit concluded that the messages were solicitations because, although there was no explicit mention to buy a good or service, the context of messages clearly implied an encouragement to make future purchases, as the points had no other use. *Id.* Contrarily, in another Ninth Circuit case, the plaintiff received an automated text asking him to enter a validation code on the defendant's website to complete a registration that the plaintiff had initiated. *Aderhold v. car2go N.A. LLC*, 668 F. App'x 795, 796 (9th Cir. 2016). The Ninth Circuit ultimately dismissed the claims due to consent, but in so holding, the Ninth Circuit explained that the message did not constitute "telemarketing" because it "contain[ed] no content encouraging purchase of [the defendant's] services. The message was directed instead to completing the registration process initiated by [plaintiff] and to validating personal information." *Id.* The Ninth Circuit agreed with "the FCC's determination that such messages, 'whose purpose is to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender are not advertisements.' " *Id.* (quoting *In re Rules & Regs. Implementing the Tel. Consum. Prot. Act of 1991*, 21 FCC Rcd. 3787, 3812 ¶ 49 (Apr. 6, 2006)).

**\*3**  Defendant here argues that "every word of the text messages at issue demonstrates that their purpose is to facilitate the completion of a loan application that was previously begun by a customer." Def.'s Mot. 8. Defendant contends that the only plausible inference from the Complaint is that it sent the messages trying to complete an application that a consumer had previously initiated; consequently, nothing indicates that the messages were sent with the purpose of securing new business. Plaintiff even acknowledges that he believed Defendant placed the texts intending to reach someone other than him. Compl. ¶ 16. Therefore, because the texts were sent to inform the recipient

on how to complete his loan, they cannot be considered solicitations, according to Defendant.

The Court disagrees. Defendant's argument relies implicitly on the recipient's consent to convert an otherwise solicitous messages into a "purely informational" message. Here, however, the recipient did not consent. The Complaint alleges that Plaintiff has no relationship with Defendant, has never provided his number to Defendant, has never had a business relationship with Defendant, and did not opt-in to receive any text messages from Defendant. There is nothing to indicate that Defendant had some existing account or ongoing transaction with Plaintiff. Assuming the truth of those allegations, the natural inference is that Defendant sent the messages to Plaintiff's phone number, pretextually referencing a loan application in order to promote its loan services to Plaintiff. The Court sees no other reason—and, notably, Defendant proffers no alternative reason—for why an auto-loan lender would reach out to a phone number on the DNC Registry that it has no existing relationship with and direct it to its website. As highlighted by Plaintiff, *Whittaker v. Freeway Ins. Servs. Am., LLC*, No. CV-22-8042-PCT-DGC, 2023 WL 167040 (D. Ariz. Jan. 12, 2023) presents a similar dispute. In *Whittaker*, the plaintiff received voicemails purporting to be following up on a request for an insurance quote and asking plaintiff to call back to hear more about how to save money on car insurance. The district court explained that "[e]xcept for encouraging the purchase of its products, it is hard to imagine why an insurance company would contact a consumer not already insured by it and state that it looked forward to saving the consumer money." *Id.* at *2. Granted, this matter differs from *Whittaker* in that Defendant here did not mention anything about saving money or promote any specific products. Beyond encouraging Plaintiff to complete a loan application through Defendant's website, the messages did not include an explicit encouragement to buy anything, they did not contain any price quotes, and they did not refer the recipient to another entity for purposes of selling anything. Nonetheless, "[n]either the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Chesbro*, 705 F.3d at 918. Here, common sense dictates suspicion. It is plausible that the messages, although informational on their face, were a part of a larger marketing scheme. The Court is reluctant to hold otherwise, as it could permit entities to circumvent the DNC Registry by addressing some unidentifiable person in the communication and claiming he or she initiated contact. With some preliminary discovery, the true purpose

and intended recipient of the text messages will be better evaluated.

The Court therefore declines to dismiss the Complaint, finding that it plausibly alleges Defendant initiated the text messages to a number listed on the DNC Registry "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services."

**II. Text messages are "calls" for purposes of § 227(c)(5).**

 **\*4** Defendant raises a secondary argument in favor of dismissal. It contends that, because § 227(c)(5) explicitly references "telephone calls" in its cause of action, it does not allow for plaintiffs to bring TCPA claims based on text messages sent in violation of the DNC Registry. Specifically, Defendant argues that only Congress has the authority to dictate who has a cause of action under the TCPA and "there is absolutely no basis for the FCC's conclusion that Congress (in 1991) meant the term 'call' to mean 'text call.' " Def.'s Reply 7. Defendant is incorrect. The cause of action provided in § 227(c)(5) includes text messages.

The TCPA generally targets two types of unsolicited phone calls: those made using automatic dialers, 42 U.S.C. § 227(b), and those made in contravention of do-not-call registries, 42 U.S.C. § 227(c). For both, Congress explicitly conferred on the FCC the authority to promulgate implementing regulations. *See* §§ 227(b)(2), 227(c)(1)–(4). Through those regulations, the FCC has expanded the TCPA to apply to text messages. First, § 227(b)'s protections against automatic dialers were clarified as applying to both telephone calls and text messages issued without the recipient's consent. *See 2003 Rules & Reguls.*, 18 F.C.C. Rcd. at 14115 ("We affirm that under the TCPA, it is unlawful to make any call using an automatic telephone dialing system or an artificial or prerecorded message to any wireless telephone number.... This encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls .... Congress found that automated or prerecorded telephone calls were a greater nuisance and invasion of privacy than live solicitation calls."); *In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961 ¶ 107 (July 10, 2015) ("Glide raises the issue of whether SMS text messages are subject to the same consumer protections under the TCPA as voice calls. We reiterate that they are."); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) ("a text message is a 'call' within the meaning of the TCPA"); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message

to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii).''). Recently, the FCC clarified "that text messages are included in the TCPA prohibitions and the private right of action in § 227(c)(5)." *See Hudson v. Palm Beach Tan, Inc.*, No. 1:23CV486(WO) (JEP), 2024 WL 4190513, at *8 (M.D.N.C. Aug. 12, 2024), *report and recommendation adopted*, No. 1:23-CV-486, 2024 WL 4188310 (M.D.N.C. Sept. 13, 2024). Indeed, in 2024, the FCC explained: "The Commission adopts the proposal to codify the National DNC Registry's existing protections to text messages. Texters must have the consumer's prior express invitation or permission before sending a marketing text to a wireless number in the DNC Registry." *Targeting and Eliminating Unlawful Text Messages, Implementation of the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, 89 Fed. Reg. 5098, 5101, 5099 (Jan. 26, 2024). Defendant's argument that the FCC lacks authority to do so is undermined by the statutory structure of the TCPA, which explicitly delegates such authority, as well as the vast applicable case law which abides by the FCC's regulations and guidance.

Moreover, the FCC's decision to include text messages is congruent with Congress's overarching goals for the TCPA. Congress enacted the TCPA "to address a growing number of telephone marketing calls and certain telemarketing practices thought to be an invasion of consumer privacy and even a risk to public safety." *2003 Rules & Reguls.*, 18 F.C.C. Rcd. at 14018. Section 227(c) specifically targets "the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." § 227(c)(1). With those goals in mind, the "basis" for the FCC's conclusion becomes abundantly clear: unsolicited text messages invade the privacy and disturb the solitude of their recipients. *See Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017). They should therefore be included within the purview of the DNC Registry's protections. The mere fact that Congress did not envision the ubiquitousness of text messaging in 1991 does not mean the FCC's conclusion lacks support. On the contrary, as technology has developed over the years, so too has our understanding of the TCPA's protections. *See 2003 Rules & Reguls.*, 18 F.C.C. Rcd. at 14017 ("significant changes in the technologies and methods used to contact consumers ... warrant modifications to our existing rules, and adoption of new rules if consumers are to continue to receive the protections that Congress intended to provide when it enacted the TCPA"). It cannot be argued in good faith that text messages are so categorically different from phone calls that the former cannot be considered an invasion of consumer privacy when directed at numbers on the DNC Registry.

**\*5** On this point, Defendant is without support. The Court concludes that unsolicited text messages sent in violation of the DNC Registry can give rise to a cause of action under § 227(c)(5).

## CONCLUSION

For the reasons state above, Defendant's Motion to Dismiss, ECF No. 11, is DENIED.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 2029274

Footnotes

1    At the motion to dismiss stage, the Court takes Plaintiff's allegations as true. *See Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag

Distinguished by Frable v. Synchrony Bank, D.Minn., October 17, 2016

Cited in uploaded document as:

Wright v. Target Corp., 2015 U.S. Dist. LEXIS 167000, 2015 WL 8751582, *7 (D. Minn. Dec. 14, 2015)

2015 WL 8751582

Only the Westlaw citation is currently available.

United States District Court, D. Minnesota.

Sean WRIGHT, Plaintiff,

v.

TARGET CORPORATION, Defendant.

Case No. 14-cv-3031 (SRN/HB)

|

Signed December 14, 2015

**Attorneys and Law Firms**

Mark T. Lavery, Hyslip & Taylor LLC LPA, 1100 W. Cermak, Suite B410, Chicago, Illinois 60608; J.D. Haas, J.D. Haas & Associates PLLC, 9801 Dupont Avenue South, Suite 430, Bloomington, Minnesota 55431, for Plaintiff.

Brian Melendez, Dykema Gossett PLLC, 4000 Wells Fargo Center, 90 South Seventh Street, Minneapolis, Minnesota 55402, for Defendant.

**MEMORANDUM OPINION AND ORDER**

SUSAN RICHARD NELSON, United States District Judge

**\*1** This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment [Doc. No. 19] and Defendant's Motion for Summary Judgment [Doc. No. 31]. For the reasons set forth below, the Court denies both motions.

**I. BACKGROUND**

Plaintiff Sean Wright brings this suit against Defendant Target Corporation ("Target") alleging that Target contacted Plaintiff on his cellular telephone, in violation of the Telephone Consumer Protection Act (TCPA). (See Compl. ¶¶ 24-27 [Doc. No. 1].) In April 2013, Wright, a resident of West Virginia, signed a Joint Account Request and Agreement ("Joint Account Agreement"), in which he agreed to be added to an existing Target credit card account that was issued in the name of his former wife. (Joint Account Agreement, Ex. F to Lavery Cert. [Doc. No. 22-6 at 15].) The Target credit card was serviced by Target Corporation's subsidiary Target Corporate Services, Inc., which provides collection services on Target credit card accounts. (Wolf Decl. ¶ 1 [Doc. No. 34].)

The Joint Account Agreement included the following statement:

> You are requesting that you be added to the account referenced above as a joint accountholder and that a credit card be issued to you. You agree to be bound by the Credit Card Agreement that will be sent to you along with your credit card and you, jointly and individually, promise to pay and be liable for, all amounts charged to the account under the terms set forth in the Credit Card Agreement. ... Once you are added to the above referenced account as a joint accountholder you become a permanent joint accountholder and your name cannot be removed in the future.

(Joint Account Agreement, Ex. F. To Lavery Cert. [Doc. No. 22-6 at 15].) The Joint Account also included a statement, in bold-face type, concerning telephone communications from Target:

> YOU CONSENT TO RECEIVING AUTODIALED AND PRERECORDED MESSAGE CALLS FROM US, OR THOSE ACTING ON OUR BEHALF OR TARGET CORPORATION, ITS AFFILIATES OR THOSE ACTING ON TARGET'S BEHALF, AT ANY MOBILE TELEPHONE NUMBER YOU PROVIDE.

(Id.) Directly below the bold-face section quoted above, Wright provided the number XXX-XXX-5651 (id.), which was his mobile telephone number. (Pl.'s Am. Resp. to Def.'s Req. for Admission, ¶ 7, Ex. C to Lavery Cert. [Doc. No. 22-3].)

The Target Consumer Credit Agreement applicable to Wright's Target credit card account also contained the following provisions:

> 12. COMMUNICATIONS WITH YOU—We or our agents may call by telephone regarding your Account. You agree that we may place such calls using an automatic dialing/announcing device. You agree that we may make such calls to a mobile telephone or other similar device. You agree that we may, for training purposes or to evaluate the quality of our service, listen to and record phone conversations you have with us.

13. WHAT LAW APPLIES—This Agreement will be governed by federal law and to the extent state law applies, by the law of South Dakota. If there is any conflict between any of the terms and conditions of this Agreement and applicable federal or state law, this Agreement will be considered changed to the extent necessary to comply with the law.

**\*2**
\*\*\*

17. CHANGES TO THIS AGREEMENT—We have the right to change this Agreement (including the right to add additional terms) and to apply those changes to any existing balance on the Account as permitted by law. We will provide you with notice of any such changes as required by applicable law.

(Target Consumer Credit Agreement, Ex. F to Lavery Cert. [Doc. No. 22-6 at 19].)

In April 2014, Target began phoning Wright's cell phone number regarding an outstanding balance on the Target credit card account. (Answer ¶ 10, Ex. A to Lavery Cert. [Doc. No. 22-1].) Target admits that it used an automated dialing system to call Wright on this occasion (id. ¶ 11), and multiple occasions, for non-emergency purposes. (Id. ¶ 25.) During an April 29, 2014 call, Wright informed Target that the account was not his and that he would not be making any payment on the account. (Wolf Decl. ¶ 14 [Doc. No. 34].)

Target subsequently autodialed Wright's cell phone on May 14, 21, and 31, 2014. (Id. ¶¶ 15-17; see also Target Log, Ex. F to Lavery Cert. [Doc. No. 22-6 at 114].) Defendant avers that during the May 21, 2014 call, Wright repeatedly denied any obligation to pay the balance due on the Target account. (Answer ¶ 16, Ex. A to Lavery Cert. [Doc. No. 22-1].) A transcript of that recorded call reflects Wright's dispute about whether he authorized that his name be added to the account:

Wright: I want proof of my signature and my authorization and your organization has yet failed to provide that to me.

Target: Okay

Wright: If you could provide me with something that says I authorized my name to be associated with the account, I will pay it in full right now. Otherwise if you cannot provide that proof, I am not legally responsible for it, so—

\*\*\*

Target: Sir, the thing—here's the deal.

Wright: (inaudible) authorized and keep interrupting me.

Target: Here's the deal. You're four months past due. This is affecting your credit.

A: (inaudible) cease communication until you provide legal verification of the debt to me.

Target: Right now, sir, you're going further past due.

Wright: (inaudible) [provides address]. Have a nice day.

(End of audio recording.)

(Transcript of 5/21/14 Call, Ex. G to Lavery Cert. [Doc. No. 22-7].) Target's records confirm that Target called Wright on May 21, 2014 and indicate that Wright refused to promise to pay the account balance. (Def.'s Inquire Account Event Detail, Ex. F to Lavery Cert. [Doc. No. 22-6 at 81].)

Following the May 21, 2014 call, Target's records show that it phoned Wright's cell phone using an autodialing mechanism on the following occasions:

(1) May 27, 2014 (Def.'s Inquire Account Event Detail, Ex. F. to Lavery Cert. [Doc. No. 22-6 at 80]; Target's Log, Ex. F to Lavery Cert. [Doc. No. 22-6 at 114] );

(2) May 28, 2014 (id.);

(3) May 29, 2014 at 10:51 a.m. (Target's Log, Ex. F to Lavery Cert. [Doc. No. 22-6 at 114] );

(4) May 29, 2014 at 11:02 a.m. (Def.'s Inquire Account Event Detail, Ex. F. to Lavery Cert. [Doc. No. 22-6 at 80]; Target's Log, Ex. F. to Lavery Cert. [Doc. No. 22-6 at 114] );

**\*3** (5) May 30, 2014 (id.);

(6) May 31, 2014 (Target's Log, Ex. F to Lavery Cert. [Doc. No. 22-6 at 114]; TSYS Archived Notes, Def.'s Ex. C [Doc. No. 36-3 at 8] );

(7) June 3, 2014 at 7:48 a.m. (Target's Log, Ex. F to Lavery Cert. [Doc. No. 22-6 at 114] );

(8) June 3, 2014 at 3:39 p.m. (Def.'s Inquire Account Event Detail, Ex. F. to Lavery Cert. [Doc. No. 22-6 at 78]; Target's Log, Ex. F. to Lavery Cert. [Doc. No. 22-6 at 114] );

(9) June 4, 2014 at 7:44 a.m. (Target's Log, Ex. F to Lavery Cert. [Doc. No. 22-6 at 114] );

(10) June 4, 2014 at 2:00 p.m. (Def.'s Inquire Account Event Detail, Ex. F to Lavery Cert. [Doc. No. 22-6 at 77]; Target's Log, Ex. F to Lavery Cert. [Doc. No. 22-6 at 114] );

(11) June 5, 2014 (Target's Log, Ex. F to Lavery Cert. [Doc. No. 22-6 at 114].)

During Target's May 31, 2014 autodialed call to Wright's cell phone, Wright told Target's representative to speak to his lawyer, although Defendant contends that Wright hung up without giving the lawyer's name or contact information. (Wolf Decl. ¶ 17 [Doc. No. 34].) Target's call records for this call indicate that "[WRIGHT] IS GOING THROUGH A DIVORCE AND DID NOT KNOW HIS WIFE ADDED HIM TO THE ACCT. [WRIGHT] STATE [sic] SPEAK TO LAWYER AND HUNG UP ON ME DURING CALL." (Def.'s 5/31/14 Inquire Account Event Detail, Ex. F to Lavery Cert. [Doc. No. 22-6 at 79] ) (emphasis in original).

After Target's May 31, 2014 call with Wright, his attorney, David Menditto, called Target that same day and asked that Target cease phoning Wright. (Wolf Decl. ¶ 18 [Doc. No. 34].) A Target representative informed Menditto that Target could not speak with him about the account without a power of attorney on file. (Id.) Target's records confirm the phone call with Attorney Menditto, who provided his firm name and phone number. (Def.'s 5/31/14 Inquire Account Event Detail, Ex. F to Lavery Cert. [Doc. No. 22-6 at 79].)

On June 4, 2014, an unidentified third party phoned Target about Wright's account. (Wolf Decl. ¶ 19 [Doc. No. 34].) The Target employee who took the call informed the third party that Target could not speak about the account unless it had a power of attorney on file. (Id.)

Wright filed this lawsuit on July 29, 2014, asserting one cause of action for violation of the TCPA. In its Answer, Target asserts that Wright had expressly consented to the calls. (Answer ¶¶ 28-30 [Doc. No. 8].) While Wright contends that he revoked his prior express consent, Target argues that revocation is unavailable under the TCPA and that any alleged revocation was ineffective. (Id. ¶ 31.)

On Wright's Motion for Partial Summary Judgment, he asserts that there are no disputed issues of material fact with respect to Target's liability for calls made after May 21, 2014. In opposition to Plaintiff's motion and in support of Defendant's Motion for Summary Judgment, Target argues that Wright expressly consented to receive all calls made by Target and that Wright could not unilaterally revoke his prior express consent, as the consent was embodied in a bilateral contract.

## II. DISCUSSION

### A. Standard of Review

**\*4** Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.' " Celotex Corp., 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. Id. at 323. However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248. Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. Defendant moves for summary judgment on all three of Plaintiffs' claims.

### B. Telephone Consumer Protection Act (TCPA)

Under the TCPA, it is unlawful for any person "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a

paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." 47 U.S.C. § 227 (b)(1)(A)(iii).

The TCPA further defines the term "automatic telephone dialing system" to mean "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." Id. § 227(a)(1)(A), (B). The TCPA grants consumers, such as Plaintiff, a private right of action, with provision for $500 or the actual monetary loss in damages for each violation, whichever is greater, and treble damages for each willful or knowing violation. Id. § 227(b)(3).

In order for Plaintiff to establish Target's liability under the TCPA for calls made after May 21, 2014, he must prove that Target called his cellular telephone number "using an automatic telephone dialing system" or "an artificial or prerecorded voice," without his "prior express consent." Steinhoff v. Star Tribune Media Co., LLC, No. 13-cv-1750 (SRN/JSM), 2014 WL 1207804, at *2 (D. Minn. Mar. 24, 2014) (citing Meyer v. Portfolio Recovery Assocs., LLC, 707 F.3d 1036, 1043 (9th Cir. 2012)).

Certain facts in this case are not in dispute. Defendant admits it made the calls to Wright's cell phone and admits that it used an automated dialing system. (See Answer ¶¶ 5, 11, 14, 25 [Doc. No. 8] ). Wright signed the Joint Account Agreement and provided his cell phone number directly under the language in the agreement consenting to the receipt of autodialed calls placed to his cell phone number. (Joint Account Agreement, Ex. F to Lavery Cert. [Doc. No. 22-6 at 15].) Moreover, he admits that he gave his prior express consent for Target to autodial his cell phone. (Pl.'s Am. Resp. to Req. for Admission ¶¶ 12-13, Ex. C to Lavery Cert. [Doc. No. 22-3].)

**\*5** The resolution of the instant motions therefore turns on the revocation of consent. As a general matter, Target argues that consent may not revoked under the TCPA, and, in particular, that Wright could not unilaterally revoke his prior express consent. (See Def.'s Mem. Supp. Mot. for Summ. J. at 10-33 [Doc. No. 33] ); Def.'s Opp'n Mem. at 3-14 [Doc. No. 39].) Wright, however, contends that he expressly revoked his consent and is entitled to summary judgment for all claimed violations of the TCPA occurring after this alleged revocation. (Pl.'s Mem. Supp. Mot. for Partial Summ. J. at 10-16 [Doc. No. 21]; Pl.'s Opp'n Mem. at 8-12 [Doc. No. 37].)

### 1. Revocation of Prior Express Consent

The TCPA is silent on the question of whether consent may be revoked, as the Federal Communications Commission ("FCC") recently acknowledged: "[N]either the text of the TCPA nor its legislative history directly addresses the circumstances under which prior express consent is deemed revoked." In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C.R. 7961, ¶ 63 (July 10, 2015) (citation omitted). Perhaps not surprisingly, courts have reached contradictory conclusions on this issue, with some courts finding that revocation is not permitted under the TCPA, see, e.g., Kenny v. Mercantile Adjustment Bureau, No. 10-CV1010, 2013 WL 1855782, at *7 (W.D.N.Y. May 1, 2013), but others finding that revocation is permitted, see, e.g., Osorio v. State Farm Bank, F.S.B., 746 F.3d 1242, 1255-56 (11th Cir. 2014). The Eighth Circuit has not directly ruled on this issue.

The FCC resolved the question of whether consent may be revoked in an order that it released on July 20, 2015 entitled In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Declaratory Ruling and Order, FCC 15–72, 30 F.C.C.R. 7961 (July 10, 2015) [hereinafter, "2015 FCC Order"]. In the 2015 FCC Order, the FCC determined that "[c]onsumers have the right to revoke consent, using any reasonable method including orally or in writing. Consumers generally may revoke, for example, by way of a consumer-initiated call, directly in response to a call initiated or made by a caller, .... (Id. ¶ 64.) Moreover, the FCC found that the right of revocation did not implicate business's rights to communicate with their customers, as they could still manually dial customers' numbers without invoking the TCPA's prohibitions against autodialed calls. (Id. ¶62.)

This court is bound by the FCC's interpretations of the TCPA, unless those interpretations are invalidated by a court of appeals. See 28 U.S.C. § 2342 et seq. (the "Hobbs Act"). The 2015 FCC Order is currently on appeal before the Court of Appeals for the District of Columbia. See ACA Int'l v. FCC, No. 15-1211 (D.C. Cir. July 10, 2015) (consolidated appeal).

Following oral argument on the instant motions, the parties submitted supplemental briefing ( [Pl.'s Sur-Reply [Doc. No. 45]; Def.'s Sur-Reply [Doc. No. 46] ) regarding whether the 2015 FCC Order is retroactively applicable, and if so, whether

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 85 of 95

it can be applied to Target without doing manifest injustice. See AT&T v. FCC, 454 F.3d 329, 332 (D.C. Cir. 2006) (noting that courts only depart from retroactive application of adjudications when doing so would lead to "manifest injustice.").

It appears that no court has yet addressed the question of retroactivity of the 2015 FCC Order. However, in King v. Time Warner Cable, —— F. Supp.3d ——, No. 14 Civ. 2018 (AKH), 2015 WL 4103689, at *5 (S.D.N.Y. July 7, 2015), the court relied on a June 18, 2015 FCC press release about the then-pending 2015 FCC Order, as well as the Third Circuit's decision in Gager v. Dell Fin. Servs., LLC, 727 F.3d 265, 270-72 (3d Cir. 2013), to support its conclusion that consumers have the authority to revoke their consent to receive autodialed calls in any reasonable way, at any time. In determining that the plaintiffs in Reardon v. Uber Technologies, Inc., No. 14-CV-05678-JST, 2015 WL 4451209, at *10 (N.D. Cal. July 19, 2015), had sufficiently pleaded their TCPA claim, the court cited authority supporting the revocation of consent under the TCPA and also observed that the 2015 FCC Order permits revocation of consent. While this Court noted the recent 2015 FCC Order in Soular v. Northern Tier Energy LP, No. 15-cv-556 (SRN/LIB), 2015 WL 5024786, at * (D. Minn. Aug. 25, 2015), and Smith v. Securus Technologies, Inc., —— F. Supp. 3d ——, No. 15-cv-550 (SRN/HB), 2015 WL 4636696, at *5, n.1 (D. Minn. Aug. 4, 2015), neither ruling involved the precise issue here, nor did those matters require the Court to address the retroactivity of the 2015 FCC Order.

**\*6** As an independent agency, the powers of the FCC are both quasi-judicial and quasi-legislative. Morrison v. Olson, 487 U.S. 654, 687, n.25 (1988) (citing Humphrey's Ex'r v. United States, 295 U.S. 602, 628 (1935)). Agency adjudications generally have retroactive effect, while rules resulting from agency rulemaking are presumed to have prospective effect. Qwest Servs. Corp. v. FCC, 509 F.3d 531, 535 (D.C. Cir. 2007). An FCC decision is considered quasi-judicial if it does " 'not purport to engage in formal rulemaking or in the promulgation of any regulations' but instead amounts to an adjudication of the rights and obligations of parties before it." Town of Deerfield, N.Y. v. FCC, 992 F.2d 420, 427 (2d Cir. 1993) (quoting FCC v. Pacifica Found., 438 U.S. 726, 734 (1978)). Moreover, "[t]he mere presence in the decision of general statements that might have applicability to controversies between other persons does not change the character of an order from one that is essentially adjudicatory to one that is quasi-legislative." Id.

In determining whether an agency decision constitutes an adjudication or rulemaking proceeding, courts

> have drawn a distinction between agency decisions that "substitut[e] ... new law for old law that was reasonably clear" and those which are merely "new applications of existing law, clarifications, and additions." The latter carry a presumption of retroactivity that we depart from only when to do otherwise would lead to "manifest injustice."

Qwest, 509 F.3d at 539(quoting AT&T v. FCC, 454 F.3d at 329, 332 (alteration and omission in original) (citations omitted).

Nearly all of the twenty-plus consolidated petitions to the FCC underlying the 2015 FCC Order were framed as petitions for declaratory rulings or clarifications, with only one petitioner framing its petition as a request for rule making. 2015 FCC Order, 30 F.C.C.R. 7961(caption). Moreover, the portion of the 2015 FCC Order regarding the revocation of consent states that it is clarifying prior law: "[W]e clarify that consumers may revoke consent through any reasonable means." Id. ¶ 55. However, as Defendant notes, the Order is styled as "In the Matter of Rules and Regulations Implementing the [TCPA] of 1991" (id. at 7961) (emphasis added), and applies across the board to the entire regulated industry, rather than being limited to particular parties or an industry subset. See Hoffman-La Roche, Inc. v. Kleindienst, 478 F.2d 1, 33 (3d Cir. 1973) (finding that the general, industry-wide application of a proceeding constituted, in substance, rule making).

Certainly, if the 2015 FCC Order is an adjudication, the Court is obliged to retroactively apply the FCC's interpretation of the TCPA. But the Court need not resolve the question here. Even assuming that the FCC exercised its rulemaking authority in the 2015 FCC Order —with prospective, non-retroactive effect—the Court would nonetheless independently conclude that revocation of consent is permissible under the TCPA.

While the Eighth Circuit has not ruled on whether prior express consent may be revoked under the TCPA, the court's decision in Brenner v. Am. Ed. Servs., 575 Fed.Appx. 703 (8th Cir. 2014) (per curiam), is instructive. Brenner involved a suit under the TCPA related to the defendant-creditor's calls concerning the plaintiff's student loan debt. Id. The Eighth Circuit reversed the district court's entry of summary judgment for the defendant because the district court had not addressed the issue of revocation of prior express consent. Id. On remand, the Eighth Circuit directed the district court

to consider whether the plaintiff had provided evidence to support the plaintiff's position that he had revoked his prior express consent. Id. While the court in Brenner only presented the question of whether revocation of consent is effective under the TCPA, in doing so, it stated, "if Brenner effectively revoked his consent, summary judgment [for the defendant] was not proper." Id. (citing Osorio, 746 F.3d at 1255-56; Gager, 727 F.3d at 270-72). The Osorio and Gager decisions cited by the Eighth Circuit both permitted revocation of prior express consent; the Eighth Circuit cited no authority to the contrary. This suggests that the Eighth Circuit considered revocation of consent permissible under the TCPA, as there would be no need for the district court to address the question on remand if revocation of consent was not permitted. In a subsequent district court case, Buchholz v. Valarity, LLC, No. 4:14CV362 TIA, 2014 WL 5849434, at *5-7 (E.D. Mo. Nov. 12, 2014), our sister court relied upon Brenner and other cases in concluding that the oral revocation of consent is cognizable, as a matter of law, under the TCPA.

*7 One reason given by courts permitting the revocation of consent is that such an interpretation is consistent with the broad, remedial objectives of the TCPA:

The TCPA is a remedial statute that was passed to protect consumers from unwanted automated telephone calls. Because the TCPA is a remedial statute, it should be construed to benefit consumers. As a result, we should interpret in [the plaintiff's] favor any silence in the TCPA as to a revocation right. Therefore, the TCPA's silence as to revocation should not be seen as limiting a consumer's right to revoke prior express consent. Instead, we view the silence in the statute as evidence that the right to revoke exists.

Gager, 727 F.3d at 271 (citations omitted); see also Osorio, 746 F.3d at 1255; Buchholz, 2014 WL 5849434, at *7. The Court agrees with this reasoning. For all of the foregoing reasons, the Court finds that revocation of prior consent is cognizable under the TCPA.

## 2. Consent Clause in Credit Agreement

Defendant also argues that Wright could not unilaterally alter the consent term in the parties' credit agreement, because it was an integral and essential part of the bilateral, written agreement. (Def.'s Mem. Supp. Mot. for Summ. J. at 11-15 [Doc. No. 33].)

As noted, the TCPA requires prior express consent for entities such as Defendant to place autodialed calls to its customers. 47 U.S.C. § 227(b)(1)(B). The Court is persuaded by the reasoning of the Third Circuit in Gager that the prior express consent to receive autodialed phone calls is not an essential element of the contractual relationship between the parties. As that court explained:

Dell asserts that basic principles of contract law should preclude Gager from revoking her prior express consent. In short, Dell posits that a creditor will want to know in advance whether a credit applicant will consent to automated phone calls and that this knowledge is part of the "consideration" that the applicant offers in support of her application. Although Dell is correct that the level of contact that a debtor will consent to may be relevant to the negotiation of a line of credit, the ability to use an autodialing system to contact a debtor is plainly not an essential term to a credit agreement. More importantly, Dell's argument that its contractual relationship with Gager somehow waives her rights under the TCPA is incorrect. The fact that Gager entered into a contractual relationship with Dell did not exempt Dell from the TCPA's requirements. As discussed above, she retained the right to revoke her prior express consent.

Id. at 273-74. That same reasoning applies here. In his Amended Answers to Defendant's Requests for Admission, Wright admits that while he could not unilaterally alter the interest charges or late fees applicable to his Target credit card account, he could revoke his consent to be contacted on his cell phone by an autodialed call from Target (Pl.'s Am. Answers to Req. for Admission ¶¶ 16-18, Ex. C to Lavery Cert. [Doc. No. 22-3] ), as the parties' agreement is governed by federal law. (Target Consumer Credit Agreement ¶ 12, Ex. F to Lavery Cert. [Doc. No. 22-6 at 19].) The essential terms of the parties' agreement related to use of the credit card, payments, interest charges, and the calculation of fees. The particular form and manner in which Target could contact Wright was not an essential part of the agreement. Moreover, noted herein, the Court finds that revocation of prior express consent is permitted under the TCPA.

## 3. Material Issues of Disputed Fact

*8 Having determined that revocation of consent is permitted, on summary judgment, the Court must consider whether oral revocation was established here, such that there are no disputed issues of material fact. The Court finds that

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 87 of 95

whether Wright effectively revoked his consent remains a disputed issue of fact. The transcript of the May 21, 2015 call reveals that Wright disputed his obligation to pay the debt and Wright's comment to "cease calling" was conditional upon Target providing proof that he owed the debt. (Transcript of 5/21/14 Call, Ex. G to Lavery Cert. [Doc. No. 22-7].) (Wolf Decl. ¶ 18 [Doc. No. 34].) While Wright's attorney subsequently asked that the communications cease, Target's representatives stated that they were not authorized to speak with the attorney about Wright's account, absent a power of attorney on file. (Wolf Decl. ¶¶ 18-19 [Doc. No. 34].) Target has not received a power of attorney authorizing it to communicate with a third party about Wright's account. (Id. ¶ 20.) Accordingly, the Court finds that the dispute regarding

revocation precludes the entry of summary judgment for either party.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff's Motion for Partial Summary Judgment [Doc. No. 19] is **DENIED**; and

2. Defendant's Motion for Summary Judgment [Doc. No. 31] is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 8751582

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 88 of 95

Zelma v. Penn LLC, Not Reported in Fed. Supp. (2020)

🚩 KeyCite Yellow Flag

Distinguished by Williams v. Schanck, N.D.Ala., January 29, 2021

2020 WL 278763

Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.

Richard M. ZELMA, Plaintiff,

v.

PENN LLC d/b/a PulseTV.com,

et al., Defendants.

Civil Action No. 19-8725

|

Signed 01/17/2020

**Attorneys and Law Firms**

Richard M. Zelma, Norwood, NJ, pro se.

Stefani C. Schwartz, Schwartz Simon Edelstein & Celso LLC, Whippany, NJ, for Defendants.

**OPINION**

John Michael Vazquez, U.S.D.J.

**\*1** *Pro se* Plaintiff Richard M. Zelma alleges that Defendants Penn LLC d/b/a PulseTV.com ("Penn"), Pulse Direct Inc. d/b/a PulseTV.com ("Pulse"), and Jaffer Ali (collectively "Defendants") engaged in unlawful conduct by using an automatic telephone dialing system ("ATDS") to send six text messages to his cell phone without his express consent. D.E. 1-1, Ex. A ("Compl."). Currently pending before the Court is Defendants' motion to dismiss, D.E. 3,[1] and Defendants' motion for sanctions, D.E. 10. The Court reviewed the parties' submissions[2] and decided the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1 (b). For the reasons stated below, Defendants' motion to dismiss, D.E. 3, is **GRANTED in part** and **DENIED in part,** and Defendants' motion for sanctions, D.E. 10, is **DENIED.**

**I. BACKGROUND**[3]

*Pro se* Plaintiff Richard Zelma is a resident of New Jersey. Compl. ¶ 3. Plaintiff's cellular phone number has been listed on the national and New Jersey "no-call-registries" since 2003 and 2004, respectively. *Id.* ¶¶ 19-20. Defendants Penn and Pulse are both Illinois companies sharing their principal place of business in Illinois. *Id.* ¶¶ 4-5. Defendant Jaffer Ali is the co-founder and CEO of PulseTV and is domiciled in Illinois. *Id.* ¶7; D.E. 3-2, Ali Cert. ¶ 1. Between December 7, 2018 and January 17, 2019, Plaintiff received six text messages to his cell phone. *Id.* ¶¶ 27-29. The messages were sent by Defendants individually or through others[4] via an ATDS to market their products and services. *Id.* ¶ 32.

**\*2** Plaintiff originally filed his Complaint in New Jersey Superior Court, alleging four counts: (1) violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii); (2) violation of the TCPA, 47 U.S.C. § 227(c)(5); (3) treble damages for willful or knowing violation of the TCPA, 47 U.S.C. § 227(b)(3); and (4) violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-1 *et seq.* D.E. 1, Ex. A. On March 19, 2019, Defendants removed the case to this Court. D.E. 1. Defendants thereafter filed a motion to dismiss for failure to state a claim. D.E. 3. Plaintiff filed opposition, D.E. 7, to which Defendants replied, D.E. 8. Defendants also filed a motion for sanctions. D.E. 10. Plaintiff filed opposition, D.E. 11, to which Defendants replied, D.E. 12.

**II. STANDARD OF REVIEW**

**A. Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss for "failure to state a claim upon which relief can be granted[.]" For a complaint to survive dismissal under Rule 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Further, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, not entitled to a presumption of truth. *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true."

Zelma v. Penn LLC, Not Reported in Fed. Supp. (2020)

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 89 of 95

*Fowler*, 578 F.3d at 210. Even if plausibly pled, however, a complaint will not withstand a motion to dismiss if the facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase &* Co., No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015).

Because Plaintiff is proceeding *pro se*, the Court construes the Complaint liberally and holds it to a less stringent standard than papers filed by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). The Court, however, need not "credit a *pro se* plaintiff's 'bald assertions' or 'legal conclusions.' " *Grohs v. Yatauro*, 984 F. Supp. 2d 273, 282 (D.N.J. 2013) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)).

### B. Rule 11

Federal Rule of Civil Procedure 11 imposes on any party who presents "a pleading, motion, or other paper ... an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing, and that the applicable standard is one of reasonableness under the circumstances." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991).[5] "[R]easonableness [under the circumstances is] defined as an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 289 (3d Cir. 1991) (citations and internal quotations omitted). Attorneys are required to conduct a "normally competent level of legal research to support the[ir] presentation." *Simmerman v. Corino*, 27 F.3d 58, 62 (3d Cir. 1994).

 **\*3**  By its plain terms, Rule 11 applies to unrepresented parties. *See* Fed. R. Civ. P. 11(a) ("or by a party personally if the party is unrepresented"), 11(b) ("an attorney or unrepresented party certifies"). As a result, "[*p]ro se* litigants are not shielded from the sanctions offered by Rule 11." *Skoorka v. Kean U.*, No. 16-3842, 2017 WL 6539449, at *3 (D.N.J. Dec. 21, 2017) (citing *Wong v. Bank of N.Y.*, No. 14-5212, 2016 WL 1597309, at *3 (D.N.J. Apr. 21, 2016)). In this context, however, a *pro se* litigant is generally "given greater leeway in following the technical rules of pleading and procedure." *Id.* (citing *Metropolitan Life Ins. Co. v. Kalenevitch*, 502 F. App'x 123, 125 (3d Cir. 2012)).

If Rule 11(b) is violated, then Rule 11(c)(4) permits the Court to impose sanctions, including reasonable attorneys' fees, expenses, or nonmonetary directives. However, any sanction "must be limited to what suffices to deter repetition of the [sanctionable] conduct[.]" Fed. R. Civ. P. 11(c)(4). "Generally, sanctions are prescribed only in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous." *Ford Motor Co.*, 930 F.2d at 289 (internal citations and quotations omitted). Additionally, "the imposition of sanctions for a Rule 11 violation is discretionary rather than mandatory." *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 146 n.28 (3d Cir. 2009) (citation omitted). In deciding a Rule 11 motion, "[a]ny doubt ... should be resolved in favor of the party charged with the violation." *Sanders v. Hale Fire Pump Co.*, No. 87-2468, 1988 WL 58966, at *1 (E.D. Pa. June 1, 1988) (citing *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 544 (3d Cir. 1985)).

Finally, when a Rule 11 motion for sanctions is made by a party, rather than by a court pursuant to Rule 11(c)(3), the rule contains a separate requirement. Specifically Rule 11(c)(2) requires in pertinent part:

> A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.

Fed. R. Civ. P. 11(c)(2).

## III. LAW AND ANALYSIS

### A. Motion to Dismiss for Failure to State a Claim

As noted, Plaintiff asserts four Counts against Defendants: (1) violation of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii); (2) violation of the TCPA, 47 U.S.C. § 227(c)(5); (3) treble damages for willful or knowing violation of the TCPA, 47 U.S.C. § 227(b)(3); and (4) violation of the NJCFA, N.J.S.A. § 56:8-1 *et seq.* D.E. 1, Ex. A. Defendants move to dismiss all Counts.

### 1. Defendant Jaffer Ali's Individual Liability under the TCPA

The Court first addresses Defendant Jaffer Ali's individual liability under the TCPA. Plaintiff asserts his claims against Defendant Ali individually. Compl. ¶ 8. "Assuming that personal-participation liability is in fact available under the

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 90 of 95

Zelma v. Penn LLC, Not Reported in Fed. Supp. (2020)

TCPA,[6] a corporation's officer 'may be personally liable under the [TCPA] if he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved.' " *City Select Auto Sales Inc. v. David Randall Associates, Inc.*, 885 F.3d 154, 162 (3d Cir. 2018) (quoting *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001)). "In other words, a corporate officer can be personally liable if he 'actually committed the conduct that violated the TCPA, and/ or [he] actively oversaw and directed this conduct.' " *Id.* For example, an individual defendant can be held liable under the TCPA for "set[ting] up the automatic telephone dialing systems and design[ing] them" to function unlawfully. *McGee v. Halsted Financial Services, LLC*, No. 13-1555, 2014 WL 1203138, at *1 (D. Del. Mar. 19, 2014).

**\*4** Here, Plaintiff fails to plausibly allege that Defendant Ali had any direct, personal participation in the allegedly unlawful conduct or that Defendant Ali personally authorized the allegedly unlawful conduct. Plaintiff merely claims that "Plaintiff sues Jaffer Ali individually under the New Jersey Responsible Corporate Officer Doctrine."[7] Compl. ¶ 8. Plaintiff, however, does not provide any specific facts evidencing that Defendant Ali authorized any unlawful conduct or that he directly participated in any unlawful conduct. Instead, Plaintiff's allegations against Defendant Ali appear to be based solely on Ali's position as co-founder and CEO of PulseTV. Such extrapolation is insufficient to adequately allege Defendant Ali's personal involvement in Defendant Penn or Defendant Pulse's purported unlawful conduct. Accordingly, the Court dismisses Counts One, Two, and Three as to Defendant Ali.

**2. Counts One and Three as to Penn and Pulse**

Plaintiff brings Count One for violation of 47 U.S.C. § 227(b)(1)(A)(iii) and Count Three for treble damages under 47 U.S.C. § 227(b)(3). Compl. ¶¶ 63-71, 79-89. Section 227(b)(1)(A)(iii) states, in relevant part, as follows:

(A) It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system [ATDS] or an artificial or prerecorded voice ...

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call[.]

§ 227(b)(1)(A)(iii). Additionally, § 227(b)(3) provides for a private right of action under subsection (b). Under this subsection, a person or entity is entitled to "an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater." § 227(b)(3)(B). "[T]o state cause of action under the TCPA [for calls made to a cellular phone], a plaintiff must allege: (1) that the defendant called the plaintiff's cellular telephone; (2) using an ATDS; (3) without the plaintiff's prior express consent." *Hale v. Creditors Relief LLC*, No. 17-2447, 2018 WL 2539080, at *4 (D.N.J. June 4, 2018) (quoting *Todd v. Citibank*, No. 16-5204, 2017 WL 1502796, *6 (D.N.J. Apr. 26, 2017)). "A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." *Rondo v. Edible Arrangements Int'l, LLC*, No. 17-701, 2018 WL 1523858, at *4 (D.N.J. Mar. 28, 2018) (quoting *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016)).

Moreover, § 227(b)(3) states as follows:

If the court finds that the defendant *willfully or knowingly* violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under [§ 227(b)(3)(B)].

§ 227(b)(3) (emphasis added). Taken together, Count One alleges that Defendants violated § 227(b)(1)(A)(iii), and Count Three alleges that Defendants *willfully or knowingly* violated § 227(b)(1)(A)(iii) such that the Court may impose treble damages pursuant to § 227(b)(3).

Defendants assert two arguments for dismissal. First, Defendants extensively rely on *Viggiano v. Kohl's Dept. Stores, Inc.*, No. 17-0243, 2017 WL 5668000, at *2 (D.N.J. Nov. 27, 2017), arguing that Plaintiff could have simply replied "Stop" to the offending text messages, which would have ceased any future text messages from Defendants. Defendants' emphasis on *Viggiano*, however, is misplaced. In *Viggiano*, the plaintiff received automated text messages on her cellular phone from the defendant. *Id.* at *1. Importantly, the plaintiff originally consented to receive the text messages. *Id.* Sometime thereafter, however, she attempted to withdraw her consent by replying to the automated text messages

with various sentences indicating that she no longer wished to receive the messages. *Id.* Defendant continued to send plaintiff text messages, explaining that the only way plaintiff could opt out of the texts – *i.e.* withdraw her consent – was to reply "STOP" to defendant's text messages. *Id.* The "the only issue" before the court in *Viggiano* "[was] whether [p]laintiff ha[d] pled facts that support a finding she revoked consent in a reasonable manner such that [d]efendant's *continued* texts violated the TCPA." *Id.* at *3. (emphasis added). As such, *Viggiano* was only concerned with whether the plaintiff effectively withdrew her *initial* consent, so that defendant's *subsequent* text messages to plaintiff violated the TCPA. Here, Plaintiff alleges that he never consented to Defendants' text messages in the first place. Therefore, *Viggiano* is inapposite.

**\*5** Second, Defendants rely on *Zemel v. CSC Holdings LLC,* No. 16-4064, 2017 WL 1503995, at *1 (D.N.J. Apr. 26, 2017), for the proposition that "[t]he TCPA was not enacted to prevent the harm claimed by [Plaintiff] – specifically, an unidentifiable loss of minutes on his cellular plan." Defs.' Br. at 13. Defendants argue that the "six [ ] text messages that were sent over the course of approximately one [ ] month could not have caused the type of harm which Congress intended to prevent." *Id.* Defendants cite the following language from *Zemel*:

> [T]hree text messages sent throughout a short period of time and in just one day is not what Congress intended to prevent [by enacting the TCPA]. Reading and responding to such text messages, and the time it required, could not have caused [p]laintiff the annoyance Congress intended to prevent. Because [p]laintiff has failed to allege why or how the small number of text messages caused him aggravation or nuisance, this Court cannot and will not infer such harm.

*Zemel v. CSC Holdings LLC,* 2017 WL 1503995, at *5. From the outset, the Court notes that *Zemel* concerned whether the plaintiff had suffered an injury-in-fact for purposes of Article III standing to survive a 12(b)(1) motion to dismiss. Defendants, however, cite *Zemel* in support of their 12(b)(6) motion to dismiss; Defendants do not raise a 12(b)(1) issue. *See* Defs.' Br. at 12-13; *see also Kaufman v. Dreyfus Fund, Inc.,* 434 F. 2d 727, 733 (3d Cir. 1970) ("[W]e must not confuse requirements necessary to state a cause of action ... with the prerequisites of standing."). Nonetheless, the Court "has an independent obligation to determine whether it has subject matter jurisdiction." *Est. of Caruso v. Fin. Recoveries,* No 15-7936, 2017 WL 2704088, at *3 (D.N.J. June 22, 2017). The Court therefore turns to whether Plaintiff has standing to sue.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.' " *Lance v. Coffman,* 549 U.S. 437, 439 (2007). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy," and it thus "limits the category of litigants empowered to maintain a lawsuit in federal court." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016). On a motion to dismiss for lack of standing, "the plaintiff bears the burden of establishing the elements of standing." *Zemel,* 2017 WL 1503995, at *2 (internal citations omitted). The three elements of standing are: "(1) an injury in fact that is actual, not 'conjectural' or 'hypothetical;' (2) a causal connection between the injury and the conduct complained of; and (3) a showing that it is likely that a favorable decision will redress the injury." *City Select Auto Sales, Inc. v. David Randall Associates, Inc.,* 296 F.R.D. 299, 309 (3d Cir. 2013) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)). An injury in fact must be "concrete and particularized," and "actual or imminent, not 'conjectural' or 'hypothetical.' " *Lujan,* 504 U.S. at 560.

While Defendants cite to *Zemel* in support of their argument, the Third Circuit shortly thereafter decided *Susinno v. Work Out World Inc.,* 862 F.3d 346 (3d Cir. 2017). In *Susinno,* the plaintiff alleged that she received an unsolicited call – which she did not answer – on her cellphone from a fitness company who left a one-minute prerecorded promotional offer on the plaintiff's voicemail. *Id.* at 348. The plaintiff filed an action alleging that the single phone call and voicemail violated § 227(b)(1)(A)(iii) of the TCPA. *Id.* The District Court dismissed plaintiff's claim for, *inter alia,* lack of concrete injury. *Id.* On appeal, the Third Circuit addressed "the question of whether [the plaintiff] ha[d] alleged a sufficiently concrete injury to establish constitutional standing to sue." *Id.* at 350. The Third Circuit found that "[w]hen one sues under a statute alleging 'the very injury [the statute] is intended to prevent,' and the injury 'has a close relationship to a harm ... traditionally ... providing a basis for a lawsuit in English or American courts,' a concrete injury has been pleaded." *Id.* at 351 (quoting *In re Horizon Healthcare Services Inc. Data Breach Litig.,* 846 F.3d 625, 639 (3d Cir. 2017)).

**\*6** In its analysis, the *Susinno* court stated that unsolicited automated or prerecorded telephone calls constituted the precise injury addressed by the TCPA. *Id.* The Third Circuit further indicated that the TCPA protects "essentially the same interests that traditional causes of action [*e.g.* invasion of privacy] sought to protect." *Id; see also Manuel v. NRA Group*

**Zelma v. Penn LLC, Not Reported in Fed. Supp. (2020)**

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 92 of 95

*LLC*, 2018 WL 388622 (3d Cir. 2018) (citing *Susinno* and finding that an alleged violation of the TCPA was a sufficient "concrete injury to establish Article III standing"); *In re Horizon Healthcare Services Inc. Data Breach Litigation*, 846 F.3d 625 (3d Cir. 2017) (finding that an alleged violation of the Fair Credit Reporting Act constituted an "injury in fact," even without evidence that the stolen information was used improperly); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (cited by *Susinno*, and holding that two unsolicited text messages constituted a concrete injury under the TCPA, as they were "the precise harm and infringe[d] the same privacy interests Congress sought to protect").

Here, Plaintiff's allegations of receiving six unsolicited text messages from an AIDS "is the very injury [the TCPA] is intended to prevent." *Susinno*, 862 F.3d at 351. In light of the Third Circuit's decision in *Susinno*, the Court finds that Plaintiff has sufficiently pled Article III standing. Because Defendants provide the Court with no other reason to dismiss Count One, Defendants' motion to dismiss Count One is denied.

With respect to Count Three, Defendants argue that Plaintiff has not pled that Defendants *willfully or knowingly* violated § 227(b)(1)(A)(iii) such that the Court may impose treble damages pursuant to § 227(b)(3). The Court disagrees. "Although the Third Circuit has not yet addressed the 'willful or knowing' requirement, districts courts within the Third Circuit have required more than a mere showing that the transmission of a [call] was itself intentional to warrant treble damages." *Robert W. Mauthe, M.D., P.C. v. MCMC LLC*, 387 F. Supp. 3d 551, 570 (E.D. Pa. 2019); *see also KHS Corp. v. Singer Financial Corp.*, 376 F. Supp. 3d 524, 530 (E.D. Pa. 2019) ("A defendant commits a willful and knowing violation of the TCPA if he or she sends an unsolicited [ ] advertisement that he or she knows to be a violation of the TCPA."); *Kline v. United N. Mortg. Bankers Ltd.*, No. 18-489, 2018 WL 4404674, at *2 (M.D. Pa. Sept. 17, 2018) (plaintiff adequately pled willful or knowing violation where complaint alleged that defendant "knew that [it] did not have [plaintiff's] prior ... express consent" to make unlawful call; "knew ... that [it] was using" an ATDS; and "knew ... that [its] conduct ... violated the TCPA").

Here, Plaintiff alleges that "Defendants knowingly or willfully violated the TCPA... when they resorted to 'robo' call and solicit Plaintiff ... and initiated their text messages to Plaintiff without prior express written consent to do so."

Compl. ¶ 81. Plaintiff adds that Defendants' "foregoing wrongful acts were knowingly made with false claims of a mis-dialed number." *Id.* ¶ 85. The Court finds that at this stage Plaintiff has sufficiently pled a knowing or willful violation of the TCPA. Accordingly, Defendants' motion to dismiss Count Three is denied.

### 3. Count Two as to Penn and Pulse

Plaintiff brings Count Two for a violation 47 USC § 227(c)(5), which provides a private right of action for violations of the Federal Communications Commission's ("FCC") regulations accompanying the TCPA. Plaintiff claims that Defendants "repeatedly initiated [the] text messages to a number that had been placed on the [national] no-call-list since its inception." Compl. ¶ 74. § 227(c)(5) creates a private right of action for "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation," and permits that person to seek an injunction, the greater of either actual damages or $500 per violation, or both. 47 U.S.C. § 227(c)(5). Section 227(c)(5) also creates an affirmative defense for a violating party who "has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection." *Id.*

**\*7** Pursuant to § 227(c)(1), the FCC implemented Regulation 47 C.F.R. § 64.1200. Courts in this District have proceeded under § 64.1200 when a plaintiff alleges a violation of the national do-not-call list *See Sieleman v. Freedom Mortg. Corp.*, No. 17-13110, 2018 WL 3656159, at *2 n.3 (D.N.J. Aug. 2, 2018) (finding that although plaintiff alleged a violation of the FCC's internal do-not-call requirements under § 227, 47 C.F.R. § 64.1200 was instead "the relevant provision to allege a violation of the [national] do-not-call list requirements"); *Dobkin v. Enter. Fin. Group*, No. 2:14-cv-01989, 2014 WL 4354070, at *2 (D.N.J. Sept. 3, 2014) ("[B]ased on these predicate violations of [§ 64.1200(c) and (d)], Plaintiff contends that Defendants violated [§ 227(c)(5) of] the TCPA.").

Here, it appears that Plaintiff's claim falls under § 64.1200(c).[8] Plaintiff brings Count Two for "unlawfully soliciting a number on the [national] no-call-list." Compl. at 12. The Court is mindful of Plaintiff's *pro se* status and therefore construes his claim under the correct regulation. *Higgs v. AG of the United States*, 655 F.3d 333, 339 (3d

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 93 of 95

Zelma v. Penn LLC, Not Reported in Fed. Supp. (2020)

Cir. 2011) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("The obligation to liberally construe a *pro se* litigant's pleadings is well-established."). 47 C.F.R. § 64.1200(c) provides the following, in relevant part:

(c) No person or entity shall initiate any telephone solicitation to:

...

(2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. Such do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator. Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if:

(i) It can demonstrate that the violation is the result of error and that as part of its routine business practice, it meets the following standards:

...

(D) Accessing the national do-not-call database. It uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and maintains records documenting this process.

(E) Purchasing the national do-not-call database. ... It purchases access to the relevant do-not-call data from the administrator of the national database and does not participate in any arrangement to share the cost of accessing the national database, including any arrangement with telemarketers who may not divide the costs to access the national database among various client sellers[.]

47 C.F.R. § 64.1200(c). Here, Plaintiff alleges that his cellphone number has been on the national no-call registry since 2003. Compl. ¶¶ 20, 74, Plaintiff also alleges that he has not removed his number from the national no-call registry. *Id.* ¶ 20. Plaintiff adds that Defendants "did not purchase a no-call subscription," *id.* ¶ 78, an allegation which Defendants

do not appear to dispute in their moving papers. *See generally* Defs.' Br.; *see also* Defs.' Reply.

**\*8** Rather, Defendants attempt to invoke the "affirmative defense" provision of 47 U.S.C. § 227(c)(5), which states that "[i]t shall be an affirmative defense in any action brought under [§ 227(c)(5)] that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). Defendants contend that they have a "text program" that only sends text messages to people who "actively sign up to participate in the text program." Defs.' Br. at 15. Defendants also contend that they use "an inbound telemarketer to read a script whereby individuals may opt into the text program," which "confirmations are recorded on tape." *Id.*

Defendants' invocation of § 227(c)(5)'s affirmative defense cannot be considered at this stage of the case. Generally, the "Federal Rules of Civil Procedure require a defendant to plead an affirmative defense ... in the answer, not in a motion to dismiss." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Robinson v. Johnson*, 313 F.3d 128, 134-35 (3d Cir. 2002)). "To prevail on a Rule 12(b)(6) motion to dismiss based on an affirmative defense,... a defendant must show that 'the defense is "apparent on the face of the complaint" and documents relied on in the complaint.' " *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130 (3d Cir. 2018) (quoting *Bohus v. Restaurant.com, Inc.*, 784 F.3d 918, 923 n.2 (3d Cir. 2015)). Here, Defendants have not shown – and it does not appear – that § 227(c)(5)'s affirmative defense is "apparent on the face" of Plaintiff's Complaint. Accordingly, the Court denies Defendants Penn and Pulse's motion as to Count Two.

**4. Count Four as to All Defendants**

Count Four is against all Defendants for violation of the NJCFA. Compl. ¶¶ 90-98. The NJCFA proscribes the use of any "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate[.]" N.J.S.A. § 56:8-2. To establish a *prima facie* claim under the NJCFA, a plaintiff must demonstrate "(1) unlawful conduct

Zelma v. Penn LLC, Not Reported in Fed. Supp. (2020)

Case 1:26-cv-00155-JKM    Document 49-1    Filed 07/30/26    Page 94 of 95

by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Valli v. Avis Budget Grp., Inc.*, No. 14-6072, 2017 WL 1956777, at \*4 (D.N.J. May 10, 2017) (citing *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 389 (2007)).

Here, Plaintiff alleges that Defendants violated New Jersey's "Do Not Call Law"[9] when they allegedly engaged in prohibited solicitation by sending Plaintiff six text messages to Plaintiff's cellphone. Compl. ¶¶ 92-93. It appears, however, that Plaintiff's claim cannot be brought under New Jersey's "Do Not Call Law," N.J.S.A. §§ 56:8-119 to -130, because Plaintiff was not solicited via a "telephone call," but rather through text message. New Jersey's "Do Not Call Law" defines "telemarketing" as "any plan, program or campaign ... to encourage the purchase or rental of ... merchandise, but does not include the solicitation of sales *through media other than a telephone call"* N.J.S.A. § 56:8-120 (emphasis added). Similarly, "telemarketing sales call" is defined as "a *telephone call* made by a telemarketer ...." *Id.*

 **\*9**  Plaintiff appears to acknowledge as much in his opposition brief, contending that "[on] November 1, 2016, [New Jersey] enhanced the [NJCFA] by specifically adding a new law that prohibits the sending of unsolicited advertisement by means of a text message to a resident of New Jersey[.]" PL's Opp. at 26. It appears to the Court that Plaintiff is alluding to N.J.S.A. § 2A:65D, which became effective November 1, 2016, and prohibits an unsolicited advertisement by means of text messaging. Notably, however, Section 2A:65D-5 explicitly states that "[n]othing set forth in this act shall be construed as creating, establishing or authorizing a private cause of action by an aggrieved person against a person who has violated, or is alleged to have violated, the provisions of this act." As such, the amendment on which Plaintiff relies does not provide for a private right of action. Accordingly, the Court dismisses Count Four against all Defendants.

### B. Motion for Sanctions
As an initial matter, prior to moving for sanctions Defendants sent Plaintiff a frivolous litigation letter providing Plaintiff

with twenty-one days to withdraw his Complaint, thus satisfying the safe harbor requirement under Fed. R. Civ. P. 11(c)(2). D.E. 10-2, Ex. B; *see also* D.E. 10-5. Plaintiff did not withdraw his Complaint. As such, Defendants now argue that sanctions should be imposed on Plaintiff-including dismissal of Plaintiff's Complaint – because "Plaintiff acted in bad faith each time he received a text message and deliberately chose to not reply 'STOP' as directed in each message," with the intent to file a lawsuit. Defs.' Sanction Br. at 9. Defendants also contend that Plaintiff's claims are not well-grounded in law. *Id.* The Court disagrees.

Defendants' argument that Plaintiff's claims are not well-grounded in law is rebutted by the fact that some of Plaintiff's claims have survived a motion to dismiss. In addition, Defendants provide no evidence to support their claim that Plaintiff acted in bad faith. In sum, the Court is mindful that "sanctions are prescribed only in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous." *Ford Motor Co.*, 930 F.2d at 289 (internal citations and quotations omitted). Importantly, "[a]ny doubt ... should be resolved in favor of the party charged with the violation." *Sanders*, 1988 WL 58966, at \*1 (citing *Eavenson*, 775 F.2d at 544). Here, the Court resolves all doubts in favor of Plaintiff and declines to exercise its discretion to impose sanctions. *See Grider*, 580 F.3d at 146 n.28 (3d Cir. 2009) ("[T]he imposition of sanctions for a Rule 11 violation is discretionary rather than mandatory."). Accordingly, Defendants' motion for sanctions is denied.

### IV. CONCLUSION
For the foregoing reasons, Defendants' motion to dismiss, D.E. 3, is **GRANTED in part** and **DENIED in part.** Defendants' motion for sanctions, D.E. 10, is **DENIED.** Plaintiff is provided with thirty (30) days to file an amended complaint that cures the deficiencies noted herein. If Plaintiff fails to do so, then the counts in his Complaint which have been dismissed will be dismissed with prejudice. An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in Fed. Supp., 2020 WL 278763

---

Footnotes

1    Defendants submitted an amended brief, D.E. 4, in support of their motion to dismiss three days after submitting their original brief. The Court did not grant leave to submit an amended brief, and Defendants did not provide an explanation for doing so, nor did they indicate which changes were made from their original brief. Plaintiff did not object. From the

Case 1:26-cv-00155-JKM   Document 49-1   Filed 07/30/26   Page 95 of 95

Zelma v. Penn LLC, Not Reported in Fed. Supp. (2020)

Court's limited review of both briefs, it appears the substantive arguments remain the same. Therefore, the Court will consider Defendants' amended brief in place of its original brief.

2  Defendants' brief in support of their motion to dismiss will be referred to as "Defs.' Br." (D.E. 4); Plaintiff's opposition will be referred to as "Pl.'s Opp." (D.E. 7); and Defendants' reply will be referred to as "Defs.' Reply" (D.E. 8). Defendants' brief in support of their motion for sanctions will be referred to as "Defs.' Sanctions Br." (D.E. 10-1); Plaintiff's opposition will be referred to as "Pl.'s Sanction Opp." (D.E. 11); and Defendants' reply will be referred to as "Defs.' Sanction Reply" (D.E. 12).

3  When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Additionally, a district court may consider "exhibits attached to the complaint and matters of public record" as well as "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

4  Specifically, Plaintiff alleges that "[t]he Defendants and each of them, individually or thorough [sic] others herein identified as DOE or XYZ Corporation defendants, used an ATDS to initiate in text messaging to market their products and services." Compl. ¶ 32.

5  Rule 11(b) provides in pertinent part as follows:

By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose ...;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support[.]

Fed. R. Civ. P. 11(b)(1)-(3).

6  The Third Circuit noted that "there is a real question as to whether [corporate officers acting in their corporate capacity] can be held liable under the [TCPA] at all." *City Select Auto Sales Inc.*, 885 F.3d 154, 162 (3d Cir. 2018) (explaining that "[i]ndividuals ordinarily are shielded from personal liability when they do business in a corporate form, and ... it should not lightly be inferred that Congress intended to disregard this shield") (internal citation omitted).

7  The "Responsible Corporate Officer Doctrine," commonly referred to as the *Park* doctrine, permits the government to prosecute senior corporate officials for violations of the Food, Drug and Cosmetic Act ("FDCA"). *See United States v. Park*, 421 U.S. 658 (1974). The doctrine is not applicable in this case.

8  Because Plaintiff received the text messages to his cell phone, the Court notes that 47 C.F.R. § 64.1200(e) expanded paragraph (c) "to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers[.]" *See also Sieleman*, 2018 WL 3656159, at *2 n.3.

9  Plaintiff's claim falls under what is commonly referred to as New Jersey's "Do Not Call Law," N.J.S.A. §§ 56:8-119 *et seq. See Zelma v. Art Conway*, No. 12-256, 2013 WL 6498548, at *1 (D.N J. Dec. 11, 2013). Specifically, Plaintiff relies on N.J.S.A. § 56:8-130. Compl. ¶¶ 93, 98.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.